IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MYSERVICE FORCE, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMERICAN HOME SHIELD | : | |
| and SERVICEMASTER | : | |
| CONSUMER SERVICES | : | |
| LIMITED PARTNERSHIP | : | NO. 10-6793 |

## MEMORANDUM

**Padova, J.**                                                                **January 17, 2013**

Plaintiff myServiceForce, Inc. ("mSF") has brought this action against Defendants alleging claims for breach of contract, unjust enrichment, promissory estoppel and tortious interference with contract arising out of the parties' four year relationship.  Defendants have moved for summary judgment in connection with all of mSF's claims.  For the following reasons, the Motion is granted in part and denied in part.

## I.    BACKGROUND

### A.    <u>The Parties</u>

mSF, formerly known as Field Master Solutions, is a software company that provides internet based software to service companies.  (Rawding Decl. ¶ 2.)  mSF is a Pennsylvania Corporation and maintains its principal place of business in Pennsylvania.  (Compl. ¶ 1; Marzola Decl. ¶ 7.)  Defendants American Home Shield ("AHS") and Service Master Consumer Services Limited Partnership ("SVM") are both Delaware corporations that maintain their primary places of business in Tennessee.  (Compl. ¶¶ 2-3; Answer ¶¶ 2-3.)  AHS, a subsidiary of SVM, sells home warranties that cover major systems and appliances in the home.  (Quandt Dep. at 36-37.)  SVM is a family of brands, which, in addition to AHS, includes Terminix, TruGreen LandCare,

Merry Maids, ServiceMaster Cleaning, AmeriSpec, and Furniture Medic.  (Id. at 37.)  AHS hires HVAC, plumbing, electrical, and appliance service contractors to perform the work under its warranties.  (Wanninger Dep. at 23-27; Marzola Decl. ¶ 5.)   AHS engages three classes of contractors:  (1) call committed contractors, also referred to a preferred contractors, who have operations agreements with AHS, pursuant to which AHS promises them a certain number of service calls per year; (2) network contractors, who have contracts with AHS but do not receive call commitments from AHS; and (3) direct dispatch contractors, who do not have formal service agreements with AHS.  (Wanninger Dep. at 25-28.)

In 2006, mSF had a product known as FieldMaster*Pro* ("FM*Pro*") that provided work order management and field service technician productivity tools.  (Joint Services and Pilot 1 Agreement at 1.)  John Lenihan, Project Manager of SVM, reached out to mSF in late December 2006, looking for software based on mSF's existing products that could be used by AHS's 14,000 contractors.  (Marzola Decl. ¶ 2, 5, 7.)  In the spring of 2007, Jim Goetz, CIO of SVM, informed mSF that, once mSF had successfully customized FM*Pro*, SVM and AHS would enroll AHS's contractors into the project and the contractors would pay mSF directly to use the customized software.  (Marzola Decl. ¶¶ 9, 11.)  mSF calculated that revenue from the project, assuming that all 14,000 of AHS's contractors were enrolled, would be at least $70,000,000.  (Id. ¶ 10.)

### B.       The Mutual Non-Disclosure Agreement

In connection with these discussions, the parties entered into a Mutual Non-Disclosure Agreement ("NDA") on January 18, 2007, which they re-executed on August 17, 2007.  (Compl. Ex. A; Def. Ex. G.)  The NDA prohibits a Recipient of Confidential Information from using that Confidential Information for its own benefit or for the benefit of another without the prior

2

consent of the Discloser.  (NDA ¶ 2.)  The NDA also prohibits a Recipient of Confidential

Information from disclosing the Confidential Information to any person outside of its

organization.  (Id.)  The NDA defines Confidential Information as follows:

> any and all information concerning the business of a Party and such Party's
> customers, including without limitation, any and all current and future technical,
> operational or financial information, marketing or business plans, unpublished
> financial information or business results, forecasts, customer names, customer
> addresses, and related customer data, partners' names and information, vendor
> names and information, employee names and information, contracts, practices,
> services and support, procedures, trade secrets, and other business information
> including, but not limited to, technical data, know-how, software, reports,
> methods, strategies, plans, documents, drawings, designs, tools, models,
> inventions, patent disclosures, and Requests for Proposals that may be disclosed
> between the parties whether in written, oral, electronic, website-based, or other
> form, which is designated as Confidential Information by each party disclosing
> such Confidential Information ("Discloser") . . . .

(NDA ¶ 1.)  John Lenihan executed the NDA on behalf of SVM; Sean Marzola, Chief Operating

Officer and Vice President of Business for mSF, executed the NDA on behalf of mSF.  (NDA.)

### C.    The Joint Services and Pilot 1 Agreement

On September 17, 2007, mSF entered into the Joint Services and Pilot 1 Agreement

("Pilot 1 Agreement") with SVM to develop an enhanced version of FM*Pro* that AHS's

contractors could use to report the status of customer calls to AHS.  (Pilot 1 Agreement (Defs.

Ex. B) ¶ 1.3; Wanninger Dep. at 14-15; Rawding Dep. at 70-72; Compl. ¶ 17; Answer ¶ 17.)

mSF and SVM had two objectives in entering into the Pilot 1 Agreement.  (Pilot 1 Agreement

Ex. A at A-1.)  The "Ultimate Project objective" (Tier A) was "the development of a fully

integrated Field Service Management ("FSM") software that is based upon, and delivered in the

same manner as, FM*Pro* and provided and supported by [mSF]."  (Id.)  This project was to

include both back office and field features.  (Id.)  The second objective (Tier B) was that the final

product, called FM*Pro+*, would meet certain minimum workflow interface requirements.  (Id. at

A-2.)  The Pilot 1 Agreement provided that SVM, AHS and mSF intended to "partner in [the] process by sharing costs, cooperating closely and sharing in future revenue according to contract terms for each Project Step."  (Id.)  Project Step 1 was completion of Pilot 1 and Project Step 2 was the final design and engineering of the Tier A requirements and the completion of a Master Contract that included 10% revenue sharing by AHS and SVM of mSF's gross revenue from sales of FM*Pro*+ to AHS's contractors and competitors.  (Id.)  The Scope of Work attached to the Pilot 1 Agreement states that there were two requirements for Pilot 1:   (1) providing functionality that will deliver dispatches (i.e., jobs) electronically into FM*Pro* through XML files attached to e-mails and (2) using the same functionality to provide status information on those jobs from contractors to AHS using FM*Pro*.  (Id. at B-3-4.)  According to Lenihan, the goal of Project 1 was to add features to FM*Pro* to enable AHS's 14,000 service contractors to directly link to AHS.  (mSF Ex. 62 at 2.)  FM*Pro*+ was to "include automated dispatching of work to AHS contractors, automated status reports, and automated invoicing."  (Id.)

The Pilot 1 Agreement provided that SVM would initially pay mSF $30,000 of the initial costs of the project and reimburse mSF 50% of the remaining costs up to $170,000.  (Pilot 1 Agreement ¶¶ 2.1.1, 2.1.2.)  The Pilot 1 Agreement had a term of not more than five continuous months.  (Id. ¶ 3.1.)  The NDA was incorporated into the Pilot 1 Agreement as Appendix C.  (Id. ¶ 5.1.)  The Pilot 1 Agreement contains an integration clause, which provides that the Agreement and Statements of Work issued thereunder "constitute the entire and final agreement between the Parties" and also provides that "[n]o waiver, consent, modification or change of terms of this Agreement will bind either Party unless agreed upon in writing and signed by both Parties."  (Id. ¶ 12.8.)  David J. Crawford, President of AHS and Vice President of SVM, executed the Pilot 1

Agreement on behalf of SVM; Gary A. Rawding, mSF's Chairman and CEO, executed the Pilot 1 Agreement on behalf of mSF.   (Id. at 8, Crawford Dep. at 87-88.)

On February 12, 2008, Lenihan met with Marzola and Rawding to discuss an extension to the Pilot 1 Agreement.  (Rawding Decl. ¶ 6.)  During this meeting, Lenihan assured Marzola and Rawding that SVM and AHS would require AHS's contractors to enroll in the project.  (Id.)  On March 19, 2008, in a telephone call with Rawding, Crawford confirmed that AHS would require its 14,000 contractors to enroll in the project.  (Id. ¶ 7.)  On March 20, 2008, SVM and mSF entered into the Joint Services and Pilot 1 Agreement Extension, which extended the term of the Pilot 1 Agreement until June 30, 2008.  (Pilot 1 Agreement Extension (Defs. Ex. C) at 3; Rawding Dep. at 75.)  The parties also agreed in the Extension to immediately begin an Initial Limited Introduction of the AHS Contractor Edition of FM*Pro+* to between 50 and 100 AHS contractors.  (Id. ¶ 4.1.1)

On May 29, 2008, Rawding e-mailed a PowerPoint presentation to Crawford, David Quandt, Senior Vice President of Service Operations for AHS, and Mike Morris.  (mSF Exs. 69, 72.)  The PowerPoint concerned mSF's concept for a contractor dashboard to enhance FM*Pro+*.  (mSF Ex. 69 at mSF 04067.)  The proposed contractor dashboard would contain the following web-based features:  one call scheduling and dispatch processing; an AHS communications center; a field authorization center; AHS invoicing and customer value reporting; points monitoring; and data management.  (Id. at mSF 04071-72.)  The PowerPoint also introduced optional components such as work order communications, field credit card processing, integrated printing for receipts and customer surveys, and voice communications.  (Id. at mSF 04072.)  mSF's business plan projected revenues of $332,500 per month based on use of the dashboard by 3500 contractors.  (Id. at mSF 04084.)   The optional features were projected to generate

5

additional revenues; for example, field credit card processing was projected to bring in $150,000 per month based on use by 3500 contractors.  (Id.)  Total revenues from the contractor dashboard services, including the optional services, were projected at $8 million per year, based on use by 3500 contractors.  (Id.)

On May 30, 2008, Rawding sent an e-mail to Crawford and Quandt recapping the telephone conference.  (mSF Ex. 70.)  In this e-mail, Rawding noted that both mSF and AHS "would like to move forward with a master contract that will be 'long term and exclusive.'"  (Id. at mSF 04103.)  Rawding also expressed a need to know whether AHS was opposed to making the project mandatory for its contractors.  (Id. at mSF 04104.)  Crawford responded by e-mail later that day, stating that he "couldn't agree with you more on your expressed concern of a slow, 1 by 1 contractor roll-out program.  This needs to be mandated or not rolled out . . . ."  (Id. at mSF 04103.)

On June 24, 2008, mSF gave a presentation about the AHS Contractor Edition of FM*Pro*+ACE ("ACE") to AHS personnel in Memphis, Tennessee.  (Quandt Dep. at 253; mSF Ex. 50.)  During this presentation, mSF detailed the features and functions of ACE and discussed future options for the project, including one call scheduling, an AHS Communications Center, field authorization, and integrated invoicing.  (mSF Ex. 50 at mSF 307353-59.)  mSF also explored issues that slowed the acceptance of ACE by contractors, including "resistance to change," cost, and "fear, uncertainty, & doubt/distrust."  (Id. at mSF 307368.)  One option that mSF suggested to resolve this issue was mandatory participation of preferred contractors at a reduced monthly fee.  (Id. at mSF 307372.)  mSF also discussed its contractor dashboard concept during the presentation.  (Id. at mSF 307374-75.)  mSF estimated that, if AHS made use of ACE mandatory for its preferred contractors by the first quarter of 2009, the project had revenue

6

potential of approximately $5.9 million in 2010 and $9.5 million in 2011.  (Id. at mSF 307399-406.)  mSF also made it clear, in its presentation, that the mandatory enrollment of 3000 preferred contractors was necessary to ensure that the project generated sufficient revenue to cover development costs.  (Id. at mSF 307413.)

At Quandt's request, Rawding sent him a follow-up letter the day after the presentation, summarizing the features and benefits of ACE.  (mSF Ex. 93.)  Rawding mentioned, in his e-mail, that mSF's business plan was based on the following three assumptions:  (1) the project will be mandatory for approximately 3000 customers; (2) AHS will agree to a long term commitment when the Pilot 1 Agreement expires; and (3) that AHS will enter into an exclusive agreement with mSF.  (Id. at mSF 00662.)

### D.      The Joint Services Agreement

mSF successfully completed Pilot 1 and the parties decided to continue to work together.  (Morris Dep. at 32.)  During the late summer and fall of 2008, mSF and AHS began to negotiate the terms of a new contract.  (See mSF Exs. 26, 72, 73, 95; Rawding Dep. at 100-01.)  On September 1, 2008, Rawding sent a draft letter of intent to Quandt, outlining the terms of a proposed master agreement between AHS and mSF.  (mSF Ex. 74.)  Those terms included a three year initial term, the requirement that AHS would enroll no less than 1000 of its preferred contractors in ACE in 2009, and expected start-up costs of $5,000,000.  (Id. at mSF 04372-74.)  Quandt forwarded the draft letter of intent to SVM Vice President and Deputy General Counsel Mark Lightfoot on September 2, 2008.  (Pl. Ex. 48.)  A month later, Quandt scheduled a meeting with Rawding for October 24, 2008 to discuss the proposed agreement.  (mSF Ex. 46.)  In an e-mail agreeing to the meeting, Rawding stressed that AHS had to make contractor participation in ACE mandatory, or its contractors would not participate in the project.  (Id.)  Quandt agreed that,

at a minimum, AHS should make participation mandatory for contractors doing more than 100 orders or more a month for AHS.  (Id.; Quandt Dep. at 285.)

On October 31, 2008, Crawford informed Rawding that AHS's IT Department would not be able to support the full roll-out plan for ACE and the parties agreed to enter into a one-year agreement to roll out ACE to a limited number of contractors.  (Rawding Decl. ¶ 11.)  On December 12, 2008, AHS and mSF entered into the Joint Services Agreement ("JSA"), which had an effective term from December 12, 2008 until December 31, 2009.  (JSA (Defs. Ex. D) ¶ 5.)  The JSA states that AHS had engaged mSF to provide the version of FM*Pro+* that mSF had developed during the Pilot 1 to its contractors.  (JSA ¶¶ 1.1, 1.2.)  The JSA required AHS to engage in a Preferred Contractor Program, the objective of which was the enrollment of 500 AHS preferred contractors into the program.  (Id. ¶ 2.1.)  AHS was also required to financially subsidize the Preferred Contractor Program by reimbursing participating contractors for hand held devices required for field technicians to operate FM*Pro+*.  (Id. ¶ 3.)  mSF was required to provide direct sales and marketing support for the Preferred Contractor Program and was also required to provide marketing materials for AHS's direct dispatch contractors.  (Id. ¶¶ 4.2.1, 4.2.2.)  The JSA also provides that it "supersedes all previous agreements" (id. ¶ 5) and incorporates the NDA (id. ¶ 8.1).  The JSA also includes the following integration clause:  "[t]his Agreement and the Statements of Work issued hereunder constitute the entire and final agreement between the Parties with regard to the subject matter hereof.  No waiver, consent, modification or change of terms of this Agreement will bind either Party unless agreed upon in writing and signed by both Parties . . . ."  (Id. ¶ 15.8.)   The JSA was executed by Crawford on behalf of AHS and by Rawding on behalf of mSF.  (Id. at 7.)

**E.      mSF's Concerns About AHS's Commitment to the Project and Misuse of mSF's Confidential Information**

While mSF was working to improve and market ACE in accordance with the JSA, its executives were becoming concerned that AHS was not committed to the project.  By the end of July 2009, Rawding was concerned that AHS's Information Technology ("I.T.") Department could not support the use of ACE by AHS's contractors.  (mSF Ex. 43.)  He was also concerned that AHS had been putting off scheduled meetings to discuss future plans with mSF.  (Id.) Quandt responded to Rawding's concerns by scheduling a conference call for August 3, 2009. (Id.)  Rawding drafted an agenda for that call, which he sent to Quandt, Matt Wendl[1] and Marzola, setting forth the strategic direction and objectives for the ACE program, and establishing parameters for achievement of those objectives.  (mSF Ex. 42.)  Rawding and Marzola participated in the conference call for mSF and Crawford, Quandt, Wendl, and Mark Mills, AHS's Vice President of I.T., participated in the conference call for AHS.  (Rawding Decl. ¶ 13; Mills Dep. at 8.)  During the call, Crawford indicated his agreement with the strategic plan as it was laid out in Rawding's agenda.[2]  (Rawding Decl. ¶ 13.)

Rawding continued to be concerned about AHS's commitment to mSF following this telephone conference and, on August 18, 2009, sent an e-mail to Quandt stating his belief that the parties would not be able to achieve the goals of the 2009 Plan.  (mSF Ex. 109 at mSF 06087.)  He also stated, in his e-mail, that he thought that the parties were four to six months

_____

[1]Wendl was the Director of Contractor Relations for AHS prior to June 2011.  (Wendl Dep. at 10.)

[2]Crawford does not recall receiving Rawding's e-mail or participating in the August 3, 2009 conference call.  (Crawford Dep. at 235-36, 239.)  Quandt also does not recall participating in the August 3, 2009 conference call.  (Quandt Dep. at 367-371.)

"from being able to discuss [let] alone complete a master agreement" and suggested modifying the 2009 Agreement instead. (Id.) Rawding sent Quandt a follow-up to that e-mail on September 4, 2009, in which he expressed his disappointment with "[t]he inability of AHS to commit anything to mSF and ACE after 3 years" and with being left out of AHS's then current planning process for replacing its I.T.[3] (Id. at mSF 06086.)

On September 22, 2009, Quandt forwarded AHS's Project Charter for Contractor Web Site to Rawding and Marzola. (mSF Ex. 41 at mSF 06113.) The Project Charter encompassed what AHS envisioned as a web site that its contractors could use to "manage their work orders from end to end." (Id.) Quandt asked Rawding and Marzola to let him know whether they thought it would be possible to create the application described in the document. (Id.) The Project Charter had been prepared by Doug Wanninger (a Contract Relations Manager for AHS), Joe Eisenbacher (also a Contract Relations Manager for AHS), and Heather Orcutt (Project Specialist for Contractor Communications for AHS), under the supervision of Matt Wendl. (Id. at mSF 06115; Wanninger Dep. at 7; mSF Ex. 114 at Defs. Supp 000250; Orcutt Dep. at 5.) The purpose of the Project Charter was to develop a vehicle by which contractors could provide AHS and its customers with call status information. (mSF Ex. 41 at mSF 06118.) Quandt sent the Project Charter to mSF "to see if they can build and support this application." (Id. at mSF 06113.) mSF believed that the Project Charter encompassed ideas and proposals that it had previously provided to AHS and SVM as the projected final phase of the ACE project. (mSF Ex. 27 at AHS 06096-97.)

_____

[3]SVM was then working on a Strategic Information System Plan with the goal of improving or replacing its I.T. (See Section I.F., *infra*.)

mSF responded to the Project Charter with an extensive proposal.  (Id. at AHS 6098-6150.)  The proposal described the ACE system, which was "based upon the combination of AHS Contractor Edition of FieldMaster*Pro* and AHS internal systems presented in new web based dash board service."  (Id. at AHS 6100.)  The proposal also stated mSF's belief that the Project Charter "was born out of the presentation made [by mSF] to the AHS Senior Management Team in May 2008 where we presented the **ACE Dash Board** concept in great detail."  (Id. at AHS 6107.)

mSF also retained counsel, Stephen V. Siana, Esq., who sent a letter to Crawford on October 19, 2009, notifying him that mSF believed that AHS had breached its obligations under the JSA.  (mSF Ex. 14.)  According to Siana, AHS had breached the JSA by failing to meet service quality requirements set forth in the JSA; failing to take commercially reasonable steps to implement the Preferred Contractor Program; failing to use its best efforts to encourage its preferred contractors to enroll in the program; and failing to use its best efforts to require preferred contractors to commit to timely reporting of appointments and job completion statuses. (Id.)  James Coggin, Vice President and Managing Attorney for AHS, responded to Siana's letter on October 19, 2009, denying that AHS had breached its obligations under the JSA.  (mSF Ex. 15.)  Coggin denied that AHS had failed to take commercially reasonable efforts to obtain contractor commitments, and detailed the efforts AHS had made to encourage its contractors to enroll in ACE.  (Id.)

Quandt spoke with Rawding on November 1, 2009 and expressed AHS's interest in continuing to develop the ACE program.  (mSF Ex. 99.)  However, the next day, unbeknownst to mSF, Trafford Seymour, Director of Customer Relationship Solutions for AHS, sent an e-mail to Quandt, in which he stated that AHS was not able, at that time, to allow mSF to integrate into its

11

accounting system and, as a result, "[i]t would be extremely difficult for us to support any development efforts by MyServiceForce until late next year."  (mSF Ex. 29.)  Consequently, he suggested that AHS "look at other alternatives to the current MyServiceForce contract" and discontinue discussions of integration efforts with mSF.  (Id.)

### F.   SVM/AHS's Strategic Information Systems Plan and Project Genesis

In May 2009, SVM engaged KPMG to develop a long-term strategic plan, the Strategic Information System Plan ("SISP"), for which KPMG looked at SVM's existing technology platform and ability to execute certain "customer experience strategies."  (Crawford Dep. at 141; Quandt Dep. at 165-66; Mills Dep. at 63.)  As part of this effort, KPMG examined both adding to SVM's already existing I.T. systems and starting fresh with new technology.  (Crawford Dep. at 141.)  KPMG performed the same process for AHS in November and December 2009.  (Mills Dep. at 15, 62-65.)

mSF began to learn about SISP in the fall of 2009 and, on November 6, 2009, Siana sent a letter to Coggin, expressing concern that a request for proposal ("RFP") issued in connection with SISP related to the subject matter of the Pilot 1 Agreement and infringed on mSF's Confidential Information in violation of the NDA.  (Siana Decl. ¶¶ 5-6.)  Coggin left Siana several voice mails during the ensuing week, maintaining that AHS did not "intend to use any of [mSF's] confidential proprietary information."  (Id. ¶ 7; mSF Ex. 17.)  On November 20, 2009, Siana responded with an e-mail stating that mSF viewed the entire "project and all matters pertaining to it to be proprietary."  (mSF Ex. 18.)  mSF learned more about SISP when Quandt scheduled a telephone conference with Rawding and Marzola for December 15, 2009, and, in the notice for that call, informed Rawding and Marzola that SVM was "working with KPMG on a global System Information Strategy Plan for the entire ServiceMaster enterprise" and that AHS

had "been directed not to go forward with any plans with technology till [sic] this strategy is presented."  (mSF Ex. 101.)

Sometime in the third quarter of 2010, SVM chose to purchase an I.T. system called Siebel from Oracle at a cost of approximately $14.5 million.  (Crawford Dep. at 142; Mills Dep. at 111-12.)  SVM hired IBM Global Services to be its implementation partner for this project.  (Mills Dep. at 110.)  SVM also hired Oracle to provide hosting services for the project on its hosting site.  (Id. at 111-12.)  The implementation of SVM/AHS's new SISP became known as Project Genesis.  (Id. at 108.)

Mark Mills has oversight responsibility for the I.T. portion of Project Genesis.  (Mills Dep. at 21.)  The I.T. portion of Project Genesis includes field services capabilities[4] and Mills believes that the field services capabilities in Project Genesis overlap in a broad way with some of the products created by mSF for AHS.  (Id. at 196.)  Several PowerPoints prepared in connection with the implementation of Project Genesis show that the field services aspect of Project Genesis includes functions that mSF was working to provide with its products, such as dispatch notification for online scheduling, a partner portal (also referred to as a contractor dash board), dispatch statuses, and invoicing.  (mSF Exs. 75, 88, and 107.)

G.    **The Memorandum of Agreement**

While SVM and AHS were working on the SISP, and choosing the software platforms that would become Project Genesis, they also began to negotiate a new contract with mSF.  Rawding executed the resulting contract, the 2010 Memorandum of Agreement ("MOA"), for

---

[4]Mills has broadly defined field services capabilities as "the ability to dispatch contractors, service contractors, and manage any of the contractor life cycle from a work order, from the point of initiation, to the point of completion."  (Mills Dep. at 17.)

mSF on January 27, 2010, Krista A. Enderes, Assistant Secretary of SVM executed the MOA for

SVM on February 1, 2010, and Quandt executed the MOA for AHS on February 3, 2010.  (MOA

(Def. Ex. E) at 4-5.)   The MOA was effective for a two-year term, with the objective of

continuing "to grow the number of AHS contractors reporting statuses automatically and in real

time to AHS."  (MOA at 1.) Pursuant to the MOA, mSF was to provide service work order

("SWO") automation and status reporting software, sales and marketing support, and

enhancements for ACE, including credit card processing, automatic invoicing, status reporting,

field authorization and a bulk order management system as defined in mSF's October 2009

Proposal to AHS.  (Id. at 1-2.)  The MOA also required AHS to:  (1) pay $250,000 to mSF "in

full and final satisfaction of all obligations of AHS under the 2009 Plan;" (2) require Preferred

and Network Contractors to "report Appointment Set within 24 hours and SWO Completion

within 5 business days;" (3) continue a full time contractor support person; (4) support mSF's

marketing of its products to AHS's contractor network; (5) work with mSF to develop and test a

Field Authorization process in the first quarter of 2010; and (6) allow mSF to give presentations

at regional AHS contractor events during the spring of 2010.  (Id. at 2.)  The MOA also contains

the following clause, requiring the parties to use their best efforts to develop a tri-party

agreement:

> The Parties will use their best efforts to develop a tri-party agreement to set forth
> all rights and obligations of the parties with respect to FMP+, including the
> incorporation and integration of the terms and conditions of any prior agreements
> which remain in effect between MSF and AHS or ServiceMaster.  Said tri-party
> agreement shall be in a form acceptable to the parties and their respective counsel.
> Notwithstanding the foregoing, the Parties reserve their respective rights and legal
> positions with respect to . . . whether and to what extent the 2007 Joint Services
> and Pilot One Agreement between ServiceMaster and mSF remains in effect and
> nothing contained herein shall be construed to amend, continue or extend the
> 2007 agreement in any way.

(Id. at 3.)

**H.    The Relationship Between mSF and AHS Continued to Deteriorate After they Entered into the MOA**

Beginning on April 7, 2010, mSF gave presentations about its products and services to AHS's contractors at 14 of AHS's regional roadshows.  (Marzola Decl. ¶ 20.)  Contractor attendance at these events was lower than mSF employees expected and they believed that "AHS's efforts to enroll their Contractors in mSF were not achieving the expected numbers." (Id. ¶ 22.)  Marzola, who attended the roadshows on behalf of mSF, discussed his concerns about contractor participation with Quandt, who had also attended the roadshows.  (Id. ¶ 24; mSF Ex. 102.)  On April 27, 2010, after the roadshows concluded, Quandt asked Marzola to prepare a proposal for making contractor enrollment mandatory, with AHS sharing the costs for certain classes of contractor.  (mSF Ex. 102.)  Quandt discussed Marzola's proposal with him on May 6, 2010.  (mSF Ex. 68.)  On May 7, 2010, Quandt informed Crawford by e-mail that he did not think that AHS should enter into an agreement with mSF to make contractor enrollment mandatory because Marzola's proposal would make too many demands of AHS and because it would be too costly (estimated costs for AHS included payments of $350,000/year for three years, additional payments of $10,000/month, and penalties of $100 per contractor under mSF's goal of 6000 contractors using the system).  (mSF Ex. 103.)  Quandt also suggested to Crawford that AHS end its relationship with mSF to avoid incurring those costs.  (Id.)

Shortly thereafter, Siana and Coggin began to discuss the preparation of a tri-party agreement.  (mSF Ex. 87.)  Despite Quandt's belief that AHS should end its relationship with mSF because of the costs of mandatory enrollment, Coggin told Siana on June 16, 2010, that "Quandt was in favor of mandatory enrollment of AHS contractors to mSF products and that

there was a place for mSF in what he described as a Customer Relationship Management system that SVM/AHS was developing." (Siana Decl. ¶ 16.) On September 17, 2010, Siana sent Coggin a draft tri-party agreement. (mSF Ex. 23.) Since the parties had not been able to agree to make contractor participation in ACE mandatory, the draft tri-party agreement provided that SVM and AHS would pay mSF for use of mSF's products. (Id.) Pursuant to the draft tri-party agreement, titled "Master Agreement," mSF would agree to provide "myServicePro" and related services to AHS's contractors. (Master Agreement (Compl. Ex. E) at 3 ¶ 1.) SVM and AHS would agree to facilitate enrollment of AHS's contractors through mandatory enrollment or "the enforcement of strict reporting requirements" and would be responsible for enrolling sufficient contractors to guarantee that mSF would receive specific targeted gross revenues from its products (Id. at 4 ¶ 2.) The Master Agreement further provided that, if mSF did not achieve these guaranteed gross revenues from AHS's contractors, SVM and AHS would pay mSF the difference between its actual gross revenues and its targeted gross revenues. (Id.) The Master Agreement was to have a term of five years. (Id. at 5 ¶ 4.) AHS did not agree to these terms. (Defs. Reply Ex. E.) The parties continued to discuss the proposed tri-party agreement during the fall of 2010, but were unable to reach an agreement. (Defs. Reply Exs. F, G.)

mSF filed the instant action on November 19, 2010. (Docket No. 1.) On December 14, 2011, Quandt sent a letter to Rawding, stating that, as of December 31, 2011, AHS would "terminate all business relationships with myServiceForce, and [would] discontinue any support or interface of the myServiceForce systems with any AHS systems." (mSF Ex. 89.) At that time, 214 of AHS's contractors used mSF's products. (Id.)

The Complaint asserts four causes of action: (1) a claim for breach of contract against AHS (Count I); a claim for unjust enrichment and promissory estoppel against AHS (Count II), a

claim for breach of contract against SVM (Count III); and a claim for tortious interference with contract against SVM (Count IV).  Defendants have moved for summary judgment as to all four claims asserted in the Complaint.  Plaintiff agrees that Count IV should be dismissed, but contests the Motion in all other respects.  (See mSF's Corrected Br. at 2.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325.  After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by:  (A) citing to particular parts of materials in the record  . . . ; or (B) showing that the materials [that the moving party has] cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  In evaluating the evidence, we take the facts "in the light most favorable" to the nonmoving party and "draw all reasonable inferences" in its favor.  Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)); Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (3d Cir. 2003)).  Nonetheless, "[s]peculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact."  Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000) (citation omitted), aff'd 29 F. App'x 100 (3d Cir. 2002). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial.  Callahan v. AEV, Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).

## III.    DISCUSSION

### A.    Count I:  The Breach of Contract Claim Against AHS

Defendants have entered into five written contracts with mSF:  (1) the NDA, entered into between SVM and mSF on January 18 and August 17, 2007 (See NDA); (2) the Pilot 1 Agreement, entered into between SVM and mSF on September 17, 2007, for a term of five months (Compl. ¶ 17; Ans. ¶ 17; Pilot 1 Agreement at 1, 3; Rawding Dep. at 74-75); (3) the Joint Services and Pilot 1 Agreement Extension,  entered into between SVM and mSF on March 20, 2008, extending the term of the Pilot 1 Agreement to June 30, 2008 (Pilot 1 Agreement Extension ¶ 5)[5]; (4) the JSA, entered into between AHS and mSF on December 12, 2008, with a

_____

[5]Rawding testified at his deposition that the parties entered into a second extension of the Pilot 1 Agreement, extending the term of that agreement until August 30, 2008 (Rawding Dep. at

term from December 12, 2008 through December 31, 2009 (JSA at 1, 4 ¶ 5); and (5) the MOA, executed by mSF on January 27, 2010, by SVM on February 1, 2010, and by AHS on February 3, 2010, with a term of two years (MOA at 1, 4, 5.)  mSF also contends that it entered into an oral agreement with AHS on August 3, 2009.  (Rawding Decl. ¶ 15.)

mSF has made it clear that the breach of contract claim it asserts in Count I is limited to the oral agreement and the MOA.  (See mSF's Corrected Br. at 14 ("mSF has not sued under the JSA.  mSF sued under the January 27, 2010 Memorandum of Agreement . . . and an oral agreement reached subsequent to the JSA.").)  mSF maintains that Defendants breached the oral agreement by failing to enroll all of AHS's contractors into mSF's products; by failing to enter into a master agreement with mSF; and by failing to retain mSF as a joint development partner for Defendants' fully integrated field service management software system.  mSF contends that Defendants breached the MOA by failing to enforce the reporting requirements for AHS's contractors and by failing to use their best efforts to develop the tri-party agreement.

Defendants argue that they are entitled to the entry of summary judgment in their favor in connection with mSF's claim for breach of the August 3, 2009 oral agreement because mSF did not assert a claim for breach of that oral agreement in the Complaint.[6]  Defendants further argue

_____

79, 116-17), but none of the parties has submitted that document as an exhibit in connection with the Motion for Summary Judgment and it is not part of the record of this action.

[6]Defendants also argue that they are entitled to the entry of summary judgment in their favor as to Count I in connection with mSF's assertion that they breached the oral agreement on the grounds that the alleged oral agreement is unenforceable and because any claims that mSF may have had in connection with the oral agreement were released by mSF in the MOA.  We need not address these arguments because, as we explain below, mSF's claims with respect to the alleged oral agreement were not raised in the Complaint and thus are not a part of this action. Defendants also deny that AHS entered into an oral agreement with mSF on August 3, 2009. However, they have not moved for summary judgment as to Count I on that basis.

that they are entitled to the entry of summary judgment in their favor in connection with mSF's claim for breach of the MOA because AHS satisfied its obligation to impose status reporting requirements on its contractors and because the MOA's provision that the parties use their best efforts to enter into a tri-party master agreement is an unenforceable agreement to agree.

### 1.     The August 3, 2009 oral agreement

mSF claims, in its Corrected Brief in Opposition to Defendants' Motion for Summary Judgment, that it entered into an oral agreement with AHS on August 3, 2009.  (See mSF's Corrected Br. at 14, 15-20.)  mSF bases all of its assertions regarding the existence and terms of the alleged August 3, 2009 oral agreement on the Declaration of Gary A. Rawding.  The record contains no other evidence regarding the existence and terms of the August 3, 2009 oral agreement.

Rawding asserts in his Declaration that AHS entered into an oral agreement with mSF during an August 3, 2009 conference call that he and Marzola of mSF participated in with Crawford, Quandt, Wendl, and Mills of AHS.  (Rawding Decl. ¶ 13.)  Rawding states in his Declaration that the oral agreement was comprised of the following terms:

1.     The primary purpose of the partnership between mSF and AHS was to "build an automated, real-time, work order dispatch and status communications service for [AHS's] contractor base that would generate a revenue stream from AHS's contractors through the use of mSF's products and services."  (Id. ¶ 15(a).)

2.     In order to achieve this purpose, "Defendants would enroll all of AHS's contractors in mSF's three-tiered product plan and Defendants would share in all revenue generated from the contractors."  (Id. ¶ 15(b).)

3.      Defendants would enter into a Master Agreement with mSF "containing detailed rollout plans for mSF's products and services, and the understandings of the parties to date." (Id. ¶ 15(c).)

4.      AHS would "have the option of purchasing mSF's interest in the partnership at a discount."  (Id. ¶ 15(d).)

5.      mSF would develop new products and services that Rawding and Marzola had presented to AHS  during the conference call and implement its existing products.  (Id. ¶ 15(e).)

The Complaint spans 86 numbered paragraphs and specifically mentions four of the five written agreements that mSF entered into with one or both of the Defendants:  the NDA (Compl. ¶ 15); the Pilot 1 Agreement (id. ¶¶ 17-21); the Joint Services and Pilot 1 Agreement Extension (id. ¶ 22);  and the MOA (referred to in the Complaint as the "Memorandum of Understanding") (id.¶ 35).   Copies of those four written agreements are attached as exhibits to the Complaint. (See id. Exs. A-D.)  The Complaint does not mention the existence of the alleged August 3, 2009 oral agreement between AHS and mSF.   Count I of the Complaint, mSF's claim for breach of contract, asserts that AHS breached its "contract" with mSF by (1) "failing to require contractors' use of the Pilot 1 software system;" (2) "failing to require that contractors fully and properly record their service calls;" (3) "failing to supply the IT support required by the Memorandum of Understanding;" and (4) "otherwise failing to act in good faith towards the mSF."  (Id. ¶ 62.)  We find that the Complaint contains no averments that suggest the existence of an August 3, 2009 oral agreement between mSF and AHS, and Count I does not mention the breach of any oral agreement.   We conclude that Count I of the Complaint does not assert a claim against AHS for breach of the alleged August 3, 2009 oral agreement.

21

mSF's present contention that AHS breached an oral agreement that Rawding and Crawford reached during the August 3, 2009 telephone conference is thus a new theory of liability.[7] "Federal pleading standards do not allow a party 'to raise new claims at the summary judgment stage.'" Dewees v. Haste, 620 F. Supp. 2d 625, 635 n.7 (M.D. Pa. 2009) (quoting Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004); and citing Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996) (additional citations omitted). Indeed, "[p]laintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in" plaintiff's response to a motion for summary judgment. Speziale v. Bethlehem Area Sch. Dist., 266 F. Supp. 2d 366, 371 n.3 (E.D. Pa. 2003) (cited with approval in Carr v. Gillis Associated Indus., Inc., 227 F. App'x 172, 176 (3d Cir. 2007)); see also Carr, 277 F. App'x at 176 (determining that district court correctly rejected as untimely plaintiff's new theory of liability that was asserted for the first time in response to defendant's motion for summary judgment). We conclude, therefore, that mSF's attempt to assert a new claim for breach of the alleged oral agreement in its response to Defendants' Motion for Summary Judgment is improper and we reject it as untimely.[8] See Carr, 277 Fed. App'x at

_____

[7]mSF has not asked leave of court to amend the Complaint to add this new theory of liability in either of the briefs that it filed in response to the Motion for Summary Judgment.

[8]We also note that the merits of mSF's claim that it entered into an enforceable oral agreement with AHS on August 3, 2009 are highly questionable. Rawding testified, during his deposition, that the parties had reached an agreement. (Rawding Dep. at 151.) He claimed, however, that he thought at the time that they had agreed to the business terms contained in the Proposal that mSF had sent to AHS in response to AHS's Project Charter. (Rawding Dep. at 152-53.) In fact, Rawding stated during his deposition that "the best document that would lay out . . . what I thought was agreed to, would be the 2009 proposal." (Id. at 156.) That Proposal, mSF Ex. 27, is dated October 7, 2009, two months after the August 3, 2009 conference call. Rawding's assertion, in his Declaration, that he reached an agreement with Crawford on August 3, 2009, is further belied by his August 18, 2009 e-mail to Quandt, in which he stated his belief

22

176 ("District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour." (citing Speziale, 266 F. Supp. 2d at 371 n.3; OTA P'ship v. Forcenergy, Inc., 237 F. Supp. 2d 558, 561 n.3 (E.D. Pa. 2002)).  Defendants' Motion for Summary Judgment is, therefore, granted as to mSF's breach of contract claim in Count I in connection with the August 3, 2009 oral agreement.

### 2.     The MOA

mSF contends that Defendants breached their duties of good faith and fair dealing in connection with the MOA by failing to enforce reporting requirements imposed on AHS's contractors and by failing to use their best efforts to develop a tri-party agreement with mSF. While both AHS and SVM are parties to the MOA, Count I of the Complaint asserts a breach of contract claim arising out of the MOA against AHS only.  mSF contends that it has learned through discovery that there was an overlap in personnel between AHS and SVM and has asked leave of court to amend Count I of the Complaint to conform to the evidence and to add SVM as a Defendant as to Count I.  (mSF's Corrected Br. at 4 n.1.)  Defendants did not address this request in their Reply Memorandum or their Supplemental Reply Memorandum and have not otherwise indicated whether they oppose this request.

Pursuant to Federal Rule of Civil Procedure 15, a plaintiff "may amend its pleading only with the opposing party's consent or the court's leave.  Fed. R. Civ. P. 15(a)(2).  Rule 15 further provides that the court "should freely give leave when justice so requires."  Id.  However, "[u]nder Rule 15(a), futility of amendment is a sufficient basis to deny leave to amend."  Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 175 (3d Cir. 2010).

---

that the parties were 4-6 months "from being able to discuss, [let] alone complete a master agreement."  (mSF Ex. 109 at mSF 06087.)

The first part of mSF's breach of contract claim brought with respect to the MOA concerns an obligation owed by AHS to mSF to require Preferred and Network contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days." (MOA at 2.) The MOA does not obligate SVM to take any action with regard to AHS's contractors. (See MOA.) Since SVM does not have any obligation pursuant to the MOA to impose reporting requirements on AHS's contractors, mSF's request to amend the Complaint to assert its claim for breach of the obligation to impose reporting requirements on AHS's contractors against SVM is denied as futile. The MOA does require all parties to that contract to "use their best efforts to develop a tri-party agreement." (Id. at 3.) However, we conclude, *infra*, that the best efforts provision of the MOA is an unenforceable agreement to agree. Allowing mSF to amend its breach of contract claim to assert a claim against SVM for failing to use its best efforts to develop a tri-party agreement would, therefore, be futile, and mSF's request to amend the Complaint to assert its claim for breach of the best efforts provision of the MOA against SVM is denied.

### a.      Status Reporting Requirements

As we noted above, the MOA provides that AHS will require its Preferred and Network contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days." (MOA at 2.) In 2010, AHS's operations agreements with its Preferred Contractors stated that: "[s]cheduled appointments must be communicated to AHS immediately" and "completion date must be provided to AHS within 24 hours of finishing the service call." (Wanninger Dep. at 81-83, 87-88.) AHS's 2010 service agreements with its Network Contractors similarly state that: "'For each Dispatch, Servicer shall (i) use every reasonable effort to **immediately** communicate to AHS the scheduled appointment date and time; (ii) provide to AHS the completion date for

24

each dispatch within **24** hours of finishing the service call.'"  (mSF Ex. 40 (quoting 2010 AHS

Service Agreement, Part 8).)

Rawding has admitted that the obligations placed on AHS's Preferred and Network

contractors in their 2010 agreements exceeded the status reporting requirements provision of the

MOA.  (Rawding Dep. at 225.)  However, mSF argues that AHS breached its contractual duties

of good faith and fair dealing in its performance of its obligations under the MOA by failing to

enforce those requirements, thereby rendering the requirements meaningless.  "'Every contract

imposes a duty of good faith and fair dealing on the parties in the performance and the

enforcement of the contract.'"  J.J. DeLuca Co. v. Toll Naval Assocs., 56 A.3d 402, 412 (Pa.

Super. Ct. 2012) (quoting Giant Food Stores, LLC v. THF Silver Spring Dev., L.P., 959 A.2d

438, 447–48 (Pa. Super. Ct. 2008)); see also Field v. Ladies' Hermitage Ass'n, No. M2011–

01736–COA–R3–CV, 2012 WL 5193368, at *3 (Tenn. Ct. App. Oct. 19, 2012) ("The common

law of Tennessee imposes on the parties to all contracts an implied obligation of good faith and

fair dealing." (citing Waller v. Nat'l Bank of Commerce, 938 S.W.2d 684, 686 (Tenn. 1997);

TSC Indus., Inc. v. Tomlin, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987).[9]  "Courts have defined

---

[9]We have diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as mSF is a
citizen of Pennsylvania and the Defendants are both citizens of Tennessee and the amount in
controversy exceeds $75,000.  "As a federal court sitting in diversity, we apply the choice-of-law
rules of the forum state, which is Pennsylvania in this case."  Pacific Emp'rs Ins. Co. v. Global
Reinsurance Corp., 693 F.3d 417, 432 (3d Cir. 2012) (citing Klaxon Co. v. Stentor Elec. Mfg.
Co., 313 U.S. 487, 496 (1941); Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 170–71 (3d Cir.
2011)).  "'Pennsylvania applies the . . . flexible, interests/contacts methodology to contract
choice-of-law questions.'"  Id. (alteration in original) (quoting Hammersmith v. TIG Ins. Co.,
480 F.3d 220, 226–27 (3d Cir. 2007)).
    The MOA does not contain a choice of law provision.  Consequently, the first step in our
choice of law analysis is to "identify the jurisdictions whose laws might apply," in this case,
Pennsylvania and Tennessee.  Id. (citing Hammersmith, 480 F.3d at 230.)  We then "determine
the substance of these states' laws, and look for actual, relevant differences between them."  Id.

the duty of good faith as [h]onesty in fact in the conduct or transaction concerned, adopting the definition set forth in Section 1201 of the Uniform Commercial Code, 13 Pa.C.S. 1201." Southeastern Pennsylvania Transp. Auth. v. Holmes, 835 A.2d 851, 858 (Pa. Cmmw. Ct. 2003) (alteration in original) (citing Creeger Brick Building Supply Inc. v. Mid-State Bank Trust Co., 560 A.2d 151, 153 (Pa. Super. Ct. 1989)); see also Cavanaugh v. Avalon Golf Properties, LLC., No. E2010–00046–COA–R3–CV, 2011 WL 662961, at *8 (Tenn. Ct. App. Feb. 24, 2011) (same). Courts have further recognized that, while "a complete catalogue of types of bad faith is impossible," bad faith may include: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Stamerro v. Stamerro, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005) (quoting Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992)); see also Sanders v. Breath of Life Christian Church, Inc., No. W2010–01801–COA–R3–CV, 2012 WL 114279, at *21 (Tenn. Ct. App. Jan. 13, 2012) ("Based on the duty of good faith, this Court has recognized that each party to a contract is 'under an implied obligation to restrain from doing any act that would delay or prevent the other party's performance of the contract' and that '[e]ach party has the right to proceed free of hindrance by

---

(citing Hammersmith, 480 F.3d at 230.) "'If [the] two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary.'" Id. (alteration in original) (quoting Hammersmith, 480 F.3d at 230). However, "[i]f there are actual, relevant differences between the laws, then we 'examine the governmental policies underlying each law, and classify the conflict as a true, false, or an unprovided-for situation.'" Id. (quoting Hammersmith, 480 F.3d at 230). "'A deeper choice of law analysis is necessary only if both jurisdictions' interests would be impaired by the application of the other's laws (i.e., there is a true conflict).'" Id. (citing Hammersmith, 480 F.3d at 230). There is no difference between the law of Pennsylvania and the law of Tennessee with regard to the contractual duty of good faith and fair dealing, so we need not engage in a choice of law analysis with respect to this aspect of mSF's breach of contract claim in Count I.

the other party.'" (quoting <u>ACG, Inc. v. Southeast Elevator, Inc.</u>, 912 S.W.2d 163, 168 (Tenn.

Ct. App. 1995)).

mSF contends that AHS breached its duty of good faith and fair dealing with respect to

its contractual obligation to require status reporting as set forth in the MOA by failing to require

its contractors to report 100% of their statuses and by failing to enforce the status reporting

requirements it did impose. In 2010, AHS had an internal reporting goal of 70% of appointment

statuses and 75% of job completions. (mSF Ex. 63 at AHS 7316.) However, in late March

2010, only about 50% of AHS's preferred contractors were meeting this goal. (<u>Id.</u>) Moreover,

while AHS appears to have tracked whether contractors ultimately reported statuses, it does not

appear to have tracked whether contractors reported those statuses within the time limitations

provided in their contracts with AHS. Orcutt, whose job involved preparing reports on

contractor's compliance with status reporting requirements, did not prepare any reports that

included information regarding how quickly contractors reported job statuses to AHS. (Orcutt

Dep. at 60-61.)

As of late March 2010, AHS planned to impose the following penalties on contractors

who did not comply with status reporting requirements: place contractors on hold, reduce

contractor call volume, or eliminate the contractor's call commitment. (mSF Ex. 63 at AHS

7316.) However, it appears that AHS had not begun to impose those penalties by June 2010,

because that month, AHS began to send e-mails to its contractors, providing the contractors with

their completion and appointment status reporting requirement compliance rates for the previous

seven months. (mSF Exs. 39, 40.) Those e-mails stated that AHS's goal was "100% compliance

with the completion and appointment-set reporting requirements" but also stated that penalties,

such as reducing call volume, would not be imposed on contractors unless their "completion and appointment-set rates [did] not exceed **75%**."  (mSF Ex. 40 at mSF 06532.)

Defendants argue that they are entitled to summary judgment on this aspect of mSF's breach of contract claim because AHS complied with the status reporting requirements provision of the MOA by including requirements for status reporting in its agreements with its preferred and network contractors, and because the MOA did not include any provision that it "enforce" that requirement.  The issue, however, is whether AHS breached its contractual obligations of good faith and fair dealing by failing to track whether its Preferred and Network Contractors were timely reporting their statuses, failing to mandate 100% compliance with status reporting requirements, and failing to enforce compliance with status reporting requirements.  As we noted earlier, bad faith in the performance of a contract may include "evasion of the spirit of the bargain, lack of diligence and slacking off, [and] willful rendering of imperfect performance[.]" Stamerro, 889 A.2d at 1259 (citing Somers, 613 A.2d at 1213).  We conclude that there is evidence in the summary judgment record upon which a jury could find that AHS evaded the spirit of the MOA, lacked diligence, and slacked off in performing its status reporting requirement obligation under the MOA, and that it willfully rendered imperfect performance of its obligations related to status reporting requirements under MOA, by failing to mandate 100% timely compliance with status reporting requirements, failing to track timeliness of contractor reporting, and failing to uniformly enforce compliance with status reporting requirements.  We further conclude, accordingly, that a genuine issue of material fact exists in connection with mSF's claim that AHS breached its contractual duty of good faith and fair dealing in connection with this obligation.  Defendant's Motion for Summary Judgment is, therefore, denied with respect to mSF's breach of contract claim in Count I of the Complaint as that claim pertains to

AHS's obligation to require "Preferred and Network AHS contractors to report Appointment Set within 24 hours and SWO Completion within 5 business days." (MOA at 2.)

### b. __Best efforts obligation__

As we mentioned, *supra*, the MOA requires all parties to that agreement to use their best efforts to enter into a tri-party agreement. (MOA at 3 ¶ 1.) mSF maintains that Defendants breached this obligation by failing to use any effort to enter into a tri-party agreement with Plaintiff. In this regard, mSF emphasizes that none of the top executives of AHS worked on developing the tri-party agreement after the parties entered into the MOA.[10] Rather, AHS executives left that job to Coggin, AHS's attorney. (See mSF Exs. 22, 23, 87; Siana Decl. ¶¶ 14-16.) mSF and AHS were ultimately unable to reach an agreement. (Defs. Reply Exs. E, F, G.)

Defendants argue that summary judgment should be entered in their favor on this aspect of mSF's breach of contract claim because the provision of the MOA requiring the parties to use their best efforts to develop a tri-party agreement is an unenforceable agreement to agree.[11] "'An agreement to agree is incapable of enforcement, especially when it is stipulated that the proposed compact shall be mutually agreeable.'" Highland Sewer & Water Auth. v. Forest Hills Mun. Auth., 797 A.2d 385, 390 (Pa. Commw. Ct. 2002) (quoting Onyx Oils & Resins, Inc. v. Moss, 80 A.2d 815, 816 (Pa. 1951)); see also Anchor Pipe Co., Inc. v. Sweeney-Bronze Dev., LLC, No.

---

[10]Crawford testified at his deposition that he did not have any discussions with anyone about developing a tri-party agreement pursuant to the MOA. (Crawford Dep. at 135.) He further testified that David Quandt had the responsibility to implement the terms of the MOA for AHS. (Id. at 135-36.) Quandt testified at his deposition that he personally took no action to develop a tri-party agreement pursuant to the MOA. (Quandt Dep. at 423.)

[11]There is no difference in the law of Pennsylvania and the law of Tennessee with regard to the enforceability of an agreement to agree. Therefore, we need not engage in a choice of law analysis with respect to this aspect of mSF's breach of contract claim in Count I. See Pacific Emp'rs, 693 F.3d at 432.

M2011–02248–COA–R3–CV, 2012 WL 3144638, at *5 (Tenn. Ct. App. Aug. 2, 2012) ("An agreement to agree to something in the future is not generally enforceable." (citing Four Eights, LLC v. Salem, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005))).   This rule does not apply, however, where the parties have agreed "on essential terms and intend them to be binding even though they intend to adopt a formal document with additional terms at a later date."   Mastroni-Mucker v. Allstate Ins. Co., 976 A.2d 510, 522 (Pa. Super. Ct. 2009) (citing Johnston v. Johnston, 499 A.2d 1074, 1076 (Pa. Super. Ct. 1985)); see also Gurley v. King, 183 S.W.3d 30, 35 (Tenn. Ct. App. 2005) ("To be enforceable, the parties must have agreed on essential terms. However, parties may agree on some of the contractual terms, understanding them to be an agreement, and leave other contract terms to be made later.  It is only when an essential term is left open for future negotiation that there is nothing more than an unenforceable agreement to agree." (citations omitted)).  mSF maintains that the best efforts clause in the MOA was not an unenforceable agreement to agree because the parties had already agreed to the essential terms of the tri-party agreement in the August 3, 2009 oral agreement, and "the only remaining step was to prepare a written document containing the already agreed terms."  (mSF's Sur-Reply at 23.)

        The language used by the parties in the best efforts provision of the MOA is clear and unambiguous.  Under both Pennsylvania and Tennessee law, "[w]hen the words of a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning."  Truserv Corp. v. Morgan's Tool & Supply Co., 39 A.3d 253, 260 (Pa. 2012) (citing LJL Transp., Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 647 (Pa. 2009)).  See also BSG, LLC v. Check Velocity, Inc., ___ S.W.3d___, 2012 WL 5862458, at *3 (Tenn. Nov. 20, 2012) ("If the contract language is found to be clear and unambiguous, the contract language is interpreted according to its plain

terms and ordinary meaning." (citing <u>Maggart v. Almany Realtors, Inc.</u>, 259 S.W.3d 700, 704 (Tenn. 2008))).

The clear and unambiguous language of the best efforts provision of the MOA does not state that the parties will use their best efforts to reduce the August 3, 2009 agreement to writing. Rather, it states that "the parties will use their best efforts to **develop** a tri-party agreement to set forth all rights and obligations of the parties . . . including the incorporation and integration of the terms and conditions of **any prior agreements which remain in effect** between MSF and AHS or ServiceMaster." (MOA at 3 (emphasis added).) The fact that the parties had <u>not</u> already agreed upon the terms of this tri-party agreement is made manifest by the concluding sentence of the best efforts clause: "[n]otwithstanding the foregoing, the Parties reserve their respective rights and legal positions with respect to the [sic] whether and to what extent the 2007 Joint Services and Pilot One Agreement between ServiceMaster and mSF remains in effect and nothing contained herein shall be construed to amend, continue or extend the 2007 agreement in any way." (<u>Id.</u>) As the parties had not yet agreed which of their prior agreements remained in effect, they could not possibly have reached an agreement as to the terms of the tri-party agreement, since the tri-party agreement had to incorporate and integrate "the terms and conditions of any prior agreements which remain[ed] in effect between MSF and AHS or ServiceMaster." (<u>Id.</u>)

We conclude that the clear and unambiguous language of the best efforts clause of the MOA states the parties' intent to use their best efforts to reach an agreement in the future, not to reduce to writing an agreement that they had previously reached. We note that the best efforts clause also includes the requirement that the "tri-party agreement . . . be in a form acceptable to the parties and their respective counsel," making it clear that this clause is only an agreement to

agree.  See Highland Sewer, 797 A.2d at 390.  The best efforts clause of the MOA is, therefore, "merely an 'agreement to agree' that is not capable of being enforced."  Behrend v. Comcast Corp., Civ. A. No. 03–6604, 2012 WL 4459582, at *7 (E.D. Pa. Sept. 25, 2012) (citing Trowbridge v. McCaigue, 992 A.2d 199, 202 (Pa. Super. Ct. 2010)).  We conclude that AHS is thus entitled to judgment as a matter of law as to mSF's claim that it breached the MOA by failing to use its best efforts to develop a tri-party agreement.  Defendants' Motion for Summary Judgment is, accordingly, granted as to Plaintiff's claim in Count I of the Complaint that AHS and SVM breached the MOA by failing to use their best efforts to develop a tri-party agreement.

**B.   Count II:  The Promissory Estoppel and Unjust Enrichment Claims Against AHS[12]**

### 1.   Promissory estoppel

mSF's claim for promissory estoppel is based on promises made by executives of Defendants that were not included within the four corners of any of the parties' contracts.  mSF claims that, during meetings between high level executives of mSF, AHS, and SVM in 2007, both AHS and SVM promised mSF that the following would occur if the Pilot Program were successful:

_____

[12]Like Count I, Count II of the Complaint asserts a claim against AHS only.  As it did with respect to Count I, mSF seeks leave to amend the Complaint to add SVM as a defendant to Count II, on the ground that it has learned through discovery that there was an overlap in personnel between AHS and SVM.  (mSF's Corrected Br. at 4 n.1.)  For the reasons stated *infra*, we conclude that Defendants' Motion for Summary Judgment should be granted as to Count II of the Complaint because both Defendants are entitled to judgment as a matter of law with respect to mSF's promissory estoppel and unjust enrichment claims.  Consequently, amendment of this Count to add SVM as a defendant would be futile.  mSF's request for leave to amend the Complaint and add SVM as a defendant as to Count II is, therefore, denied.  See Great W. Mining, 615 F.3d at 175 ("Under Rule 15(a), futility of amendment is a sufficient basis to deny leave to amend.").

> (1) mSF would be the joint development partner for an [sic] automated field service management software in which all 14,000 AHS contractors would be enrolled; (2) the enrollment program would be extended to other SVM subsidiaries for use by their contractors, the partnership would market mSF's products and services to AHS's competitors, and the partnership would market mSF's products and services to companies in other similar service-based industries; and (3) that the parties would enter into a long-term agreement concerning the rollout of mSF's products and services incorporating provisions for Defendants' purchase of mSF's stake in the partnership and for sharing 10% of the revenue of the partnership with Defendants.

(mSF's Corrected Br. at 20-21; Rawding Decl. ¶¶ 3-4; Marzola Decl. ¶¶ 7-11.)  mSF maintains that these promises were renewed by Defendants in the 2007 Pilot 1 Agreement and were "subsequently confirmed and renewed by Defendants through their agreements and representations to mSF from 2008 to 2010."  (mSF's Corrected Br. at 21.)  mSF relied on these promises, particularly with regard to the volume of AHS's contractors and projected future revenue, and abandoned its retail strategy to pursue the business opportunity provided by the joint development partnership.  (Rawding Decl. ¶ 5.)

Defendants have moved for summary judgment on mSF's promissory estoppel claim on the ground that promissory estoppel is not applicable where there is a written contract between the parties.  The doctrine of promissory estoppel is treated similarly under Pennsylvania and Tennessee law.[13]  Under Pennsylvania law, a plaintiff asserting a claim for promissory estoppel must establish that "(1) the defendant made a promise that he should have reasonably expected to induce the plaintiff to act or refrain from acting, (2) the plaintiff actually relied on the promise

---

[13]We conclude, *infra*, that Defendants are entitled to the entry of judgment as a matter of law as to mSF's promissory estoppel claim under both Pennsylvania and Tennessee law. Consequently, even though the promissory estoppel laws of Pennsylvania and Tennessee are not identical, there is not a true conflict between the laws of Pennsylvania and Tennessee regarding the promissory estoppel claim asserted in this case.  We therefore need not engage in a conflicts of laws analysis.  Pacific Emp'rs, 693 F.3d at 432.

and either took, or refrained from taking, action, and (3) enforcing the promise is the only way to avoid injustice." Bennett v. Itochu Int'l, Inc., Civ. A. Nos. 09–CV–1819, 09–CV–4123, 2012 WL 3627404, at *20 (E.D. Pa. Aug. 23, 2012) (citing Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000); Burton Imaging Grp. v. Toys "R" Us, Inc., 502 F. Supp. 2d 434, 438–39 (E.D. Pa. 2007)).  Under Tennessee law, the doctrine of promissory estoppel applies to make a promise binding on the promisor where "'the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person,'" the promisor "induce[d] such action or forbearance," and "injustice can be avoided only by enforcement of the promise." Frankenbach v. Rose, No. M2002-02073-COA-R3-CV, 2004 WL 221319, at *14 (Tenn. Ct. App. Feb. 3, 2004) (quoting and citing Amacher v. Brown-Forman Corp., 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991), and citing Alden v. Presley, 637 S.W.2d 862, 864 (Tenn. 1982)).  To recover on a claim for promissory estoppel the plaintiff must establish that:  "'(1) the detriment suffered in reliance [is] substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance [was] foreseeable by the promisor; (3) the promisee . . . acted reasonably in justifiable reliance on the promise as made.'" Id. (quoting Alden, 637 S.W.2d at 864).

The laws of Pennsylvania and Tennessee differ slightly with regard to whether the existence of an enforceable contract precludes relief under the doctrine of promissory estoppel. "Under Pennsylvania law, an enforceable contract between two parties precludes relief for a claim of promissory estoppel." Isobunkers, L.L.C. v. Easton Coach Co., Civ. A. No.  09-879, 2010 WL 547518, at *4  (E.D. Pa. Feb. 9, 2010) (citing Carlson v. Arnot–Ogden Mem'l Hosp., 918 F.2d 411, 416 (3d Cir. 1990)).  In Pennsylvania, promissory estoppel is thus "reserved for situations 'where the formal requirements of contract formation' have failed." Id. (citing Carlson, 918 F.2d at 416).  The Tennessee courts however, unlike the Pennsylvania courts,

recognize claims for promissory estoppel in limited instances where there is a written contract between the parties.  See Sparton Tech., Inc. v. Util-Link, LLC, 248 F. App'x 684, 690 (6th Cir. 2007) ("While cases do exist where the doctrine has been applied where the parties have contracts, these cases have been limited to cases where a claim of promissory estoppel was advanced to expand the terms of, not change the terms of, an existing contract." (citing Bill Brown Constr. Co. v. Glens Falls Ins. Co., 818 S.W.2d 1, 9-11 (Tenn. 1991))).  These cases appear to be limited to expanding the coverage provided by insurance contracts where the insurance agent failed to obtain requested insurance coverage.  See Bill Brown, 818 S.W.2d at 9-11.  Otherwise, as in Pennsylvania, "[o]nce an express contract is found, . . . the alternative claim of promissory estoppel becomes moot."  Spartan Tech., Inc., 248 F. App'x at 690 (citation omitted).

The parties have entered into five written contracts:  (1) the NDA, which pertains only to the disclosure of confidential information and is not relevant to mSF's promissory estoppel claim, (2) the Pilot 1 Agreement, (3) the Joint Services and Pilot 1 Agreement Extension, (4) the JSA, and (5) the MOA.  The Pilot 1 Agreement, whose term was extended by the Joint Services and Pilot 1 Agreement Extension, concerns mSF's development of its FM*Pro* work order management and field service technician productivity tools for SVM.  (Pilot 1 Agreement ¶¶ 1.1, 1.3.)  As we noted previously, mSF contends that Exhibit A to the Pilot 1 Agreement renewed Defendants' oral promises.  (See mSF's Corrected Br. at 21; Pilot 1 Agreement, Ex. A.)  Exhibit A to the Pilot 1 Agreement states that the ultimate objective of the project between SVM and mSF is "the development of a fully integrated Field Service Management . . . software . . .[;] that SVM, AHS, and [mSF] intend to partner in this process[;]" and that, after the Pilot was completed, the parties would complete a Master Contract that would include "ten percent (10%)

35

revenue sharing by AHS/SVM of [mSF]'s gross revenue [from] sales of FM*Pro+*."  (Pilot 1 Agreement, Ex. A at A-1 - A-2.)

The JSA concerns the marketing of mSF's work order management and field service technician productivity tools to AHS's contractors.  (JSA at 1.)  Pursuant to the JSA, mSF was to provide its software, FMP+, to AHS's contractors, and AHS was to enroll at least 500 of its Preferred Contractors into the program.  (Id. ¶¶ 1.2, 2.1.)  mSF contends that the JSA does not concern the same subject matter as the oral promises on which it relies, because the JSA dealt only with some of the same subject matter as Defendants' oral promises to mSF, was limited to requiring AHS to enroll 500 preferred contractors in the program during the course of one year, and did not affect the other agreements reached by the parties.  mSF further contends that, during the time in which the JSA was effective, the Defendants continued to renew their prior oral promises to mSF.

The plain language of the JSA, however, undermines mSF's argument.  The JSA does not state that it is a limited agreement that does not affect the parties' other agreements.   Quite the opposite, the JSA specifically states that it "supersedes all previous agreements" (JSA ¶ 5) and includes an integration clause that states that the JSA "and the Statements of Work issued hereunder constitute the entire and final agreement between the Parties with regard to the subject matter hereof.  No waiver, consent, modification or change of terms of this Agreement will bind either Party unless agreed upon in writing and signed by both Parties . . . ."  (Id. ¶ 15.8.)  Both paragraphs 5 and 15.8 of the JSA are clear and unambiguous.  Consequently, we construe the JSA as a matter of law as constituting the entire agreement of the parties from December 12, 2008 through December 31, 2009, and as barring its modification by an oral contract.  See USA Techs., Inc. v. Tirpak, Civ. A. No. 12-2399, 2012 WL 1889157, at *3 (E.D. Pa. May 24, 2012)

(stating that, under Pennsylvania law, "[w]e construe a clear and unambiguous contract as a matter of law." (citing Trizechahn Gateway LLC v. Titus, 976 A.2d 474, 483 (Pa. 2009)). See also Morgan Dev., LLC v. Morrow,  No. E2010–00610–COA–R3–CV, 2011 WL 662948, at *3 (Tenn. Ct. App. Feb. 23, 2011) ("When the language of a contract is plain and unambiguous, courts 'determine the parties' intention from the four corners of the contract, interpreting and enforcing [the contract] as written.'" (alteration in original) (citing Union Realty Co. v. Family Dollar Stores of Tenn., Inc., 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007))).

The MOA also addresses the relationship between the parties with respect to the subject matter of Defendants' oral promises.  The MOA states that mSF was to provide SWO automation and status reporting software, sales and marketing support, and enhancements for ACE, including credit card processing, automatic invoicing, status reporting, field authorization and a bulk order management system as defined in mSF's October 2009 Proposal to AHS. (MOA at 1-2.)  The MOA further governs mSF's marketing of its software to AHS's contractors and AHS's efforts to encourage its contractors to purchase mSF's software.  (See id. at 2.)  The MOA also provided that the parties would "use their best efforts to develop a tri-party agreement to set forth all rights and obligations of the parties with respect to FMP+."  (Id. at 3.)  mSF argues that the subject matter of the MOA is not the same as the subject matter of the oral agreement because the MOA did not require AHS to enroll all of its contractors in the program and did not require mSF to develop its products and services.  However, while the MOA may not specifically require these things, it does address both the enrollment of AHS's contractors and the development of mSF's products and services.

mSF argues that Defendants' Motion should be denied with respect to its promissory estoppel claim because the rule that promissory estoppel may not be invoked where the parties

have an enforceable contract does not apply where the enforceable contract does not concern precisely the same subject matter as the promises that are the subject of the promissory estoppel claim.  (See mSF's Sur-Reply at 10 (arguing that "both Pennsylvania's and Tennessee's jurisprudence on the viability of promissory estoppel [claims] . . . do not hinge on whether written contracts exist between the parties, but on whether the subject matter of those written contracts is the same as the subject matter of the promises").).  We reject this argument for three reasons.  First, mSF has not cited any authority that supports this argument.  Second, while mSF argues that Defendants made oral promises to them prior to and during the pendency of both the Pilot 1 Agreement and the JSA, and that those oral promises supplement or modify the terms of those agreements, the Pilot 1 Agreement and JSA by their own terms constitute the entire agreements between the parties for the time periods in which they were in effect and could not be modified by oral agreements.  (See Pilot 1 Agreement ¶ 12.8; JSA ¶ 15.8.)  Third, the Pilot 1 Agreement, the JSA and MOA address the same subject matter as the promises on which mSF has based its promissory estoppel claim, i.e., mSF's development of field service management software for Defendants, the marketing of that software to AHS's contractors, and the future development of a master agreement.  In sum, mSF seeks to use its promissory estoppel claim to supplement its written contracts with Defendants by making Defendants liable for promises they did not enter into in writing.  We therefore conclude, on the basis of the record before us, that AHS is entitled to judgment as a matter of law on mSF's promissory estoppel claim under both Pennsylvania and Tennessee law.  See Tomlinson v. Checkpoint Sys., Inc., Civ. A. No. 06–2205, 2008 WL 219217, at *6 (E.D. Pa. Jan. 25, 2008) (stating that promissory estoppel may "not be used to supplement or modify a written, enforceable contract").  See also Spartan Tech., 248 F. App'x at 690 ("Once an express contract is found, . . . the alternative claim of promissory

estoppel becomes moot." (citation omitted)).[14]  Defendants' Motion for Summary Judgment is,

therefore, granted as to mSF's claim for promissory estoppel in Count II of the Complaint.

### 2. Unjust enrichment

mSF's claim for unjust enrichment is based on Defendants' failure to involve mSF in

Project Genesis.  mSF argues that:

> mSF proposed and developed a lucrative business opportunity through the joint
> development partnership by introducing Defendants to the means and providing
> the know-how to enable the partnership to generate substantial revenue by
> enrolling the AHS contractors in the mSF products and services, through credit
> card processing, and through a contractor portal where supply and retail materials
> are sold.  As a result of Defendants' actions in eliminating mSF, the entirety of
> the lucrative business opportunity has been misappropriated by the Defendants for
> the sole benefit of the Defendants.  Defendants precluded mSF from any
> involvement in Project Genesis, including the all-important Field Services portion
> of Project Genesis.  Instead, Defendants took the features and functions that mSF
> proposed, presented, and developed and passed them on to their Project Genesis
> vendors, Oracle and IBM Global Services.
>
> Because the parties had discussed and agreed to revenue sharing from enrollment
> of contractors, from credit card processing and from the portal, Defendants
> understood the value of the lucrative business opportunity.  The retention by

---

[14]mSF's promissory estoppel claim also fails under Tennessee law because the mSF has
submitted no evidence that Defendants' conduct was akin to fraud.  The Tennessee courts only
recognize claims for promissory estoppel in "exceptional cases."  Barnes & Robinson Co. v.
OneSource Facility Servs., Inc., 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006)).  "Such
exceptional cases are found only where defendant's conduct is akin to fraud."  Spartan Tech, 248
F. App'x at 689 (citing Shedd v. Gaylord Entm't Co., 118 S.W.3d 695 (Tenn. Ct. App. 2003));
see also  Shedd, 118 S.W.3d at 700 (noting that the Tennessee Supreme Court has restricted the
application of the doctrine of promissory estoppel to "'exceptional cases where to enforce the
statute of frauds would make it an instrument of hardship and oppression, verging on actual
fraud.'" (quoting Baliles v. Cities Serv., 578 S.W.2d 621, 624 (Tenn. 1979); and citing GRW
Enters., Inc. v. Davis, 797 S.W.2d 606 (Tenn. Ct. App. 1990), and D & S Coal Co. v. USX
Corp., 678 F. Supp. 1318 (E.D. Tenn. 1988))).  The Complaint does not allege, and mSF does
not argue, that Defendants' actions in this case amount to fraud.  Consequently, even if mSF's
promissory estoppel claim was not moot under Tennessee law, Defendants would be entitled to
the entry of judgment in their favor on that claim as a matter of law because mSF has not
established that their conduct verged on actual fraud.

Defendants, to the exclusion of mSF, of all benefits from this substantial business opportunity would be grossly inequitable.

(mSF's Corrected Br. at 34-35.)  In order to succeed on a claim for unjust enrichment, a plaintiff must establish the following elements:   "'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'"   Lackner v. Glosser, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) (quoting AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. Ct. 2001)); see also Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005) ("The elements of an unjust enrichment claim are: 1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" (alteration in original) (quoting Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 155 (Tenn. 1966))).[15]   "The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff."  Lackner, 892 A.2d at 34 (quoting AmeriPro, 787 A.2d at 991); see also Freeman, 172 S.W.3d at 525 ("The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." (citing Paschall's, 407 S.W.2d at 155; Whitehaven Cmty. Baptist Church v. Holloway, 973 S.W.2d 592, 596 (Tenn. 1998)).

---

[15]The elements of a claim for unjust enrichment are the same in Pennsylvania and Tennessee and, thus, we need not engage in a conflicts analysis with respect to mSF's unjust enrichment claim.  See Pacific Empl'rs, 693 F.3d at 432.

Defendants have moved for summary judgment on mSF's unjust enrichment claim on the ground that unjust enrichment is not applicable where there is a written contract between the parties.  Under both Pennsylvania and Tennessee law, the doctrine of unjust enrichment does not apply where the parties have a written contract.  See Lackner, 892 A.2d at 34 ("By its nature, the doctrine of quasicontract, or unjust enrichment, is inapplicable where a written or express contract exists."  (citing Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999))); Hayes v. Washburn, No. M2006-01135-COA-R3-CV, 2007 WL 3202765, at *1 (Tenn. Ct. App. 2007) ("Once it is found that a valid contract exists, the contract should be interpreted as written, parol evidence may not be introduced to vary its terms, and unjust enrichment may not be used to alter contractual terms.").  We have already concluded that the parties have entered into three contracts that concern the subject matter of their unjust enrichment claim (the joint development partnership, enrollment of AHS's contractors into the project, and revenue sharing):  the Pilot 1 Agreement, the JSA, and the MOA.  In addition, mSF's unjust enrichment claim is intertwined with its claim in Count III of the Complaint that Defendants violated the NDA by using mSF's confidential information for their own benefit.  (See mSF's Corrected Br. at 34 n.1.)  Therefore, to the extent that mSF's unjust enrichment claim is related to its claim that Defendants precluded mSF from participating in the Field Services portion of Project Genesis and violated the NDA by passing the features and functions that mSF proposed, presented, and developed to their Project Genesis vendors, Oracle and IBM Global Business Services, the written NDA also governs the subject matter of that claim.  Since the parties have entered into four written contracts that concern the subject matter of their unjust enrichment claim, we conclude that AHS is entitled to the entry of judgment as a matter of law as to this claim.  See Lackner, 892 A.2d at 34;  Hayes,

2007 WL 3202765, at *1.  Defendants' Motion for Summary Judgment is, therefore, granted as to mSF's claim for unjust enrichment in Count II of the Complaint.

### C.    Count III:  The Breach of Contract Claim Against SVM[16]

Count III of the Complaint alleges that SVM breached the NDA by sharing mSF's proprietary information with others and by using mSF's proprietary information for its own projects.  (Compl. ¶¶ 78-79.)  "Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'"  Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  Similarly, under Tennessee law, "[i]n a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." Federal Ins. Co. v. Winters, 354 S.W.3d 287, 291 (Tenn. 2011) (citing ARC LifeMed, Inc. v. AMC–Tenn., Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).[17]  Defendants have moved for summary judgment with respect to Count III of the Complaint on the ground that the record contains no evidence that either SVM or AHS breached the NDA by sharing any of mSF's

---

[16]Count III of the Complaint asserts a claim against SVM only.  mSF seeks leave to amend the Complaint to conform to the evidence to add AHS as a defendant to Count III, on the ground that AHS is subject to the NDA as an affiliate of SVM.   (mSF's Corrected Br. at 35 and n.14.)   For the reasons stated infra, we conclude that Defendants' Motion for Summary Judgment should be granted as to Count III of the Complaint.  Consequently, amendment of this Count to add AHS as a defendant would be futile.  mSF's request for leave to amend the Complaint to add AHS as a defendant as to Count III is, therefore, denied.  See Great W. Mining, 615 F.3d at 175.

[17]Since the elements of a claim for breach of contract are the same in Pennsylvania and Tennessee, we need not engage in a conflicts analysis with respect to the breach of contract claim asserted in Count III.  See Pacific Empl'rs, 693 F.3d at 432.

42

protected confidential information with any other company or by using mSF's protected confidential information for its own projects.

As we mentioned *supra*, the NDA defines Confidential Information as:

> any and all information concerning the business of a Party and such Party's customers, including without limitation, any and all current and future technical, operational or financial information, marketing or business plans, unpublished financial information or business results, forecasts, customer names, customer addresses, and related customer data, partners' names and information, vendor names and information, employee names and information, contracts, practices, services and support, procedures, trade secrets, and other business information including, but not limited to, technical data, know-how, software, reports, methods, strategies, plans, documents, drawings, designs, tools, models, inventions, patent disclosures, and Requests for Proposals that may be disclosed between the parties whether in written, oral, electronic, website-based, or other form

(NDA ¶ 1.)  The NDA limits a recipient's disclosure of Confidential Information as follows:

> Recipient will use the Confidential Information only for the purpose of and in connection with the Parties' business relationship and not for its own benefit or the benefit of another without the prior written consent of Discloser.  Recipient shall hold in confidence, and shall not disclose (or permit or allow its personnel to disclose) to any person outside its organization (except as provided below), any Confidential Information.

(Id. ¶ 2.)  However, the NDA does not prevent a Recipient from independently developing technology similar to that disclosed by a Discloser and explicitly provides that "[s]ubject to the obligations of this Agreement, no Party will be precluded from independently developing technology or pursuing business opportunities similar to those covered by this Agreement."  (Id. ¶ 8(b).)

mSF contends that Defendants breached their obligations under the NDA by using mSF's Confidential Information for their own purposes, in the development of the field services portion of Project Genesis, and also shared mSF's Confidential Information with the companies they worked with in developing the SISP and Project Genesis, i.e., KMPG, Oracle, and IBM Global

Business Services.  Defendants argue that they are entitled to the entry of summary judgment in their favor as to mSF's breach of contract claim in Count III because mSF has failed to identify any of its Confidential Information that was used by them in violation of the NDA.

mSF relies on the following exhibits to support its argument that Defendants have violated the NDA by using its Confidential Information for their own benefit and have shared its Confidential Information with others.

1.     AHS Project Genesis Diagrams (mSF Ex. 88):  mSF has marked several diagrams relating to AHS's Project Genesis as its Exhibit 88.  It does not, however, explain these documents,  The diagrams appear to show functions that may be performed by Oracle's Siebel product.  mSF has made copies of some of these documents and has noted on the copies the functions that mSF's products can also perform.  (See mSF's Corrected Br. at 42-43; mSF Ex. 88.)

2.     September 15, 2010 Project Genesis Phase 0 Field Service Summary (mSF Ex. 66):  This document appears to be a printout of a PowerPoint presentation that AHS and IBM Global Business Services gave regarding the types of software that AHS needed.  (mSF Exs. 66, 97.)  One of the slides from the presentation shows that AHS sought the ability to schedule work orders through real time scheduling on the web, a "Web portal for open dispatches (contractor ability to self select dispatches from queue)," and the implementation of a contractor dashboard. (mSF Ex. 66 at Defs. Supp  00309.)

3.     July 1, 2009 e-mails sent by Wend to several AHS employees, including Orcutt, Eisenbacher, and Quandt, regarding how they would fast track the new contractor web site and noting that they would need to discuss how the new web site would work with "MSF strategy." (mSF Ex. 98 at Defs. Supp 000207-08.)

44

4.      July 7, 2009 e-mail from Rawding of mSF to Crawford of AHS attaching draft Statements of Work requested by AHS:  (1) mSF-AHS 3rd party Dispatch Services Integration Proposal, which proposes "the creation of a web services platform that can be used by mSF and other application developers and contractors to unify the means of exchanging dispatch-related information with AHS"  (mSF Ex. 44 at mSF 06028, mSF 06030); (2) FMP - ACE: ACE Modifications for AHS, July 6, 2009, which addresses the way in which ACE handles dispatches, reporting initial contact dates, and changes to the appointment set function (id. at mSF 06036-37); (3) FMP-ACE: "ACE Dashboard" or "ACE dB" for AHS, July 6, 2009, which provides a graphic view of the dashboard concept (id. at mSF 06040-42); (4) FMP-ACE: Automated Invoicing Component, which outlines "a means of integrating Vendor Service Center (VSC) invoicing workflows into the FMP-ACE application" (id. at mSF 06044, 06046).

5.      September 22, 2009 e-mail sent by Quandt from AHS to Rawding and Marzola at mSF enclosing a copy of the SVM Project Charter for Contractor Web Site.  (mSF Ex. 41.)  As we discussed *supra*, the Project Charter was a proposal for AHS's new contractor web site which was intended to provide a user friendly "vehicle by which contractors can provide AHS and it's [sic] customers with timely and accurate service call status information in a format that also allows the contractor to manage the life cycle of the call all the way from receipt of dispatch through payment receipt."  (Id. at mSF 06118.)  The vehicle was also intended to serve "as AHS's contractor account management and communication tool."  (Id.)  The e-mail asked Rawding and Marzola for their input as to whether "we are dreaming on all these requirements or if you think we have missed something." (Id. at mSF 06113.)

6.      mSF's October 7, 2009 Proposal for AHS.  (mSF Ex. 27.)  This is a detailed Proposal for creation of the web site envisioned by AHS's September 22, 2009 Project Charter

and was sent by mSF to Crawford, Quandt, Wendl, Mills and others at AHS and SVM.  (Id. at AHS 6096-97.)  In the letter accompanying the Proposal, Marzola noted that mSF had provided previous proposals to AHS and SVM over the past three years that encompassed most of the functions requested by AHS in the Project Charter.  (Id. at AHS 6097.)  The Proposal itself contains language asserting that the idea behind the Project Charter originated with mSF: "[w]hile we were not directly involved with its development, the concept was born out of the presentation made to the AHS Senior Management Team in May 2008 where we presented the **ACE Dash Board** concept in great detail."  (Id. at AHS 6107.)  The Proposal also includes a copy of a sample ACE Dash Board that mSF presented to AHS in May 2008.  (Id. at AHS 6112.) The Proposal further includes a list of the enhancements that mSF had made to the ACE product since September 2008 and a list of features that were available in ACE, or that were being incorporated into ACE.  (Id. at AHS 6125-28; AHS 6131-32.)

       7.      November 12, 2009 e-mail from Quandt to Wendl, Orcutt, Wanninger, and others at AHS asking that the recipients fill out templates for the SISP relating to Service Work Order Status and Time and Material prior to Wednesday, November 18, 2009.  (mSF Ex. 84.)  The e-mail suggests that the information needed for the templates might be contained in project charters previously prepared by AHS.[18]  (Id. at Defs.' Supp 000128.)

       8.      November 16, 2009 e-mail from Matt Wendl to Sean Marzola asking for a copy of the presentation that Marzola and Rawding gave to senior staff at AHS regarding the mandatory dashboard concept.  (mSF Ex. 100.)

---

[18]mSF suggests, in its Corrected Brief, that an attachment to that e-mail specified the information that was required to be included in the template.  (mSF's Corrected Br. at 47.)  mSF did not, however, include that attachment in the version of Exhibit 84 that it submitted to the Court.

9.      August 28, 2009 e-mail from Quandt to Wendl, Wanninger, Eisenbacher, and other AHS employees regarding AHS's top five company priorities.  (mSF Ex. 81.)  In this e-mail, Quandt states that one of his personal top five priorities for the balance of 2009 was "Working with Karen Paris, Mark Mills, MSF and on identifying what status is needed and the mechanism to deliver these [sic] status."  (Id. at Defs. Supp 000111.)  Wendl's top five priorities included "[c]ontinu[ing] to move forward with MSF initiative by focusing on converting non users to using" and "Work[ing] with IT to scope details of Contractor's Dashboard to manage life cycle of Dispatch."  (Id. at Defs. Supp 000113.)

10.     September 7, 2010 e-mail from Quandt to Wendl, Eisenbacher and other AHS employees regarding preparation for a meeting with IBM concerning AHS's current state of operations and vision for the future.  (mSF Ex. 110.)  In the e-mail, Quandt asks the recipients to fill out the AHS Future State Template with the functions the recipients believe Project Genesis must enable in order to support the work done by AHS.  (Id. at Defs. Supp 000211-18.)

11.     Undated completed Future State Template that includes the following functions as core functions Project Genesis should enable by 2012:  "Web portal for open dispatches (contractor ability to self select dispatches out of the queue)" and "Manage pictures and real time video along with schematics (SKYP)."  (mSF Ex. 111 at Defs. Supp 000209.)

12.     AHS Project Genesis Meeting Summary for a meeting that took place on August 24-25, 2010, regarding field service management.  (mSF Ex. 113.)  This meeting was attended by Quandt, Wendl, and other AHS employees.  (Id. at Defs. Supp 000204.)  The summary shows that Project Genesis was expected to enable automated service request dispatching and a contractor portal.  (Id. at Defs. Supp 000201-02, 000204-05.)

None of these exhibits is evidence that Defendants, or any of their employees, gave any of mSF's Confidential Information to any other company, or used mSF's Confidential Information for their own benefit.  There is some circumstantial evidence that employees of AHS had a printout of mSF's presentation regarding its contractor dashboard concept when they filled out templates for the AHS SISP relating to Service Work Order Status and Time and Material. (See mSF Exs. 84, 100.)  There is not, however, any evidence that this printout, or any information contained in this printout, was given to KMPG (which was preparing the SISP), or to Oracle or IBM Global Business Services.  At best, the exhibits on which mSF relies demonstrate that Defendants sought the inclusion of certain functions and products in the field services portion of Project Genesis that they knew could also be performed by mSF's products. There is, however, no evidence on the record of this Motion that KMPG, Oracle, or IBM Global Business Services were aware of, or had access to, any of mSF's Confidential Information while they were working on the SISP or Project Genesis.  To the contrary, there is evidence that Oracle's Siebel product, which mSF contends duplicates many of its functions and products, was an off-the-shelf product that was not customized in any way for AHS.  (See Mills Dep. at 197 (stating that AHS did not ask Oracle to customize its products).)[19]  Viewing the evidence in the

---

[19]In order to support their position that they did not give Oracle any of mSF's Confidential Information in connection with their purchase of the Siebel product, Defendants have also submitted their summary of the testimony they expect to be offered at trial by Marshall Powell, Industry Director for Business Services for Oracle.  (Defs.' Reply at 20.)  This summary of testimony is contained in Defendants' January 6, 2012 Rule 26 Disclosure.  (Id.; Reply Ex. H at 2.)  In their Rule 26 Disclosure, Defendants state that they expect to call Powell as a trial witness to testify that "[n]either ServiceMaster nor AHS disclosed mSF's portal design to Oracle. Oracle has never relied on proprietary information or technology of mSF in the concept or development of a partner portal.  Oracle has been developing and using partner portals since at least the early 2000s."  (Reply Ex. H at 2.)  To be considered on summary judgment, evidence must be admissible, or "'reduc[ible] to admissible evidence.'"  J.F. Feeser, Inc. v. Serv-A-

light most favorable to mSF, we conclude that it is insufficient to create a genuine issue of material fact as to whether Defendants breached their duties under the NDA.

mSF also argues that AHS ensured that mSF's Confidential Information would be disclosed to KPMG and IBM Global Business Services because the AHS executives and employees who were responsible for developing Project Genesis were familiar with mSF's products and Confidential Information. mSF points out that Crawford and Quandt, both of whom dealt with mSF, were identified as "Decision Owners" in connection with Project Genesis. (mSF Ex. 80 at Defs. Supp 000104.) Wendl, who worked with mSF, was also assigned to the team working on the field services portion of Project Genesis. (mSF Ex. 114 at Defs. Supp 000250.) Joe Eisenbacher, who participated in mSF's product presentations for contractors in California, was also assigned to the team working on the field services portion of Project Genesis. (Id.; mSF Ex. 59.) K'Lynn Ludwig, who acted as AHS's project manager for mSF (Ludwig Dep. at 11-12), was also put on the Project Genesis team (mSF Ex. 114 at Defs. Supp 000250). Mills, who was also aware of mSF's work for AHS, was involved in the SISP and Project Genesis. (Mills Dep. at 21, 60, 63-64.)

It is unsurprising that AHS executives had occasion to deal with different companies that were involved in significant projects regarding AHS's information technology. It is also unsurprising that individuals who were employed by AHS's I.T. department had contact with different companies that provided, or hoped to provide, I.T. to AHS. It is no less unsurprising

---

Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990) (alteration in original) (quoting Williams v. Borough of West Chester, 891 F.2d 458, 466 n.12 (3d Cir. 1989)). We cannot rely on an unsworn statement in the context of a motion for summary judgment. See Woloszyn v. Cnty. of Lawrence, 396 F.3d 314, 323 (3d Cir. 2005). Consequently, we have not considered Defendants' summary of Powell's anticipated trial testimony in connection with the instant Motion for Summary Judgment.

that individuals employed by AHS to work with its contractors also had occasion to communicate with companies that were working to improve its I.T. in connection with its contractors.  The fact that these executives and employees of AHS had occasion to work with both mSF and the companies brought in to improve AHS's I.T. through Project Genesis is not, in and of itself, suspicious, nor is it circumstantial evidence that these executives and employees provided any of mSF's Confidential Information to KMPG, Oracle, or IBM Global Business Services in violation of the NDA.

mSF also argues that the NDA "unambiguously prohibit[s] Defendants from pursuing business opportunities or requesting features and functions similar to mSF's Confidential Information" and that, consequently, AHS's request for, and purchase of, products that included features and functions similar to those developed by mSF constitutes a breach of the NDA.  (See (mSF's Sur-Reply at 5.)  This argument is belied by the plain language of the NDA.  The NDA clearly states that "no Party will be precluded from independently developing technology or pursuing business opportunities similar to those covered by this Agreement."  (NDA ¶ 8(b).) Therefore, according to the plain language of the NDA, Defendants could request and purchase products that included features and functions that are similar to features and functions of products developed by mSF, so long as Defendants did not use mSF's Confidential Information or share mSF's Confidential Information with others in order to request or purchase those products.  There is no evidence in the record that Defendants shared mSF's Confidential Information with KMPG, Oracle, or IBM Global Business Services during the development of the SISP, during the development of Project Genesis, or in connection with the Siebel software that AHS purchased from Oracle.

As the non-moving party, mSF has the burden of making a factual showing "sufficient to establish the existence of an element essential" to its case, "on which [it] will bear the burden of proof at trial."  <u>Celotex</u>, 477 U.S. at 322.  mSF would bear the burden of proving at trial that Defendants breached the NDA by sharing mSF's Confidential Information with KMPG, Oracle, or IBM Global Business Services, or by using mSF's Confidential Information for its own projects.  "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact."  <u>Boykins</u>, 78 F. Supp. 2d at 408.  After having reviewed all of the evidence upon which mSF relies in support of its breach of contract claim in Count III, we conclude that mSF has not satisfied its burden of pointing to facts sufficient to establish that Defendants breached the NDA either by using mSF's Confidential Information for their own purposes or by sharing that information with KMPG, Oracle, and IBM Global Business Services. We further conclude that SVM is thus entitled to the entry of summary judgment in its favor as to Count III of the Complaint.  Defendants' Motion for Summary Judgment is, therefore, granted as to mSF's breach of contract claim in Count III of the Complaint.

## IV.    CONCLUSION

For the forgoing reasons, Defendants' Motion for Summary Judgment is denied as to mSF's claim, in Count I of the Complaint, that AHS breached its duty of good faith and fair dealing with respect to the MOA by failing to enforce the status reporting requirements it imposed on its contractors.  The Motion is granted as to the remaining claims in the Complaint. We enter Judgment in AHS's favor on Count I insofar as it relates to the August 3, 2009 oral agreement and the best efforts provision of the MOA.  We enter Judgment in AHS's favor, without limitation, on Count II.  We enter Judgment in SVM's favor, without limitation, on

Counts III and IV.  mSF's requests that Counts I, II and III be amended to conform to the evidence are denied.  An appropriate Order follows.

BY THE COURT:

**/s/** John R. Padova

_____

John R. Padova, J.