IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MYSERVICE FORCE, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMERICAN HOME SHIELD | : | NO. 10-6793 |

<u>**MEMORANDUM**</u>

**Padova, J.**                                                                                      **April 24, 2013**

This is a breach of contract action arising from Defendant American Home Shield's ("AHS") alleged breach of its duty of good faith and fair dealing in connection with its performance of one of its duties under a Memorandum of Agreement ("MOA") entered into by the parties on January 27, 2010.  Before the Court are Defendant's Motion to Strike Plaintiff's Experts, Defendant's Second Motion to Strike Plaintiff's Experts, and Defendant's Motion for Leave to File Motion for Summary Judgment.  For the following reasons, the Motion to Strike Plaintiff's Experts is granted, the Second Motion to Strike Plaintiff's Experts is dismissed as moot, and the Motion for Leave to File Motion for Summary Judgment is granted.

## I.    BACKGROUND

### A.    <u>Procedural Background</u>

This action was filed on November 19, 2010.  (Docket No. 1.)  The Complaint asserted four causes of action against AHS and Service Master Consumer Services Limited Partnership ("SVM"):  (1) a claim for breach of contract against AHS (Count I); a claim for unjust enrichment and promissory estoppel against AHS (Count II), a claim for breach of contract against SVM (Count III); and a claim for tortious interference with contract against SVM (Count IV).  Defendants moved for summary judgment as to all four claims asserted in the Complaint and we granted that motion in part and denied it in part on January 17, 2013.  <u>See</u>

mySeviceForce, Inc. v. American Home Shield, Civ. A. No. 10–6793, 2013 WL 180287 (E.D. Pa. Jan. 17, 2013). We denied the Motion for Summary Judgment as to mySeviceForce, Inc.'s ("mSF") claim, in Count I of the Complaint, that AHS breached its duty of good faith and fair dealing with respect to its obligations under the parties' MOA to imposing status reporting requirements on its contractors. Id. at *27. We granted the Motion for Summary Judgment as to mSF's remaining claims for breach of contract asserted in Count I of the Complaint. Id. We also granted the Motion for Summary Judgment as to Counts II-IV of the Complaint and dismissed SVM as a Defendant in this action. Id. at *27-*28.

After we resolved the Motion for Summary Judgment, we gave the parties the opportunity to produce revised expert reports with respect to the sole claim remaining in the case. (See Docket No. 105.) We also scheduled the trial to commence on April 22, 2013. (See Docket No. 107.) AHS subsequently filed the instant Motions to Strike Plaintiff's Experts, seeking to preclude the introduction of mSF's experts' reports and opinions at trial, and the Motion for Leave to File Motion for Summary Judgment, seeking to file a Motion for Summary Judgment on the ground that mSF cannot establish that it was injured by AHS's alleged breach of its duty of good faith and fair dealing. We held argument on all three Motions on April 9, 2013.

B.      Factual Background[1]

AHS, a subsidiary of SVM, sells home warranties that cover major systems and appliances in the home. (Quandt Dep. at 36-37.[2]) It engages three classes of contractors to

---

[1]We discuss only the facts relevant to the instant Motions. A more detailed recitation of the parties' relationships and the facts underlying their dispute may be found in our January 17, 2013 Memorandum. See mySeviceForce, 2013 WL 180287, at *1-*10.

perform the work under the warranties:   (1) Preferred Contractors, who have operations agreements with AHS, pursuant to which AHS promises them a certain number of service calls per year; (2) Network Contractors, who have contracts with AHS but do not receive call commitments from AHS; and (3) direct dispatch contractors, who do not have formal service agreements with AHS.   (Wanninger Dep. at 25-28.)   In 2006, mSF had a product known as FieldMaster*Pro* ("FM*Pro*"), which provided work order management and field service technician productivity tools.   (Joint Services and Pilot 1 Agreement ("Pilot 1 Agreement") at 1.) John Lenihan, Project Manager of SVM, reached out to mSF in late December 2006, looking for software based on mSF's existing products that could be used by AHS's contractors.   (Marzola Decl. ¶¶ 2, 5, 7.)   The parties entered into several contracts in connection with mSF's development of products for use by AHS's contractors:   the January 18, 2007 Mutual Non-Disclosure Agreement, the September 17, 2007 Pilot 1 Agreement, the December 12, 2008 Joint Services Agreement, and the January 27, 2010 MOA.   SVM paid mSF a portion of its initial costs to develop those products pursuant to the Pilot 1 Agreement, but the parties anticipated that mSF would be primarily compensated for its efforts through revenues from the sale of its products to AHS's contractors.   (Pilot 1 Agreement ¶¶ 2.1.1, 2.1.2; Pilot 1 Agreement Ex. A at A-1.)

By the time the parties entered into the MOA, mSF had developed a service work order ("SWO") automation and status reporting product called myServiceACE ("ACE") that would enable AHS's contractors to report the statuses of their SWOs, such as the dates and times of customer appointments and the date and time an SWO had been completed, to AHS

---

[2]The Depositions, Declarations, and Exhibits referred to in this portion of our Memorandum were made part of the record in connection with the first Motion for Summary Judgment.

automatically and in real time.  (MOA at 1.)  Pursuant to the MOA, mSF was to provide SWO automation and status reporting software, sales and marketing support, and enhancements for ACE, including credit card processing, automatic invoicing, status reporting, field authorization and a bulk order management system.  (Id. at 1-2.)  The MOA was effective for a two-year term, with the objective of continuing "to grow the number of AHS contractors reporting statuses automatically and in real time to AHS."  (Id. at 1.) The MOA required AHS to:  (1) pay $250,000 to mSF "in full and final satisfaction of all obligations of AHS under the 2009 Plan;" (2) require Preferred and Network Contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days;" (3) continue a full time contractor support person; (4) support mSF's marketing of its products to AHS's contractor network; (5) work with mSF to develop and test a Field Authorization process in the first quarter of 2010; and (6) allow mSF to give presentations at regional AHS contractor events during the spring of 2010.  (Id. at 2.)

Beginning on April 7, 2010, mSF gave presentations about its products and services to AHS's contractors at 14 regional roadshows.  (Marzola Decl. ¶ 20.)  Both contractor attendance at these events and the number of contractors purchasing mSF's products were lower than mSF's employees expected.  (Id. ¶ 22.)  In response to the lower than expected sales of mSF's products, on April 27, 2010, three months after mSF and AHS entered into the MOA, AHS asked mSF to prepare a proposal for making contractor enrollment in mSF's products mandatory, with AHS sharing the costs for certain classes of contractor.  (mSF Ex. 102.)  AHS ultimately decided not to enter into the proposed agreement to make its contractors' use of mSF's products mandatory because mSF's proposal was too costly (estimated costs for AHS included payments to mSF of $350,000/year for three years, additional payments of $10,000/month, and penalties of $100 per

contractor under mSF's goal of 6000 contractors using the system).  (mSF Ex. 103.)  mSF subsequently filed this lawsuit.

        C.        <u>mSF's Claim for Breach of the Duty of Good Faith and Fair Dealing</u>

Count I of the Complaint included a claim that AHS breached its obligations under the MOA, including its obligation to require its Preferred and Network contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days" (the "status reporting requirements provision").  (MOA at 2.)  In its first Motion for Summary Judgment, AHS moved for summary judgment on that breach of contract claim, arguing that it had complied with the status reporting requirements provision of the MOA by including requirements for status reporting in its agreements with its Preferred and Network Contractors. In 2010, AHS's operations agreements with its Preferred Contractors required that:  "[s]cheduled appointments . . . be communicated to AHS immediately" and the "completion date . . . be provided to AHS within 24 hours of finishing the service call."  (Wanninger Dep. at 81-83, 87-88.)  AHS's 2010 service agreements with its Network Contractors similarly stated:  "'For each Dispatch, Servicer shall (i) use every reasonable effort to **immediately** communicate to AHS the scheduled appointment date and time; (ii) provide to AHS the completion date for each dispatch within **24** hours of finishing the service call.'"  (mSF Ex. 40 (quoting 2010 AHS Service Agreement, Part 8).)  In its response to the first Motion for Summary Judgment, mSF did not deny that the obligations AHS placed on its Preferred and Network contractors in their 2010 agreements exceeded the status reporting requirements provision of the MOA.  (Rawding Dep. at 225.)  However, it contended that AHS breached its duty of good faith and fair dealing in its performance of its obligations under that provision of the MOA by failing to enforce the status reporting requirements it imposed on its contractors.

In analyzing this claim, we determined that there was evidence in the summary judgment record upon which a jury could find that AHS failed to mandate 100% timely compliance with the status reporting requirements it imposed on its contractors, failed to track the timeliness of its contractors' status reporting, and failed to uniformly enforce compliance with its status reporting requirements.  myServiceForce, 2013 WL 180287, at *15.  We concluded that there was, accordingly, a genuine issue of material fact in connection with mSF's claim that AHS breached its contractual duty of good faith and fair dealing in connection with its performance of its obligations pursuant to the status reporting requirements provision of the MOA by failing to enforce those requirements, and we denied the first Motion for Summary Judgment insofar as it pertained to that claim.  Id.  That is the sole claim remaining in this case.

mSF has indicated that it will call four expert witnesses at trial to testify as to the damages mSF incurred as a result of AHS's alleged breach of its duty of good faith and fair dealing:  Thomas Tinsley, Marc Reid (who jointly produced the "Tinsley/Reid Report"), David Chandler Thomas, and Bruce Luehrs.  AHS has moved to strike the opinions and revised reports of Plaintiff's experts on the grounds that the opinions are unreliable and do not fit Plaintiff's sole remaining claim.

## II.   LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence.  Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 n.10 (1993)). "Under Rule 702, the district court acts as a 'gatekeeper' to ensure that 'the expert's opinion [is] based on the methods and procedures of science rather than on subjective belief or unsupported speculation.'"  ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290 (3d Cir. 2012) (alteration in original) (quoting Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003)). There are three requirements for the admissibility of expert testimony pursuant to Rule 702, "'qualification, reliability and fit.'"  Calhoun, 350 F.3d at 321 (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).  The United States Court of Appeals for the Third Circuit has explained these requirements as follows:

> First, the witness must be qualified to testify as an expert.  Qualification requires that the witness possess specialized expertise.  We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such.  Second, the testimony must be reliable. In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief.   An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.  Third, the expert testimony must fit, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

Id. (quotations omitted). The following factors are used as a guide for determining reliability:

> "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put."

Id. (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994).  The Third Circuit has explained that "'the reliability analysis [required by Daubert] applies to all aspects of

an expert's testimony:  the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.'"  ZF Meritor, 696 F.3d at 291 (alterations in original) (quoting Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999)).  "'When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.'"  Id., at 290 (quoting Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp. 509 U.S. 209, 242 (1993); and Advo, Inc. v. Phila. Newspapers, Inc., 51 F.3d 1191, 1198 (3d Cir. 1995)).

The third requirement for admissibility under Rule 702, fit, requires that the expert testimony assist the trier of fact and, thus, pertains "'primarily to relevance.'"  Meadows v. Anchor Longwall & Rebuild, Inc., 306 F. App'x 781, 790 (3d Cir. 2009) (quoting Lauria v. Amtrak, 145 F.3d 593, 599 (3d Cir. 1998)).  "The expert's testimony must 'fit' under the facts of the case so that 'it will aid the jury in resolving a factual dispute.'"  Id. (quoting Lauria, 145 F.3d at 600).  This element "'requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'"  Id. (quoting Lauria, 145 F.3d at 600).  "In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded."  Id. (citing Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002)).  Consequently, when we consider the admissibility of the reports and opinions of Tinsley, Reid, Thomas, and Luehrs, we must consider whether they would assist the jury in determining whether AHS breached its duty of good faith and fair dealing with respect to the status reporting requirements provision of the MOA, and, if so, whether these reports and opinions would assist the jury in its determination of the extent of damages (if any) that mSF incurred as a result of the breach.  We are not concerned with the question of whether AHS required its Preferred and

Network Contractors to use the best or most technologically advanced products for reporting statuses, we are concerned only with the issue of whether AHS breached its duty of good faith and fair dealing by failing to enforce the status reporting requirements that it imposed on its contractors.

## III.    DISCUSSION

AHS's argument that the opinions of all four of Plaintiff's experts should be stricken from this case focuses primarily on Tinsley's opinion concerning the manner in which AHS should have performed its obligations pursuant to the status reporting requirements provision of the MOA.  AHS has asked us to strike Tinsley's opinion that the only way that AHS could comply with its obligations was to require its Preferred and Network Contractors to purchase mSF's products.  (See 4/9/13 Arg. Tr. at 4.)  AHS argues that Tinsley's opinion is unreliable and does not fit this case because, in order to reach this opinion, Tinsley assumed that AHS had to satisfy obligations that the MOA did not actually impose.  AHS further argues that this opinion is unreliable and does not fit this case because it assumes facts that are not in the record and ignores facts that are in the record.

AHS also asks us to strike the opinions of Reid, Thomas and Luehrs because those opinions rely on Tinsley's opinion.  Reid and Thomas have provided opinions as to the profits that mSF lost during the contract term as a result of AHS's alleged breach of its duty of good faith and fair dealing, and Luehrs has provided an opinion as to mSF's expected value at the end of the term of the MOA, if AHS had not breached its duty of good faith and fair dealing.  Those opinions all include an assumption, based upon Tinsley's opinion, that AHS had a contractual obligation to mandate that all of its Preferred and Network Contractors purchase mSF's products.

AHS contends that the opinions of Reid, Thomas and Luehrs are thus unreliable and do not fit this case.

   A.      The Duty of Good Faith and Fair Dealing

   As we discussed in Section I.C. above, the only claim remaining in this case is the claim that AHS breached its duty of good faith and fair dealing in its performance of its obligations pursuant to the status reporting requirements provision of the MOA by failing to enforce those requirements.  "Courts have defined the duty of good faith as [h]onesty in fact in the conduct or transaction concerned, adopting the definition set forth in Section 1201 of the Uniform Commercial Code, 13 Pa.C.S. 1201."[3] Southeastern Pennsylvania Transp. Auth. v. Holmes, 835 A.2d 851, 858 (Pa. Commw. Ct. 2003) (alteration in original) (citing Creeger Brick Building Supply Inc. v. Mid-State Bank Trust Co., 560 A.2d 151, 153 (Pa. Super. Ct. 1989)); see also Cavanaugh v. Avalon Golf Props., LLC., No. E2010–00046–COA–R3–CV, 2011 WL 662961, at *8 (Tenn. Ct. App. Feb. 24, 2011) (same).  Courts have further recognized that, while "'a complete catalogue of types of bad faith is impossible,'" bad faith may include:  "'evasion of the

_____

   [3]We have diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as mSF is a citizen of Pennsylvania and AHS is a citizen of Tennessee and the amount in controversy exceeds $75,000.  "As a federal court sitting in diversity, we apply the choice-of-law rules of the forum state, which is Pennsylvania in this case."  Pacific Emp'rs Ins. Co. v. Global Reinsurance Corp., 693 F.3d 417, 432 (3d Cir. 2012) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 170–71 (3d Cir. 2011)). "'Pennsylvania applies the . . . flexible, interests/contacts methodology to contract choice-of-law questions.'"  Id. (alteration in original) (quoting Hammersmith v. TIG Ins. Co., 480 F.3d 220, 226–27 (3d Cir. 2007)).
   The MOA does not contain a choice of law provision.  Consequently, the first step in our choice of law analysis is to "identify the jurisdictions whose laws might apply," in this case, Pennsylvania and Tennessee.  Id. (citing Hammersmith, 480 F.3d at 230.)  We then "determine the substance of these states' laws, and look for actual, relevant differences between them."  Id. (citing Hammersmith, 480 F.3d at 230.)  "'If [the] two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary.'" Id. (alteration in original) (quoting Hammersmith, 480 F.3d at 230).  There is no difference between the law of Pennsylvania and the law of Tennessee with regard to the contractual duty of good faith and fair dealing, so we need not engage in a choice of law analysis with respect to this claim.

spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'" Stamerro v. Stamerro, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005) (quoting Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992)); see also Sanders v. Breath of Life Christian Church, Inc., No. W2010–01801–COA–R3–CV, 2012 WL 114279, at *21 (Tenn. Ct. App. Jan. 13, 2012) ("Based on the duty of good faith, this Court has recognized that each party to a contract is 'under an implied obligation to restrain from doing any act that would delay or prevent the other party's performance of the contract' and that '[e]ach party has the right to proceed free of hindrance by the other party.'" (quoting ACG, Inc. v. Southeast Elevator, Inc., 912 S.W.2d 163, 168 (Tenn. Ct. App. 1995)). Nonetheless, "'the common law duty of good faith does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties.'" Dick Broad. Co. v. Oak Ridge FM, Inc., ___ S.W.3d ___, 2013 WL 175491, at *9 (Tenn. 2013) (quoting Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 684, 687 (Tenn. 1996)). Consequently, "'[t]he implied obligation of good faith and fair dealing does not . . . create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement.'" Id. (alterations in original) (quoting Lamar Adver. Co. v. By-Pass Partners, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009). See also John B. Conomos, Inc. v. Sun Co., Inc. (R&M), 831 A.2d 696, 706-07 (Pa. Super. Ct. 2003) (stating that, since the "'obligation of good faith is tied specifically to and is not separate from the [express] duties a contract imposes on the parties,' it cannot imply a term not explicitly contemplated by the contract" (alteration in original) (quoting Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 434 n.11 (Pa. 2001))).

B.      The Tinsley/Reid Report - Tinsley's Opinion

Tinsley has a B.A. in Business Administration from Georgia State University.  He has 40 years of experience in information technology, including software development, technical management and enterprise architecture.  He has written three books.  AHS does not challenge his qualifications to testify as an expert in this case.

1.      The assumptions underlying Tinsley's analysis

Tinsley prepared Section 2 of the Tinsley/Reid Report, in which he analyzes five options available to AHS's contractors for reporting Appointment Set and SWO Completion statuses to AHS, and expresses his opinion that, AHS could only fulfill its obligations under the status reporting requirements provision of the MOA by requiring its Preferred and Network Contractors to purchase mSF's products.[4]  (Tinsley/Reid Rpt. at 6, 13.)  Tinsley based his opinion on **his** understanding of AHS's obligations under that provision of the MOA:

> In order to fulfill its contractual commitment to mSF, it was necessary and incumbent upon AHS to enforce the status reporting requirements in the service agreements as relaxed by the 2010 MOA.[5]  If AHS had done so, the Preferred and Network contractors would have had to utilize a product capable of reporting statuses to AHS automatically and in real time, enabling verification of compliance with the status reporting requirements in the 2010 MOA.

_____

[4]Surprisingly, mSF does not share this opinion.  Gary Rawding, Chairman and CEO of mSF, believes that AHS's contractors had the ability to report appointment sets within 24 hours and SWO completions within five business days during the term of the MOA, even without the use of mSF's products, although they would not be able to report those statuses in an automated fashion.  (Rawding Dep. at 334-35.)

[5]As we noted earlier, the status reporting requirements provision of the MOA obligated AHS to require its Preferred and Network Contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days."  (MOA at 2.)  The status reporting requirements that AHS imposed in its operations agreements with its Preferred Contractors and in its service agreements with its Network Contactors during the term of the MOA were more stringent, mandating that those contractors report scheduled appointments to AHS immediately and report SWO completion dates within 24 hours of finishing the service call.  (Wanninger Dep. at 81-83, 87-88; mSF Ex. 40 (quoting 2010 AHS Service Agreement, Part 8).)

(Id. at 7, footnote added.)   Tinsley defines the term "real time" to mean "Time-Stamped and submitted so it is part of and occurs simultaneously with contractor action."   (Id. at 11.)   The MOA does not, however, obligate AHS to require its contractors to use status reporting products that both report statuses automatically, and submit those reports as part of, and simultaneously with, the contractor's action of calling the customer to schedule the appointment or completing the SWO.   To the contrary, AHS agreed in the MOA only to require its Preferred and Network Contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days."   (MOA at 2.)   Consequently, Tinsley's understanding of AHS's obligations pursuant to the status reporting requirements provision of the MOA, which provides the foundation for his analysis and opinion, is inconsistent with the plain meaning of the MOA, because Tinsley has inserted into the MOA an obligation on the part of AHS to require its Preferred and Network Contractors report statuses automatically and in real time, which requirement is plainly not part of the MOA.   The issue in this case is not whether AHS fulfilled its obligations pursuant to the status reporting requirements provision of the MOA in the best, most technologically advanced manner, it is whether AHS satisfied its duty of good faith and fair dealing with respect to its obligations pursuant to that provision.

Tinsley explains that his assumption that AHS's contractors had to report statuses automatically and in real time arises from AHS's need to monitor its contractors' compliance with their status reporting requirements.   Tinsley contends that, in order to monitor its contractors, AHS needed to know the date and time that the contractor contacted the customer, data that is not recorded by non-mSF products that were available to AHS during the term of the MOA.   Tinsley states that:

> The 2010 MOA requires that Appointment Set be reported within 24 hours.   To
> track this requirement AHS would need to know on what day and at what time the

> customer was contracted by their contractor, thus marking the start of the
> measurement period.  The only reasonable way for that to happen is for it to occur
> in the normal course of the AHS-contractor work order process, i.e., automatically
> and in real time.
>
> The same is true for the Completion status.  Without knowing when the job is
> actually completed (thus starting the clock running), there is no way to measure
> the delta between completion and when the contractor sends the completion
> status.

(Tinsley/Reid Rpt. at 11.)  Tinsley's explanation is based on his assumption that AHS has no

way, other than automatic and real time reporting, in which to start the measurement period for

tracking whether its contractors complied with their status reporting requirements.  While

automatic, real time reporting may be the best, most technologically advanced, way of marking

the start of the measurement period, it does not identify the only point in the process from which

AHS could start to measure the time it took its contractors to report statuses.  AHS could instead

have used its own SWO records to identify the starting point for measuring contractor

compliance.  A contractor cannot contact a customer, and set an appointment date, until it

receives an SWO from AHS.  AHS could independently track when it sent the SWO to the

contractor, and then use that date and time as the starting point for measuring compliance with

the requirement that Appointment Set statuses be reported within 24 hours.[6]  Moreover, AHS is

informed, through the contractor's entry of the Appointment Set status, of when the contractor is

scheduled to go to the customer's house to perform the work requested in the SWO.  AHS could

---

[6]Obviously, starting the 24 hour measurement period when the SWO is sent to the
contractor would narrow the time frame a contractor would have to report the Appointment Set
status to AHS, compared to that which would be available to contractors if the clock started
when the contractor hung up the phone after speaking with the customer.  However, the issue in
this case is whether AHS breached its duty of good faith and fair dealing with respect to its
obligations under the MOA.  AHS's imposition of a particularly tight reporting time frame on its
contractors could not possibly be seen as bad faith.  See Stamerro, 889 A.2d at 1259 (noting that
bad faith includes "'evasion of the spirit of the bargain, lack of diligence and slacking off, [and]
willful rendering of imperfect performance'" (quoting Somers, 613 A.2d at 1213)).

then use the customer appointment date as the starting point for measuring compliance with the requirement that SWO Completion status be reported within 5 business days.  AHS could thus monitor whether its Preferred and Network Contractors complied with their status reporting requirements without requiring that those contractors purchase products that enabled them to report statuses automatically and n real time.  Consequently, Tinsley's assumption that AHS could not fulfill its obligations pursuant to the status reporting requirements provision of the MOA without mandating the use of a system that provides statuses automatically and in real time has no basis in the record of this case.

2.    Tinsley's analysis of products available for status reporting

Tinsley personally reviewed and analyzed five products available to AHS's contractors for use in reporting statuses during the term of the MOA.  (Id. at 7.)  Those products are:  mSF's product myServicePro, mSF's product myServiceACE, AHS IVR, AHS VendorWeb, and mSF's product myServiceCentral, which enables a contractor using third-party software to send status reports to AHS.[7]  Tinsley also notes that AHS's contractors could report statuses to AHS through a product called InvoiceWeb, or by calling the AHS customer service center.  (Id. at 7 n.5.) Tinsley did not analyze either of these reporting methods, and instead simply summarily concluded that they were inadequate products for tracking contractor compliance with status reporting requirements.

Tinsley describes the three mSF products, AHS IVR and VendorWeb as follows:

---

[7]The record shows that AHS hosted applications for some contractors to report statuses via its vendor web portal, and that it had an xml interface that was used for status reporting by ARS and the dESCO system, as well as by mSF's products.  (Seymour Dep. at 78-80.)  AHS also had a custom application that it developed for scheduling and status reporting for customers of Sears.  (Id. at 78.)  Tinsley does not state in his report whether he reviewed any of those status reporting products.

**myServicePro**:  this mSF product is an automatic, computer/internet based, work order processing system that a contractor can use to manage its SWOs for AHS and for other home warranty companies.  (Id. at 7.)   A contractor can use this system in the field, through a portable electronic device, or in the office, using a computer.  (Id.)  In order to report appointment set status, the contractor clicks on the client's SWO in the software's appointment screen, calls the customer and sets the appointment date and time, then enters the date and time on the customer's computer SWO using a pull down feature.  (Id. at 8.)  myServicePro automatically, and in real time, sends the client's SWO to the AHS customer service system, which time-stamps its receipt.  (Id.)  In order to report SWO completion status, the field technician or contractor's office clicks the complete button on the client's computer SWO, preparing it for invoicing.  The status with date and time are sent to AHS automatically and in real time, and AHS tags the data with an electronic time-stamp.  (Id.)  Tinsley concludes that "[b]ecause Pro transmits the Appointment Set and Completion statuses automatically . . . and in real time to AHS, Pro allows AHS to reliably track the compliance of Preferred and Network contractors with the status reporting requirements of the 2010 MOA."  (Id.)

**myServiceAce**:  this mSF product is an automatic, computer/internet based, work order processing system that a contractor can use only to manage its SWOs for AHS.  (Id.)  myServiceAce works similarly to myServicePro.   In order to report appointment set status using myServiceAce, the contractor clicks on the client's SWO in the software's appointment screen, calls the customer and sets the appointment date and time, then enters the date and time on the SWO using a pull down feature.  (Id.)  myServiceAce automatically and in real time sends the appointment date and time to the AHS customer

service system, which time-stamps its receipt.  (Id.)  In order to report SWO completion status, the field technician or contractor's office clicks the complete button on the SWO status screen.  (Id.).  The completion status, with date and time, is sent to AHS automatically and in real time, and AHS tags it with an electronic time-stamp.  (Id.)  Tinsley concludes that, "[b]ecause ACE transmits the Appointment Set status automatically . . . and in real time to AHS, and because ACE provides a far more efficient method for reporting Completion status, using the ACE software allows AHS to reliably track the compliance of Preferred and Network contractors with the status reporting requirements of the 2010 MOA."  (Id. at 8-9.)

**AHS IVR**:  the AHS IVR is a telephone-based system.[8]  (Id. at 9.)  Contractors access the IVR by calling an 800 number.  (Id.)  In order to report an appointment set status, the contractor first calls the customer to set up the appointment.  (Id.)  The contractor then calls the 800 number and follows voice prompts to enter the customer's appointment date.  The contractor reports the completion date the same way.  (Id.)  Tinsley states that this system is time consuming because it isn't automatic.  (Id.)  He also opines that it is unreliable because "the information can be entered at any time and with any data that is convenient" and because "the IVR process does not collect time information, rather it only collects date information."  (Id.)  We note that Tinsley's conclusion that the IVR process collects data that is unreliable and cannot be used to track contractors' compliance with their status reporting obligations appears to rely on two assumptions:  1) that the MOA obligated AHS to use a status reporting product that was "real time" and "automated" and 2) that a contractor would enter information in the system that is

_____

[8]IVR stands for "interactive voice recognition system."  (Seymour Dep. at 79.)

"convenient" rather than accurate.  In reality, however, the MOA does not require real time or automated reporting, and Tinsley has pointed to no record evidence that would support an assumption that AHS's contractors entered inaccurate information about setting customer appointments or completing SWOs in the IVR.  Without any record support for these critical factual assumptions, Tinsley lacks the necessary factual support for his conclusions that the IVR system produces "[u]nreliable data" which "cannot be used to track status reporting in any reliable fashion" and which does not allow "AHS to track the compliance of Preferred and Network contractors with the status reporting requirements of the 2010 MOA."  (Id.)  We therefore conclude that Tinsley's conclusions regarding the AHS IVR have no factual basis in the record of this case.

**AHS Vendor Web**:  "AHS VendorWeb is an Internet website that contractors can use to report statuses to AHS."  (Id.)  In order to report appointment set status, the contractor arranges the appointment with the customer, logs into VendorWeb over the internet, selects Work Order Status, selects a dispatch ID, selects appointment set status from a drop down menu, and enters the date of the appointment in the status date field.  (Id. at 9-10.)  The contractor reports SWO completion the same way.  (Id. at 10.)  Tinsley concludes that, since this process is not automatic, it is time consuming to use and that it is unreliable as follows:

> [T]he information can be entered at any time and with any data that is convenient.  Finally, the VendorWeb process does not collect time information; rather it only collects date information.  Therefore, the VendorWeb process is not real time, not automated, and the data is unreliable.  Unreliable data cannot be used to track status reporting in any reliable fashion.
>
> Because VendorWeb is not an automated, real time system with data integrity, it does not allow AHS to track the compliance of Preferred and

Network contractors with the status reporting requirements of the 2010 MOA."

(Id.)  We note, as we did in connection with Tinsley's analysis of the IVR, that Tinsley's conclusion that VendorWeb collects data that is unreliable and cannot be used by AHS to track its contractors' compliance with their status reporting requirements appears to rely on two unsupported assumptions:  1) that AHS was obligated to use a status reporting product that was "real time" and "automated" and 2) that a contractor would enter information in the system that is "convenient" rather than accurate.  Tinsley has pointed to no evidence in the record of this case that would support an assumption that AHS's contractors report inaccurate information about setting customer appointments or completing SWOs through VendorWeb.  Consequently, Tinsley's conclusions that VendorWeb collects "unreliable data," does not have "data integrity" and cannot be used to track contractors' compliance with their status reporting requirements is based upon unwarranted assumptions that AHS could only monitor status reports that were made automatically and in real time and that AHS's contractors would not enter accurate data into the VendorWeb system.  Tinsley's conclusion regarding VendorWeb thus has no factual basis in the record of this case.

**Third-Party Vendor Software Reporting Through myServiceCentral**:  Tinsley does not describe how myServiceCentral works.  He merely states that a contractor could direct its third-party software to report appointment set or SWO completion to myServiceCentral, which would automatically time-stamp the status and send it to AHS automatically and in real time  (Id.)  Tinsley concludes that "[b]ecause Central time-stamps all third-party statuses and transmits them automatically and in real time to AHS,

Central allows AHS to track the compliance of Preferred and Network contractors using third-party software with the status reporting requirements of the 2010 MOA." (Id.)

      3.    Tinsley's opinion regarding AHS's ability to comply with its status reporting obligations pursuant to the MOA

Tinsley has concluded, based on his analysis of the five products listed above, that AHS could not monitor its Preferred and Network Contractor's compliance with its status reporting requirements without the information provided by mSF's products:

> AHS' own status reporting products (IVR and VendorWeb) would not allow Preferred and Network contractors to reliably report statuses within the timeframes required by the 2010 MOA. Neither VendorWeb nor the IVR (independently or through their related internal AHS systems) provides a starting point for a measurement of the status reporting interval, nor do they collect the necessary time data required. Instead, the products permit contractors to input the appointment and completion information at any time and with any data that is convenient. Thus, when the contractor uses VendorWeb or the IVR, AHS has no reliable way of knowing whether any information received is valid for compliance monitoring.

(Id. at 12.) As we discussed in Section III.A.1. above, Tinsley's conclusions that AHS would not have a starting point for measuring contractor compliance with its status reporting requirements if it allowed its contractors to report statuses through IVR or VendorWeb is based on assumptions that are unsupported by the factual record of this case. Furthermore, as we discussed in Section III.A.2, Tinsley's conclusion that AHS has no reliable way of monitoring whether contractors who use IVR and VendorWeb have complied with their status reporting requirements depends on his baseless assumption that contractors who use IVR and VendorWeb would input into those systems "any information that is convenient" rather than information that is accurate. Tinsley's conclusion that AHS could not monitor whether contractors using IVR and VendorWeb complied with their status reporting requirements is thus without factual or scientific foundation.

Tinsley expands upon his unsupported determination that AHS could not monitor whether contractors who used IVR and VendorWeb complied with their status reporting requirements, by leaping to the conclusion that contractors could not report statuses in a manner that would generate the information that AHS needed to monitor compliance with the status reporting requirements provision of the MOA without using mSF's products:

> Because the AHS status reporting products did not provide data that would allow AHS to determine whether Preferred and Network contractors reported statuses within the requisite timeframes under the 2010 MOA, the only way for Preferred and Network contractors to report their statuses to AHS in a manner that would allow AHS to comply with its obligation under the 2010 MOA was to use one of mSF's three products (Pro, ACE, or Central).

(Id. at 12.) This entirely unsupported conclusion is the foundation upon which Tinsley bases his opinion that AHS could only comply with its duty of good faith and fair dealing in performing its obligations pursuant to the status reporting requirements provision of the MOA by mandating that its contractors purchase mSF's products:

> In order to fulfill its obligation under the 2010 MOA, it was necessary and incumbent upon AHS to require Preferred and Network contractors to report Appointment Set statuses within 24 hours of the scheduled appointment and SWO Completion statuses within five (5) business days after completing a job by enforcing status compliance.  If AHS had done so, it would have been necessary for the Preferred and Network contractors to utilize a product which was capable of not only reporting statuses to AHS within the timeframes outlined in the 2010 MOA, but doing so automatically (that is, as part of the work order process), and in real time (that is, when the work order step occurred).  It is my opinion that the only option for Preferred and Network contractors to comply with AHS' requirements would be to enroll in one of mSF's three products (Pro, ACE, or Central).  Only electronically time-stamped statuses, submitted automatically and in real time to AHS, would allow Preferred and Network contractors to report Appointment Set and SWO Completion statuses with the time data necessary for AHS to fulfill its obligation under the 2010 MOA.  Based on my analysis, mSF's products were the only products available to Preferred and Network contractors that electronically time-stamped statuses and submitted them automatically and in real time to AHS.

(Tinsley/Reid Rpt. at 13.)   Glaringly, Tinsley reaches his opinion only by imposing a status reporting obligation on AHS's Preferred and Network Contractors that is entirely different from the status reporting requirement actually included in the MOA.  Tinsley states that, the only way in which AHS could comply with its obligation to require Preferred and Network Contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days" would be to require those contractors to use a product that reported statuses "automatically (that is, as part of the work order process), and in real time (that is, when the work order step occurred)." (Id.)  Thus, Tinsley's opinion rests on a requirement that **does not appear in the MOA**, the requirement that AHS's Preferred and Network Contractors report statuses automatically and in real time.

The only issue remaining in this case is whether AHS breached its duty of good faith and fair dealing in the execution of its obligation to require Preferred and Network Contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days."  The duty of good faith and fair dealing may not be used to "'create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement.'"  Dick Broad. Co., 2013 WL 175491, at *9 (quoting Lamar Adver. Co., 313 S.W.3d at 791); see also John B. Conomos, Inc., 831 A.2d at 706-07.  Tinsley's opinion, however, relies on doing just that, adding to the MOA the obligation that AHS require its contractors to use a product that reports status automatically and in real time, rather than within 24 hours (for Appointment Set) or five days (for SWO Completion).  Tinsley's opinion also rests squarely on his completely unsupported conclusion that AHS could not monitor whether contractors who used IVR and VendorWeb complied with their status reporting requirements because neither IVR nor VendorWeb enabled a contractor to report statuses automatically and in real time and

because a contractor using IVR or VendorWeb could "input the appointment and completion information at any time and with any data that is convenient." (Tinsley/Reid Rpt. at 12.) Tinsley's opinion also ignores clear evidence in the record that AHS was not required, pursuant to the MOA, to mandate that its Preferred and Network Contractors purchase mSF's products. Rawding specifically acknowledged, during his deposition, that the parties did not enter into any written agreement that made the use of mSF's software by AHS's contractors mandatory. (Rawding Dep. at 103-04.) Moreover, three months **after** they executed the MOA, mSF and AHS began to discuss entering into an agreement to make contractor enrollment in mSF's products mandatory, with AHS sharing the costs for certain classes of contractor. (mSF Exs. 102, 103.) The parties would have had no reason to discuss entering into such an agreement if the MOA itself obligated AHS to mandate that its contractors purchase mSF's products.

We have thoroughly examined Tinsley's portion of the Tinsley/Reid Report. We conclude that Tinsley's opinion that, in order for AHS to perform its obligations under the status reporting requirements provision of the MOA, "it would have been necessary for the Preferred and Network contractors to utilize a product which was capable of not only reporting statuses to AHS within the timeframes outlined in the 2010 MOA, but doing so automatically (that is, as part of the work order process), and in real time (that is, when the work order step occurred)" and that "the only option for Preferred and Network contractors to comply with AHS' requirements would be to enroll in one of mSF's three products (Pro, ACE, or Central)" (Tinsley/Reid Rpt. at 13), is based upon a misinterpretation of the MOA and is entirely without evidentiary or scientific support in the record of this case.

Our role as a gatekeeper pursuant to Rule 702 is to ensure that Tinsley's opinion is "'based on the methods and procedures of science rather than on subjective belief or unsupported

speculation.'"   ZF Meritor, 696 F.3d at 290 (quoting Calhoun, 350 F.3d at 321).   The fundamental underpinnings of Tinsley's opinion, however, consist of unsupported speculation. "'When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, . . . it cannot support a jury's verdict.'"   ZF Meritor, 696 F.3d at 290 (quoting Brooke Grp., 509 U.S. at 242); and Phila. Newspapers, Inc., 51 F.3d at 1198).   We conclude that Tinsley's opinion is, thus, not sufficiently reliable to be entered into evidence in this case pursuant to Rule 702.

Furthermore, Tinsley's opinion is likely to confuse the jury as it rests on assumptions and conclusions that are not supported by the factual record.   Tinsley's report and opinion dangerously conflate AHS's obligations pursuant to its duty of good faith and fair dealing in connection with the status reporting requirements provision of the MOA with his baseless assumptions that AHS had to require its Preferred and Network Contractors to use status reporting products that enabled them to report statuses automatically and in real time.   Expert testimony that is "based on assumptions lacking factual foundation in the record" does not "'fit under the facts of the case'" and, consequently, will not "'aid the jury in resolving a factual dispute.'"   Meadows, 306 F. App'x at 790 (citing Stecyk, 295 F.3d at 414, and quoting Lauria, 145 F.3d at 599).   Tinsely's report and opinion regarding the manner in which he believes AHS should have fulfilled its duties pursuant to the MOA would irredeemably confuse the jury regarding AHS's duty of good faith and fair dealing.   We further conclude, accordingly, that Tinsley's opinion would not assist the trier of fact and that it is properly excluded from the trial of this action.   AHS's Motion to Strike Experts is, therefore, granted as to Tinsley's opinion as it is explained in pages 6 through 13 of the Tinsley/Reid Report.

C.     The Tinsley/Reid Report - Reid's Opinion

Reid is a Certified Public Accountant, with a B.A. in Economics and a Master of Accounting Science from the University of Illinois Urbana.  He has over 23 years of experience in financial management, auditing and management consulting.  AHS does not challenge his qualifications to testify as an expert in this case.

Reid prepared Section 3 of the Tinsley/Reid Report, in which he calculated mSF's damages arising from "AHS' failure to meet its contractual obligation under the 2010 MOA to require AHS Preferred and Network contractors to report Appointment Set statuses within 24 hours and SWO Completion statuses within five (5) business days, which would achieve the objective of requiring AHS contractors to report statuses automatically and in real time." (Tinsley/Reid Rpt. at 14.)   His objective was to "assess the damages associated with mSF's expectation of lost profits and loss of business opportunity," i.e., "the lost profits that mSF could have expected to receive" during the term of the MOA if AHS had fulfilled its obligations pursuant to the status reporting requirements provision of the MOA, and "[t]he resulting revenue generation from the mSF contractor base at the end of the contract term, for use in valuing mSF's business at that time."  (Id.)

Reid based his damages analysis on the following assumptions:   (1) there were a minimum of 4,500 and a maximum of 10,000 AHS Preferred and Network Contractors during the term of the MOA; (2) all of these contractors would have been fully enrolled in one of mSF's three products by May 1, 2010; (3) the period of projected damages covered 8 months of 2010 and all of 2011; (4) "mSF's three products . . . were the only status reporting options for the Preferred and Network Contractors that would comply with AHS's enforcement of the status reporting timeframes in the 2010 MOA;" (5) AHS's Preferred and Network Contractors would

comply with the status reporting requirements enforced by AHS; (6) enrollment of AHS's contractors into mSF's products would be steady during the 20 months of the damages period; and (7) AHS's contractors would choose from the three mSF products in the same average proportion as mSF's existing customers during the 2010-2012 time period. (Id. at 14-15.)  Based upon these assumptions, Reid calculated mSF's estimated expectation and loss of business opportunity damages to fall within the range of $11,469,404.76 (assuming 4,500 AHS contractors would purchase mSF's products)  to $26,414,872.37 (assuming that 10,000 contractors would purchase mSF's products). (Id. at 17.)

Reid's assumptions that "mSF's three products . . . were the only status reporting options for the Preferred and Network Contractors that would comply with AHS's enforcement of the status reporting timeframes in the 2010 MOA," and that all of AHS's Preferred and Network Contractors would have purchased mSF's products during the term of the MOA (id. at 15), are based entirely on Tinsley's opinion. We have concluded that Tinsley's opinion that "the only option for Preferred and Network contractors to comply with AHS' requirements would be to enroll in one of mSF's three products (Pro, ACE, or Central)" (id. at 13), is based on a misinterpretation of the requirements of the MOA and is without evidentiary and scientific support in the record of this case.  Consequently, we further find that Reid's opinion that mSF suffered damages within the range of $11,469.404.76 to $26,414,872.37 as a result of mSF's alleged breach of its duty of good faith and fair dealing in its performance of its obligations pursuant to the status reporting requirements provision of the MOA is based on a misinterpretation of the requirements of the MOA and is without evidentiary and scientific support in the factual record.

An expert opinion that is without evidentiary support "cannot support a jury's verdict," ZF Meritor, 696 F.3d at 290 (quotation omitted) and, thus, is not sufficiently reliable to be entered into evidence in this case pursuant to Rule 702.  Moreover, expert testimony that is "based on assumptions lacking factual foundation in the record" does not "fit under the facts of the case" and will not "aid the jury in resolving a factual dispute."  Meadows, 306 F. App'x at 790 (quotation and citation omitted).  We conclude that Reid's opinion of the damages suffered by mSF is unreliable and would confuse rather than aid the jury, because it is based on assumptions lacking factual foundation in the record.  AHS's Motion to Strike Experts is, therefore, granted as to Reid's opinion, stated on page 17 of the Tinsley/Reid Report, that "mSF's estimated expectation and loss of business opportunity damages from AHS' failure to require their Preferred and Network contractors to report Appointment Set and SWO Completion statuses within the timeframes required in the 2010 MOA . . . fall within the range of $11,469,404.76 to $26,414,872.37."

     D.     The Thomas Report

 Thomas has a B.A. and M.A. in economics from San Jose State University (California State University) and is currently working on his Ph.D. in economics from George Mason University.  He is presently a business consultant for Faqtors Consulting and is that company's Managing Director.  Thomas teaches an economics class at George Mason and has experience leading technology companies.  AHS does not challenge his qualifications to testify as an expert in this case.

Thomas prepared "a range of revenue and profit forecasts for use in determining a reasonable business outcome" for mSF under the assumptions of the MOA.  (Thomas Rpt. at 2.) He created five-year forecasts based on mSF's business model assumptions, service pricing

schedules and estimates of the AHS contractor base.  (Id.)  Thomas's estimates of the AHS contractor base were based on Tinsley's expert report and, in particular, on Tinsley's assertion that, in order to enforce the requirement that contractors "report  statuses as outlined in the 2010 MOA . . . the contractors would have to enroll and utilize the mSF products."  (Id. at 3.)  Thomas assumed, based on the Tinsley Report, that all of AHS's contractors would have used mSF's products by the fourth quarter of year one.  (Id.)  Thomas estimated that AHS had between 2,200 and 3,100 Preferred Contractors and between 2,300 and 6,500 Network Contractors.  (Id. at 4.) Thomas prepared his financial forecasts based on his estimates of the AHS contractor base, but subtracted from his estimates the number of actual contractors who used mSF's products during the term of the MOA to avoid double counting of revenues and expenses.  (Id.)  Based on these assumptions, Thomas estimated that mSF's sales of its products to AHS's Preferred and Network Contractors would have resulted in net income of $5,704,147 in year one, $12,251,744 in year two, and $13,403,758 in each of years three, four and five.  (Id. at 13.)

Thomas's assumptions that all of AHS's Preferred and Network Contractors would have purchased and used mSF's three products by the end of the first year of the MOA is based exclusively on Tinsley's opinion. We have concluded that Tinsley's opinion that AHS would have to require its Preferred and Network Contractors to use mSF's products in order to perform its obligations pursuant to the status reporting requirements provision of the MOA is based on a misinterpretation of the MOA and is without evidentiary or scientific support in the record of this case.  Consequently, we also find that Thomas's estimation of the income that mSF's sales of its products to AHS's Preferred and Network Contractors would have generated over the contract term is based on a misinterpretation of the MOA and is without evidentiary and scientific support.  Since Thomas's financial forecasts lack evidentiary and scientific support, we conclude

28

that they are not sufficiently reliable to be entered into evidence in this case pursuant to Rule 702 and that they would confuse rather than aid the jury in determining whether, or to what extent, mSF has suffered any damages in this case.  See ZF Meritor, 696 F.3d at 290;  Meadows, 306 F. App'x at 790.  AHS's Motion to Strike Experts is, therefore, granted as to Thomas's financial forecasts.

       E.        The Luehrs Report

 Luehrs has a B.A. in economics, summa cum laude from Trinity College, Duke University and an MBA from the Kellogg School of Management at Northwestern University. He is presently the General Partner in the Emerald Stage2 Venture Fund, which focuses on early-stage technology companies in Southeastern Pennsylvania.  AHS does not challenge his qualifications to testify as an expert in this case.

     Luehrs prepared an analysis of the economic loss sustained by mSF.  (Luehrs Rpt. at 1.) He valued mSF as of the end of the second year of the MOA based on the "revenue that would have been generated by the myServiceForce customer base, consisting of all AHS Preferred and Network contractors at the end of Year 2."  (Id. at 2.)  Luehrs conducted his valuation of mSF using a "Market Multiple" of the revenue figures calculated by Reid and Thomas in their analyses of the revenue that mSF would have earned from sales of its products to AHS's Preferred and Network contractors during the second of the MOA.  (Id.)  Luehrs calculated the Market Multiples based on the acquisition values of actual and comparable companies with revenue models similar to that of mSF during the 2007-11 time period.  (Id.)  Luehrs estimated the value of mSF at the end of the second year of the MOA, based on Reid's calculations of mSF's annualized revenues for that year, as between $49,049,011 and $171,282,260.  (Id. at 3.) Luehrs estimated the value of mSF at the end of the second year of the MOA, based on

Thomas's calculations of mSF's annualized revenues for that year, as between $30,998,279 and $112,857,311.  (Id.)

Luehrs's estimated valuations of mSF are based on the expert opinions of Reid and Thomas as to what mSF's revenues would have been if all of AHS's Preferred and Network Contractors had purchased mSF's products during the second year of the MOA.  Those opinions are in turn based on Tinsley's expert opinion that, in order to comply with its obligations under the MOA, AHS would have had to require all of its Preferred and Network Contractors to purchase mSF's products.  As we have discussed at length above, those expert opinions are all based on a misinterpretation of the MOA and lack foundation in the evidentiary record of this case.  Since the core assumptions underpinning Luehrs's estimated valuations of mSF all lack evidentiary and scientific support, we conclude that they are not sufficiently reliable to be entered into evidence in this case pursuant to Rule 702 and that they would confuse, rather than aid the jury in determining whether, or to what extent, mSF has suffered any damages in this case.  See ZF Meritor, 696 F.3d at 290; Meadows, 306 F. App'x at 790.  AHS's Motion to Strike Experts is, therefore, granted as to Luehrs's analysis of the economic loss sustained by mSF.

## IV.    CONCLUSION

For the reasons stated above, we conclude that the core assumptions underlying Tinsley's portion of the Tinsley/Reid Report are based on a misinterpretation of the MOA and have no basis in the evidentiary record of this case and that his opinion, which is based on those core assumptions, must be excluded from evidence at the trial of this action because it lacks sufficient reliability to be admitted into evidence and because it would confuse the jury.  We also conclude that the damages analyses performed by Reid, Thomas and Luehrs lack reliability and would confuse the jury because they are based on Tinsley's opinion and that the expert opinions of

Reid, Thomas and Luehrs as to the damages suffered by mSF in this case must, therefore, be excluded from trial.  AHS's Motion to Strike Plaintiff's Expert is, accordingly, granted and the reports and opinions of mSF's experts, Thomas Tinsley, Marc Reid, David Chandler Thomas, and Bruce Luehrs are all stricken pursuant to Federal Rule of Evidence 702.

Since we have granted AHS's first Motion to Strike Plaintiff's Experts and stricken the reports and opinions of Tinsley, Reid, Thomas and Luehrs, AHS's Second Motion to Strike Plaintiff's Experts is moot and we dismiss it on that basis.

AHS has filed a Motion for Leave to File a Summary Judgment Motion, on the ground that the expert reports provided by Tinsley, Reid, Thomas and Luehrs cannot support a finding that mSF suffered any damages as a result of the AHS's alleged breach of the duty of good faith and fair dealing in this case.  AHS further contends that, in the absence of those expert reports, mSF cannot sustain its burden of proving that it was damaged by AHS's alleged breach.  By letter dated April 10, 2013, mSF stated that, if we granted Defendant's Motion to Strike, it would not oppose the Motion for Leave to File a Summary Judgment Motion.  AHS's Motion for Leave to File a Summary Judgment Motion is, therefore, granted as uncontested.

An appropriate order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.