IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MYSERVICEFORCE, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMERICAN HOME SHIELD | : | NO. 10-6793 |

**MEMORANDUM**

**Padova, J.**                                                                                                       **April 2, 2014**

This is a breach of contract action arising from Defendant American Home Shield's ("AHS") alleged breach of its duty of good faith and fair dealing in connection with its performance of one of its duties under a Memorandum of Agreement ("MOA") entered into by the parties on January 27, 2010.  Before the Court is AHS's Motion to Strike February 18, 2014 Declaration of David Thomas.  For the following reasons, the Motion to Strike is granted.

**I.      BACKGROUND**

This action was filed on November 19, 2010.  (Docket No. 1.)  The Complaint asserted four causes of action against AHS and Service Master Consumer Services Limited Partnership ("SVM"):  (1) a claim for breach of contract against AHS (Count I); a claim for unjust enrichment and promissory estoppel against AHS (Count II), a claim for breach of contract against SVM (Count III); and a claim for tortious interference with contract against SVM (Count IV).  Defendants moved for summary judgment as to all four claims asserted in the Complaint and we granted that motion in part and denied it in part on January 17, 2013.  See myServiceForce, Inc. v. American Home Shield, Civ. A. No. 10–6793, 2013 WL 180287 (E.D. Pa. Jan. 17, 2013).  We denied the Motion for Summary Judgment as to myServiceForce, Inc.'s ("mSF") claim, in Count I of the Complaint, that AHS breached its duty of good faith and fair dealing with respect to its obligations under the MOA to impose status reporting requirements on

its contractors. Id. at *27. We granted the Motion for Summary Judgment as to mSF's remaining claims for breach of contract asserted in Count I of the Complaint. Id. We also granted the Motion for Summary Judgment as to Counts II-IV of the Complaint and dismissed SVM as a Defendant in this action. Id. at *27-*28.

After we resolved the Motion for Summary Judgment, we issued a new Scheduling Order, giving mSF the opportunity to produce revised expert reports with respect to the sole claim remaining in the case no later than February 20, 2013. (See 2/6/13 Order ¶ 2.) We also listed this case for trial on April 22, 2013. (Id. ¶10.) AHS subsequently filed two Motions to Strike Plaintiff's Experts, seeking to preclude the introduction of mSF's experts' reports and opinions at trial, and a Motion for Leave to File Motion for Summary Judgment, seeking to file a Motion for Summary Judgment on mSF's remaining claim, on the ground that mSF could not establish that it had been injured by AHS's alleged breach of its duty of good faith and fair dealing.

AHS's first Motion to Strike Plaintiff's Experts asked that we strike the opinions of Thomas Tinsley and Marc Reid and their joint expert report (the "Tinsley/Reid Report"), and the opinions and reports of David Chandler Thomas and Bruce Luehrs on the grounds that those opinions were unreliable and did not fit mSF's remaining claim in this case. Specifically, AHS asked us to strike Tinsley's opinion that the only way that AHS could comply with its obligation under the MOA to impose certain status reporting requirements on its Preferred and Network contractors was to require those contractors to purchase mSF's products. AHS also asked us to strike the Tinsely Reid Report and Reid's opinions, as well as the reports and opinions of David Chandler Thomas and Bruce Luehrs, because those experts' opinions and reports were based on Tinsley's opinion. We granted AHS's first Motion to Strike on April 25, 2013 and dismissed its

2

second Motion to Strike as moot.  See myServiceForce, Inc. v. American Home Shield, Civ. A. No. 10-6793, 2013 WL 1773799 (E.D. Pa. Apr. 25, 2013).  We also granted AHS leave to file a Motion for Summary Judgment.  See id. at *16-*17.

mSF did not seek leave to submit new expert reports after we granted AHS's first Motion to Strike Plaintiff's Experts.  Nonetheless, mSF responded to AHS's second Motion for Summary Judgment by filing new expert reports prepared by David Chandler Thomas and Bruce Luehrs dated May 16, 2013.  AHS filed a Motion to Strike those expert reports on the grounds that they were filed after the February 20, 2013 deadline for Plaintiff to provide amended expert reports in support of their remaining claim in this case.  We denied that Motion to Strike, but granted AHS leave to depose Mr. Thomas and Mr. Luehrs and to submit its own expert reports responsive to the opinions of Mr. Thomas and Mr. Luehrs.  (8/15/13 Order ¶¶ 4-5.)  We also dismissed AHS's second Motion for Summary Judgment as moot and granted AHS leave to file a new Motion for Summary Judgment no later than October 29, 2013.  (Id. ¶ 6.)

Mr. Thomas prepared a revised version of his May 16, 2013 Report on October 10, 2013 and AHS took his deposition on October 31, 2013.  On December 20, 2013, AHS filed its third Motion to Strike Plaintiff's Experts, seeking to strike the new opinions and reports of Mr. Thomas and Mr. Luehrs.  AHS also filed its third Motion for Summary Judgment on December 20, 2013.[1]  Both Motions have been extensively briefed.  On February 18, 2014, mSF filed a "Motion for Leave to File Sur-Reply in Further Opposition to Defendant's Motion to Strike Plaintiff's Expert Witnesses." (Docket No. 184.)  We granted that Motion on February 25, 2014.

---

[1] Pursuant to the requests of both parties, our deadlines for AHS's submission of its own expert reports, expert depositions and the filing of the new Motion for Summary Judgment were extended several times.  mSF never sought leave to serve modified or amended versions of its experts' reports after May 16, 2013, nor did it seek leave to file any additions to its experts' reports.

3

One of the exhibits to mSF's Sur-Reply is the Declaration of David Chandler Thomas dated February 18, 2014.  AHS has moved to strike that Declaration, on the grounds that it was filed both after the extended period for expert disclosures in this case had concluded and nearly four months after Mr. Thomas's deposition, and that its filing was thus prejudicial to AHS.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 26(a)(2) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A).  If an expert witness has been retained to provide expert testimony, that disclosure "must be accompanied by a written report -- prepared and signed by the witness," Fed. R. Civ. P. 26(a)(2)(B), that contains the following:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications . . . ;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert . . . ;
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Id.  The parties in a civil action have a duty to timely supplement their discovery responses if they learn "that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ." Fed. R. Civ. P. 26(e)(1).  The duty to supplement discovery responses extends to information provided in expert reports "and to information given during the expert's deposition." Fed. R. Civ. P. 26(e)(2).  "Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Id.  When we consider whether to allow a party to supplement its

expert's report after the time provided for doing so by our Scheduling Orders has expired, we consider the following five factors:

> (1) "the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified" or the excluded evidence would have been offered; (2) "the ability of that party to cure the prejudice"; (3) the extent to which allowing such witnesses or evidence would "disrupt the orderly and efficient trial of the case or of other cases in the court"; (4) any "bad faith or willfulness in failing to comply with the court's order"; and (5) the importance of the excluded evidence.

ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 298 (3d Cir. 2012). (quoting Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977)).

### III.    DISCUSSION

####    A.    Mr. Thomas's October 10, 2013 Report

In his October 10, 2013 Report, Mr. Thomas gave his opinion of the range of revenue and profits that mSF would have generated from the sale of its products to AHS's Preferred and Network contractors if AHS had complied with its duty of good faith and fair dealing with respect to its obligation under the MOA to impose certain status reporting requirements on those contractors. (10/10/13 Thomas Rpt. at 3.) Mr. Thomas used a Monte Carlo Simulation to calculate two-year forecasts for mSF's revenue and profits "using mSF-provided business data, service pricing schedules, and the size of the AHS contractor base." (Id. at 3.) In his Report, Mr. Thomas estimated that if AHS had complied with its status reporting requirements obligation under the MOA, a minimum of 28% and a maximum of 53% of AHS's Preferred and Network contractors would have purchased mSF's products. (Id. at 5, 7.) The Report refers to these percentages as "Market Penetration Assumptions." (Id.) Mr. Thomas explains in the Report that he based his Market Penetration Assumptions on the responses of 191 of AHS's estimated 4500 Preferred and Network contractors to pressure placed on them by AHS to become compliant with

their status reporting requirements in June 2010 (Id. at 5, 7.) Mr. Thomas explains his calculation of the Market Penetration Assumptions in the Report as follows:

> We found that, in response to the limited pressure from AHS, eight (8) contractors responded by enrolling in an mSF product to address compliance. Our analysis also found that a low of 7 and a high of 21 contractors similarly pressured by AHS used AHS services to become compliant by the end of 2010 (the range being dependent upon the Low and High Appointment Set compliance levels used -- 75% to 86.1%). No other AHS contractors responded to AHS's enforcement efforts by becoming compliance using an AHS status reporting option.
>
> The results of this analysis offered a range for use in the Monte Carlo simulation that represents the effect AHS's enforcement efforts would have had upon a contractor's decision to address compliance by purchasing an mSF product or by properly using an AHS status reporting option. The ratio used was the number of contractors who purchased mSF's products out of the total number of contractors who responded to AHS's pressure by taking action. The minimum value (used in the Monte Carlo simulation) for contractors who would have purchased mSF's products to address compliance was 28%. The maximum value was 53%.
>
> We believe this data is representative of the total population of Preferred and Network contractors because it is a statistically significant sample size (191 out of approximately 4,500 Preferred and Network contractors).

(Id. at 6-7.)

### B. Mr. Thomas's Deposition

During Mr. Thomas's deposition, counsel for AHS questioned him extensively regarding his Market Penetration Assumptions. Many of those questions focused on the methodology that Mr. Thomas used in calculating the percentage of AHS's Preferred and Network contractors who would have purchased mSF's products. (Thomas Dep. at 22-32, 54-71, 118-28.) Other questions were directed to the statistical significance of Mr. Thomas's sample size and whether the Market Penetration Assumptions could be reliably extrapolated to all of AHS's Preferred and Network contractors. (Id. at 57-64, 119-121.) In responding to these questions, Mr. Thomas mentioned, for the first time, that the methodology he used to determine mSF's market

penetration assumed a confidence interval of 85 percent.[2] (Id. at 53, 56.) In response, counsel for AHS extensively questioned Mr. Thomas about the methodology he used to calculate that confidence interval. (Thomas Dep. at 59-64.) Mr. Thomas failed to provide counsel with specific explanations or descriptions of the methodology he used or the authority on which that methodology relied. For example, when counsel for AHS asked Mr. Thomas how he calculated his confidence interval, Mr. Thomas instructed AHS's attorney to check Wikipedia:

> Q. How do you calculate the confidence interval?
>
> A. It's a standard statistical calculation.
>
> Q. If I want to check you on it, what do I check?
>
> A. You can look at confidence intervals on Wikipedia or any other site and see how they work.

(Id. at 59-60.) Counsel for AHS also specifically asked Mr. Thomas to identify an authoritative source for his determination that the sample size he used in this case was adequate. Mr. Thomas again answered by referring AHS's counsel to Wikipedia, or the internet:

> A. You should be able to look it up on internet documents, Wikipedia and other places that would describe the mathematics behind it. It's very complicated because it depends on the size of the population, the size of the sample, the size of the respondents. It's all very complicated, but there is an established methodology for calculating that.

(Id. at 63.) Mr. Thomas was also asked to disclose the "peer-reviewed authoritative treatises, articles, methodologies" that support his use of the methodology he utilized to calculate his Market Penetration Assumptions. (Id. at 121.) Mr. Thomas responded that his methodology could be found in "[v]irtually any textbook[]" (id.), but did not disclose the names of any such

---

[2] On January 14, 2014, counsel for mSF sent a letter to counsel for AHS stating that Mr. Thomas actually utilized a confidence level of 75% in calculating his Market Penetration Assumptions. (Mot. to Strike Decl. Ex. C.)

textbooks and declined to disclose the name of any peer-reviewed or authoritative statistical materials that support his methodology and further declined to disclose the specific methodology he used:

> Q.   What I'm asking you now is, What peer-reviewed authoritative treatises, articles, methodologies can I go, would you point me to to say that the statistical sampling you do in this case, your positive results method is an appropriate way to predict what 4500 AHS preferred and network contractors would do relative to purchasing an MSF product?
>
> A.   Virtually any textbook.
>
> Q.   Give me one.
>
> A.   I wouldn't know the titles of the textbooks off the top of my head.
>
> Q.   Your report does not identify with specificity a single statistical treatise, article, material of any kind that supports the statistical sampling you are doing in this case; correct? . . .
>
> BY MR. CREAGH:
> Q.   I'm asking if the document identifies any peer-reviewed or authoritative material that supports the statistical sampling methodology that you used in this case?  I don't see any such materials identified in the report.  Am I missing something?
>
> A.   There are a number of different statistical systems that I use.
>
> Q.   Are there any in the report?· ·That's the question.
>
> A.   Yes.  Yes.
>
> Q.   What's in . . . your October 10th, 2013 report that supports the statistical sampling that you arrived in this case to come to the conclusion that 28 to 53 percent of the entire 4500 contractor base of the preferred and network contractors would have purchased an MSF product? . . .
>
> THE WITNESS:  As I stated in my second paragraph, I used industry-standard statistical methods.
>
> BY MR. CREAGH:

8

> Q.  I want to know what they are.  I want to know what a peer-reviewed or authoritative statistical materials support the kind of statistical sampling that you have done in this case?
>
> A.  This is so, such a common application of statistical sampling.  I guess I just didn't feel it was necessary to provide footnote on it because it is so well understood.
>
> Q.  Provide them to me now, please. . . .
>
> BY MR. CREAGH:
> Q.  Can you identify any authoritative document, material, treatise, article that directly supports the statistical sampling that you have conducted to arrive at your opinion that 28 to 53 percent of the entire contract, preferred and network contractor base would purchase an MSF product?
>
> A.  I cannot off the top of my head list a specific document or journal.  But this particular method is so well-understood and accepted, that I can't even imagine that -- for example, you can simply just go to Wikipedia and look up statistical sampling and read step by step exactly what I did.
>
> Q.  Anything else you want to refer me, reference me to other than Wikipedia?
>
> A.  I was making the point that it's that well-known.

(Thomas Dep. at 121-26.)

        C.       <u>AHS's December 20, 2013 Motion to Strike</u>

AHS's December 20, 2013 Motion to Strike Plaintiff's Experts asks this Court to strike the reports and opinions of mSF's experts, David Chandler Thomas and Bruce Luehrs. AHS contends that Mr. Thomas's report and opinion should be stricken because his "opinions and damages calculations are based on a flawed and unreliable methodology, improper conclusions regarding the statistics upon which he relies, and unsupported assumptions regarding the nature and extent of AHS's contractual obligations." (Mot. to Strike Pl.'s Experts ¶ 4.) AHS further maintains that Mr. Luehr's report and opinion should be stricken because they are based on Mr. Thomas's "unsupported and unreliable statistical extrapolation." (<u>Id.</u>) AHS specifically

challenges the methodology that Mr. Thomas used in connection with his Market Penetration Assumptions. (Mem. in Support of Mot. to Strike Pl.'s Experts at 5-7, 10-12.) AHS also challenges Mr. Thomas's determination that his sample size was statistically significant and that his Market Penetration Assumptions can be reliably extrapolated to predict the behavior of all of AHS's Preferred and Network contractors. (Id. at 14-15, 20.) AHS further argues, in its "Reply in Support of Motion to Strike Plaintiff's Experts," that Mr. Thomas had provided no support for the methodology he claims to have used to calculate his Market Penetration Assumptions. (Reply at 3.) AHS also pointed out that Plaintiff's Memorandum in Opposition to AHS's Motion to Strike Plaintiff's Experts did "not cite to a single textbook, study, or any other authoritative resource in support of Mr. Thomas's methodology." (Reply at 3.)

    D.    mSF's Sur-Reply

mSF's "Sur-Reply in Further Opposition to Defendant's Motion to Strike Plaintiff's Expert Witnesses" was written to support Mr. Thomas's methodology in response to those arguments. Indeed, mSF devotes half of its Sur-Reply to supporting the methodology that Mr. Thomas used to calculate his Market Penetration Assumptions. (See Pl.'s Sur-Reply at 6-13.) mSF attached Mr. Thomas's February 18, 2014 Declaration to the Sur-Reply in support of this argument.

The Declaration discloses, for the first time, the formula that Mr. Thomas claims he used to calculate his Market Penetration Assumptions:

**Confidence Interval = t** $\sqrt{\dfrac{p(1-p)}{n}}$

In this Formula n = the sample population; p = the percentage of the sample reflecting certain studied behavior; and t = critical value derived from standard t-distribution tables.

(Thomas Decl. ¶ 5 (footnote omitted).)  The Declaration also discloses, for the first time, Mr. Thomas's authority for his use of that formula:  David M. Lane, et al., *Introduction to Statistics - Online Edition*, Ch. 10 (Rice University; University Houston, Downtown Campus) available at http://onlinestatbook.com/On-line_Statistics_Education.pdf; Amir D. Aczel and Jayavel Soiunderpandian, *Complete Business Statistics*, Ch. 6 (McGraw Hill/Irwin 7th ed. 2008); Utah Dept. of Health, Confidence Intervals in Public Health, available at http://health.utah.gov/opha/IBIShelp/Conflint.pdf; Boston Univ. Sch. of Public Health, *Confidence Intervals*, available at http://sphweb.bumc.bu.edu/otlt/MPH-Modules/BS/BS704_Cofidence_Intervals/BS704_Confi-dence_Intervals_print.html;  Stan Brown, Stats without Tears, Ch. 9C, available at http://www.tc3.edu/instruct/sbrown/swt/chap09.html; and Deborah J. Rumsey, *How to Determine the Confidence Interval for a Population Proportion*, in Statistics for Dummies (Wiley Pub., Inc. 2d Ed.), available at http://www.dummies.com/how-to/content/how-to-determine-the-confidence-interval-for-a-pop.html.  (Thomas Decl. ¶ 8.)  Neither the formula reproduced above nor the authority listed above appear in Mr. Thomas's October 10, 2013 report.

The information in Mr. Thomas's Declaration is clearly responsive to the questions AHS's counsel asked Mr. Thomas during his deposition regarding the methodology he used to calculate his Market Penetration Assumptions; it also constitutes part of the basis for his opinions.  As such, we conclude that mSF had a duty to timely supplement Mr. Thomas's Report and deposition responses with this information pursuant to Federal Rule of Civil Procedure 26.  See Fed. R. Civ. P. 26(a)(2)(B); Fed. R. Civ. P. 26(e)(2) ("For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  Any additions or

changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.").

We conclude that AHS has been prejudiced by mSF's failure to timely provide it with the information in Mr. Thomas's Declaration because AHS's December 20, 2013 Motion to Strike Experts was based, in substantial part, on Mr. Thomas's failure to disclose that very information. We further conclude that this prejudice could not be cured without once again disrupting the orderly and efficient trial of this case. The prejudice to AHS could only be cured by granting AHS additional time to depose Mr. Thomas regarding his Declaration, to prepare its own expert reports in response to the Declaration, and to supplement its Motion for Summary Judgment. However, as mSF's previous filing of new expert reports without prior leave of this court has thus far delayed the trial of this action for more than eleven months, we conclude that allowing Mr. Thomas's February 18, 2014 Declaration to become part of the record of this case would substantially disrupt the orderly and efficient trial of this case.  Moreover, we also conclude that mSF's failure to provide AHS with the information contained in Mr. Thomas's February 18, 2014 Declaration in a timely fashion was willful, as Mr. Thomas testified, during his deposition, that he could find textbooks, journal articles and peer-reviewed studies that "were consistent with or supported the statistical sampling method that he used to calculate his Market Penetration Assumptions," if he were given some additional time, yet counsel for mSF failed to provide that information to counsel for AHS at any time before February 18, 2014.  (Thomas Dep. at 143-44.) We additionally conclude that the formula and authority included in Mr. Thomas's Declaration are important, because they constitute the only support Mr. Thomas has identified for the methodology he employed to calculate the Market Penetration Assumptions that he used to project the range of revenue and profits mSF would have generated if AHS had complied with its

duty of good faith and fair dealing with respect to its obligations under the MOA. Consequently, we conclude that the five factors set forth by the Third Circuit in ZF Meritor for determining whether to strike an untimely supplement to an expert report all favor striking Mr. Thomas's February 18, 2014 Declaration.

### IV.   CONCLUSION

For the reasons stated above, we grant AHS's Motion to Strike the November 18, 2014 Declaration of David Chandler Thomas.  The Declaration is stricken from the evidentiary record before us and will not be considered in connection with AHS's December 20, 2013 Motion to Strike Plaintiff's Experts and Motion for Summary Judgment.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.