IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MYSERVICE FORCE, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMERICAN HOME SHIELD | : | NO. 10-6793 |

**MEMORANDUM**

**Padova, J.**                                                                               **May 1, 2014**

This is a breach of contract action arising from Defendant American Home Shield's ("AHS") alleged breach of its duty of good faith and fair dealing in connection with its performance of one of its duties under a Memorandum of Agreement entered into by the parties on January 27, 2010 (the "MOA").  Before the Court is AHS's Motion to Strike Plaintiff's Experts.  For the following reasons, the Motion is granted.

## I.      BACKGROUND

A.      Procedural Background

This action was filed on November 19, 2010.  (Docket No. 1.)  The Complaint asserted four causes of action against AHS and Service Master Consumer Services Limited Partnership ("SVM"):  (1) a claim for breach of contract against AHS (Count I); a claim for unjust enrichment and promissory estoppel against AHS (Count II), a claim for breach of contract against SVM (Count III); and a claim for tortious interference with contract against SVM (Count IV).  Defendants moved for summary judgment as to all four claims and we granted that motion in part and denied it in part on January 17, 2013.  See myServiceForce, Inc. v. American Home Shield, Civ. A. No. 10–6793, 2013 WL 180287, at *1 (E.D. Pa. Jan. 17, 2013) ("myServiceForce I").  We denied the Motion for Summary Judgment as to myServiceForce, Inc.'s ("mSF") claim,

in Count I of the Complaint, that AHS breached its duty of good faith and fair dealing with respect to its obligations under the MOA to impose status reporting requirements on its contractors.  Id. at *27.  We granted the Motion for Summary Judgment as to mSF's remaining claims for breach of contract asserted in Count I of the Complaint.  Id.  We also granted the Motion for Summary Judgment as to Counts II-IV of the Complaint and dismissed SVM as a Defendant in this action.  Id. at *27-*28.

After we resolved the Motion for Summary Judgment, we issued a new Scheduling Order, giving mSF the opportunity to produce revised expert reports with respect to the sole claim remaining in the case no later than February 20, 2013.  (See 2/6/13 Order ¶ 2.)  We also listed this case for trial on April 22, 2013.  (Id. ¶10.)  AHS subsequently filed  a Motion to Strike Plaintiff's Experts, seeking to preclude the introduction of mSF's experts' reports and opinions at trial, and a Motion for Leave to File Motion for Summary Judgment, seeking to file a motion for summary judgment as to mSF's remaining claim, on the ground that mSF could not establish that it had been injured by AHS's alleged breach of its duty of good faith and fair dealing.

In its Motion to Strike Plaintiff's Experts, AHS  asked that we strike the opinion of Thomas Tinsley that the only way that AHS could comply with its obligation under the MOA to impose certain status reporting requirements on its contractors was to require those contractors to purchase mSF's products.  AHS also asked us to strike both the expert report Tinsley authored with Marc Reid and Reid's opinions, as well as the reports and opinions of David Chandler Thomas and Bruce Luehrs, because those experts' opinions and reports were based on Tinsley's opinion.  We granted AHS's  Motion to Strike on April 25, 2013.  See myServiceForce, Inc. v. American Home Shield, Civ. A. No. 10-6793, 2013 WL 1773799, at *1 (E.D. Pa. Apr. 25, 2013). We also granted AHS leave to file a second Motion for Summary Judgment.  See id. at *16-*17.

mSF responded to AHS's second Motion for Summary Judgment by filing new expert reports prepared by David Chandler Thomas and Bruce Luehrs dated May 16, 2013.  AHS filed a Motion to Strike those expert reports on the grounds that they were filed after the February 20, 2013 deadline for Plaintiff to provide amended expert reports.  We denied that Motion to Strike, but granted AHS leave to depose Mr. Thomas and Mr. Luehrs and to submit its own expert reports responsive to their opinions.  (8/15/13 Order ¶¶ 4-5 n.1.)  We also dismissed AHS's second Motion for Summary Judgment as moot and granted AHS leave to file a new Motion for Summary Judgment no later than October 29, 2013.  (Id. ¶ 6.)

Mr. Thomas prepared a revised version of his May 16, 2013 Report on October 10, 2013.  Mr. Luehrs prepared a revised version of his May 16, 2013 Report on October 18, 2013.  AHS deposed Mr. Thomas on October 31, 2013 and Mr. Luehrs on November 1, 2013.  On December 20, 2013, AHS filed the instant Motion to Strike Plaintiff's Experts, seeking to strike the newest versions of the opinions and reports of Mr. Thomas and Mr. Luehrs.  AHS also filed its third Motion for Summary Judgment on December 20, 2013.[1]  A Hearing was held on the instant Motion to Strike Plaintiff's Experts on March 20, 2014.

B.     Factual Background[2]

AHS, a subsidiary of SVM, sells home warranties that cover major systems and appliances in the home.  (Quandt Dep. at 36-37.[3])  It engages three classes of contractors to

---

[1]Pursuant to the requests of both parties, we extended our deadlines for AHS's submission of its own expert reports, expert depositions and the filing of the third Motion for Summary Judgment several times.

[2]We discuss only the facts relevant to the instant Motion.  A more detailed recitation of the parties' relationships and the facts underlying their dispute may be found in our January 17, 2013 Memorandum.  See myServiceForce I, 2013 WL 180287, at *1-*10.

perform the work under the warranties:   (1) Preferred Contractors, who have operations agreements with AHS, pursuant to which AHS promises them a certain number of service calls per year; (2) Network Contractors, who have contracts with AHS but do not receive call commitments from AHS; and (3) direct dispatch contractors, who do not have formal service agreements with AHS.   (Wanninger Dep. at 25-28.)   In December 2006, John Lenihan, an employee of SVM, contacted mSF regarding software that could be used by AHS's contractors and would be based on mSF's existing work order management and field service technician productivity products.   (Joint Services and Pilot 1 Agreement (the "Pilot 1 Agreement") at 1; Marzola Decl. ¶¶ 2, 5, 7.)   The parties entered into several contracts in connection with mSF's development of products for use by AHS's contractors:   the January 18, 2007 Mutual Non-Disclosure Agreement, the September 17, 2007 Pilot 1 Agreement, the December 12, 2008 Joint Services Agreement, and the January 27, 2010 MOA.   SVM paid mSF a portion of its initial costs to develop those products pursuant to the Pilot 1 Agreement, but the parties anticipated that mSF would be primarily compensated for its efforts through revenues from the sale of its products to AHS's contractors.   (Pilot 1 Agreement ¶¶ 2.1.1, 2.1.2; Pilot 1 Agreement Ex. A at A-1-A-2.)

> 1.   The MOA

By the time the parties entered into the MOA, mSF had developed a service work order ("SWO") automation and status reporting product called myServiceACE ("ACE") that would enable AHS's contractors to report the statuses of their SWOs, such as the dates and times of customer appointments and the date and time an SWO had been completed, to AHS

---

[3]The Depositions, Declarations, and Exhibits referred to in this portion of our Memorandum were made part of the record in connection with the first Motion for Summary Judgment.

automatically and in real time.  (MOA at 1-2.)  Pursuant to the MOA, mSF was to provide SWO automation and status reporting software, sales and marketing support, and enhancements for ACE, including credit card processing, automatic invoicing, status reporting, field authorization and a bulk order management system.  (Id.)  The MOA was effective for a two-year term.  (Id. at 1.)  The MOA required AHS to:  (1) pay $250,000 to mSF "in full and final satisfaction of all obligations of AHS under the 2009 Plan;" (2) require its Preferred and Network contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days;" (3) continue a full time contractor support person; (4) support mSF's marketing of its products to AHS's contractors; (5) work with mSF to develop and test a Field Authorization process in the first quarter of 2010; and (6) allow mSF to give presentations at regional AHS contractor events during the spring of 2010.  (Id. at 2.)

Beginning on April 7, 2010, mSF gave presentations about its products and services to AHS's contractors at 14 regional events.  (Marzola Decl. ¶ 20.)  Both contractor attendance at the events and the number of contractors purchasing mSF's products were lower than mSF's employees expected.  (Id. ¶ 22.)  In response to the lower than expected sales of mSF's products, on April 27, 2010, three months after mSF and AHS entered into the MOA, AHS asked mSF to prepare a proposal for making contractor enrollment in mSF's products mandatory, with AHS sharing the costs for certain classes of contractor.  (mSF Ex. 102.)  AHS ultimately decided not to enter into the proposed agreement to make its contractors' use of mSF's products mandatory because mSF's proposal was too costly.  (mSF Ex. 103.)  mSF subsequently filed this lawsuit.

2.      mSF's claim for breach of the duty of good faith and fair dealing

Count I of the Complaint alleges that AHS breached its duty of good faith and dealing pursuant to its obligation under the MOA to require its Preferred and Network

contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days" (the "status reporting requirements provision").  (MOA at 2.)  In its first Motion for Summary Judgment, AHS argued that it had complied with the status reporting requirements provision of the MOA by including requirements for status reporting in its agreements with its Preferred and Network contractors.  In 2010, AHS's operations agreements with its Preferred Contractors required that:   "[s]cheduled appointments . . . be communicated to AHS immediately" and the "completion date . . . be provided to AHS within 24 hours of finishing the service call."  (Wanninger Dep. at 82-83, 87-88.)  AHS's 2010 service agreements with its Network Contractors similarly stated:   "'[f]or each Dispatch, Servicer shall (i) use every reasonable effort to **immediately** communicate to AHS the scheduled appointment date and time; (ii) provide to AHS the completion date for each dispatch within **24** hours of finishing the service call.'"  (mSF Ex. 40 (quoting 2010 AHS Service Agreement, Part 8).)  In its response to the first Motion for Summary Judgment, mSF did not deny that the obligations AHS placed on its Preferred and Network contractors in their 2010 agreements exceeded the status reporting requirements provision of the MOA.  (Rawding Dep. at 225.)  However, it contended that AHS breached its duty of good faith and fair dealing in its performance of the status reporting requirements provision by failing to enforce the status reporting requirements it imposed on its contractors.

We determined that there was evidence in the summary judgment record that could support a jury's finding that AHS breached its contractual duty of good faith and fair dealing in connection with its performance of its obligations pursuant to the status reporting requirements provision of the MOA by failing to enforce the requirements in its agreements with its Preferred and Network contractors.  For example, even though AHS's agreements with its Preferred and

Network contractors required those contractors to report scheduled appointments to AHS immediately and service completion within 24 hours, AHS did not track "whether contractors reported those statuses within the time limitations provided in their contracts with AHS." myServiceForce I, 2013 WL 180287, at *14 (citation omitted).  Moreover, while AHS's internal reporting goal in 2010 was 70% of appointment statuses and 75% of job completions, only about 50% of AHS's preferred contractors were meeting this goal in late March 2010, yet AHS did not impose any penalties on non-compliant contractors prior to June 2010.  Id. at *14-*15 (citations omitted).  Furthermore, although AHS sent emails to its Preferred and Network contractors in June 2010, announcing that it would begin to impose penalties on contractors who did not comply, it also informed those contractors that the penalties, such as reducing call volume, "would not be imposed on contractors unless their completion and appointment-set rates [did] not exceed 75%."  Id. (alteration in original) (quotation omitted).  We concluded, based on this evidence, that there was a genuine issue of material fact as to mSF's claim that AHS breached its contractual duty of good faith and fair dealing in connection with its performance of its obligations pursuant to the status reporting requirements provision of the MOA by willfully failing to diligently enforce those requirements, and we denied the first Motion for Summary Judgment insofar as it pertained to that claim.  Id.  That is the sole claim remaining in this case.

     3.    mSF's experts

David Chandler Thomas was retained by mSF to provide an opinion as to what mSF's revenue and profits would have been if AHS had not breached its duty of good faith and fair dealing with respect to the status reporting requirements provision of the MOA.  mSF retained Bruce Luehrs to provide an opinion as to what mSF's value would have been at the end of the second year of the MOA, if AHS had not breached its obligation of good faith and fair dealing

with respect to the status reporting requirements provision of that agreement.   Mr. Luehrs utilized Mr. Thomas's revenue and profit forecasts to estimate mSF's value.  AHS argues that we should strike Mr. Thomas's opinion and Report because it is unreliable and does not fit the only remaining claim in this case.  AHS further argues that we should strike Mr. Luehrs's opinion and Report because his opinion and Report rely on Mr. Thomas's opinion and report.

## II.   LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence.  Padillas v. Stork-Gamco, Inc., 186 F3d 412, 418 (3d Cir. 1999) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 n.10 (1993)); see also Mahmood v. Narciso, No. 12-4207, 2013 WL 6610127, at *3 (3d Cir. Dec. 17, 2013) (citing In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999)).  "Under Rule 702, the district court acts as a 'gatekeeper' to ensure that 'the expert's opinion [is] based on the methods and procedures of science rather than on subjective belief or unsupported speculation.'"  ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290 (3d Cir. 2012) (alteration in original) (quoting Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003)).   There are three requirements for the admissibility of expert testimony pursuant to Rule 702, "'qualification,

reliability and fit.'" Calhoun, 350 F.3d at 321 (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).

The Third Circuit has explained that qualification means "'that the witness possess specialized expertise.'" Id. (quoting Schneider, 320 F.3d at 405).   Reliability means that the "'the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief.'" Id. (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) ("Paoli II")).  Fit means that "'the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.'" Id. (quoting Schneider, 320 F.3d at 405).

We use the following factors as a guide for determining reliability:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Id. (citing Paoli II, 35 F.3d at 742 n.8).  "'[T]he reliability analysis [required by Daubert] applies to all aspects of an expert's testimony:  the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.'" ZF Meritor, 696 F.3d at 291 (quoting Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999)).  "'When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.'" ZF Meritor, 696 F.3d at 290 (quoting Brooke Grp. Ltd. v. Williamson Tobacco Corp., 509 U.S. 209, 242 (1993)); and Advo, Inc. v. Phila. Newspapers, Inc., 51 F.3d 1191, 1198 (3d Cir. 1995)).

Fit pertains "'primarily to relevance.'"   <u>Meadows v. Anchor Longwall & Rebuild, Inc.</u>, 306 F. App'x 781, 790 (3d Cir. 2009) (quoting <u>Lauria v. Amtrak</u>, 145 F.3d 593, 599 (3d Cir. 1998)).  "The expert's testimony must 'fit' under the facts of the case so that 'it will aid the jury in resolving a factual dispute.'"  <u>Id.</u> (quoting <u>Lauria</u>, 145 F.3d at 599).  This element "'requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'"  <u>Id.</u> (quoting <u>Lauria</u>, 145 F.3d at 600).  "In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded."  <u>Id.</u> (citing <u>Stecyk v. Bell Helicopter Textron, Inc.</u>, 295 F.3d 408, 414 (3d Cir. 2002)).

## III.   DISCUSSION

### A.     <u>Mr. Thomas's Opinions and Report</u>

Mr. Thomas has a B.A. and M.A. in economics from San Jose State University (California State University) and is currently a doctoral student in economics at George Mason University.  AHS has not contested Mr. Thomas's qualifications to give his opinion as an expert in this case.

Mr. Thomas used a Monte Carlo simulation to forecast what mSF's revenues and profits would have been if AHS had satisfied its obligation of good faith and fair dealing with respect to the status reporting requirements provision of the MOA.  In developing his Monte Carlo simulation, Mr. Thomas assumed that AHS had an obligation under the MOA to engage in comprehensive efforts to enforce the status reporting requirements it placed on its contractors and that those contractors would have to use either AHS's existing services or mSF's products to report their SWO statuses.  (Thomas Rpt. at 4.[4])  In order to "account for potential delays of

---

[4]All citations to the Thomas Report refer to the October 10, 2013 version of that Report.

product rollouts, software defects, and operational failures" in the Monte Carlo simulation, Mr.

Thomas used three "business ramp-up scenarios" with different market penetration assumptions.

(Id.)  His high estimate model assumes that contractors who would have purchased products

from mSF if AHS had engaged in comprehensive efforts to enforce the status reporting

requirements it imposed on its Preferred and Network contractors would have done so by the end

of the fourth quarter of Year 1 of the MOA.  (Id.)  His median estimate model assumes a two-

quarter slip in those purchases, and his low estimate model assumes a four-quarter slip in those

purchases.  (Id.)

       Mr. Thomas designed his Monte Carlo simulation based on evidence that AHS had 1,652

Preferred contractors and 3,096 Network contractors for a total of 4,748 contractors in 2010 and

1617 Preferred contractors and 2,683 Network contractors for a total of 4,300 contractors in

2011.  (Id.)  In structuring the simulation, he assumed that 28% to 53% of those contractors

would have purchased products from mSF to report SWO statuses if AHS had not breached its

duty of good faith and fair dealing in connection with the status reporting requirements provision

of the MOA.  (Id. at 5-7.)  His Report refers to that assumption as the "Market Penetration

Assumptions."  (Id.)

       Mr. Thomas based his Market Penetration Assumptions on the results of an effort that

AHS started in June 2010 to pressure a group of Preferred and Network contractors to comply

with the status reporting requirements in their agreements with AHS.  (Id. at 5.)  Mr. Thomas

explains in his Report that:

> In June 2010, Matt Wendl (Director of Contractor Relations) selected a subset of
> Preferred and Network contractors to be a focus group for status compliance
> efforts.  The goal was to pressure the contractors into using an mSF product or
> becoming compliant using some other AHS service, preferably the IVR or Vendor
> Web.  The criteria focused on contractors with more than 50 service work orders

per month and with a compliance rate of less than 60% for reporting Appointment Set and Completion statuses.  AHS did not take timeliness of status reporting into account.

The method used by AHS to pressure these contractors was telephone calls regarding compliance and the reduction of the number of SWOs dispatched to the contractor.

(Id. (footnote omitted); see also Pl.'s Opp'n to Mot. to Strike, Ex. F.)  Mr. Thomas states in his Report that AHS applied this pressure to a total of 191 of its approximately 4500 Preferred and Network contractors (these 191 Preferred and Network contractors are referred to henceforth as the "target group").  (Thomas Rpt. at 7.)  Mr. Thomas determined that between 15 and 29 contractors responded to this pressure by either purchasing products from mSF or by achieving compliance with AHS's status reporting requirements using services provided by AHS:

in response to the limited pressure from AHS, eight (8) contractors responded by enrolling in an mSF product to address compliance.  Our analysis also found that a low of 7 and a high of 21 contractors similarly pressured by AHS used AHS services to become compliant by the end of 2010. . . .  No other AHS contractors responded to AHS's enforcement efforts by becoming compliant using an AHS status reporting option.[5]

(Id.)  Mr. Thomas used these results to develop "a range for use in the Monte Carlo simulation that represents the effect AHS's enforcement efforts would have had upon a contractor's decision to address compliance by purchasing an mSF product or by properly using an AHS status reporting option."  (Id.)  Mr. Thomas excluded the 162-176 contractors who did not respond to AHS's June 2010 enforcement efforts from his calculation of that range.  Instead, he calculated his Market Penetration Assumptions by using a ratio of "the number of contractors who purchased mSF's products out of the total number of contractors who responded to AHS's

_____

[5]Mr. Thomas states in his Report that 21 contractors became compliant with their status reporting requirements at least 75% of the time using AHS's status reporting options.  (Thomas Rpt. at 7.)  Seven of those 21 contractors complied 86.1% of the time.  (Id.)

pressure by taking action." (Id.)  Calculated this way, the "minimum value . . . for contractors who would have purchased mSF's products to address compliance was 28%.  The maximum value used was 53%."[6]  (Id.)  Mr. Thomas states in his report that he believes that "this data is representative of the total population of Preferred and Network contractors because it is a statistically significant sample size (191 out of approximately 4,500 Preferred and Network contractors)." (Id.)

The Monte Carlo simulation also incorporates assumptions regarding which mSF products would be purchased by AHS's contractors, and the pricing of those products, which Mr. Thomas based on the purchases made by the 300 AHS contractors who purchased products from mSF.  (Id.)  The simulation further assumes that a minimum of 64% and maximum of 97% of AHS's Preferred and Network contractors who purchased products from mSF would also use mSF's credit card processing service.  (Id. at 8.)  The simulation also factors in customer attrition rates of 3% to 26%, that Mr. Thomas based on the attrition rates of 13 publicly traded companies whose businesses were similar to mSF.  (Id. at 8-9.)

Mr. Thomas also used the following costs in the Monte Carlo simulation:  fixed costs related to general, administrative, engineering, and professional services personnel and their overhead (which were based on the actual costs of the mSF staff members who worked on the AHS contract); and variable costs such as the costs of maintaining an established data center. (Id. at 11.)  Mr. Thomas did not include marketing and sales costs in the simulation because the AHS contractor base was a captive market.  (Id.)

---

[6]Mr. Thomas thus calculated his Market Penetration Assumptions by dividing the number of contractors who were contacted by AHS in June 2010 and later purchased products from mSF (8), by the total number of contractors who responded to the pressure put on them by AHS in June 2010 (15-29):  $8 \div 29 = 27.586\%$ and $8 \div 15 = 53.33\%$.

Mr. Thomas ran the Monte Carlo simulation using these assumptions and generated the following forecast of what he believes mSF's pretax net income would have been for the two years of the MOA, if AHS had not breached its duty of good faith and fair dealing with respect to the status reporting requirements provision of the MOA:

|  | Year 1 | Year 2 | Total |
|---|---|---|---|
| Low Estimate | $   295,552 | $ 1,808,397 | $ 2,103,939 |
| Mean Estimate | $ 1,202,585 | $ 2,984,566 | $ 4,187,151 |
| High Estimate | $ 2,364,032 | $ 4,327,773 | $ 6,691,805 |

(Id. at A1-A3.)

B.    Mr. Luehrs's Opinions and Report

Mr. Luehrs has a B.A. in economics, summa cum laude from Trinity College, Duke University and an MBA from the Kellogg School of Management at Northwestern University. He is presently the General Partner in the Emerald Stage2 Venture Fund, which focuses on early-stage technology companies in Southeastern Pennsylvania. He has prior experience with other venture funds and merchant banking. AHS has not contested Mr. Luehrs's qualifications to give his opinion as an expert in this case.

Mr. Luehrs was retained to calculate what the value of mSF's business would have been at the end of the second year of the MOA, if AHS had not breached its duty of good faith and fair dealing. (Luehrs Rpt. at 2.[7]) He valued mSF as of the end of the second year of the MOA based on "revenue that would have been generated by the myServiceForce customer base, consisting of the AHS Preferred and Network contractors who would have signed up with mSF by the end of Year 2." (Id. at 2.) In order to value mSF, Mr. Luehrs used the revenue figures that Mr. Thomas

---

[7]All citations to the Luehrs Report refer to the October 18, 2013 version of that Report.

calculated for mSF using the Monte Carlo simulation.  (Id.)  The model used by Mr. Luehrs in

his analysis valued mSF's business using a "Market Multiple" of Mr. Thomas's revenue figures.

(Id.)  The Market Multiples used by Mr. Luehrs took into account both the acquisition values of

actual and comparable companies with revenue models similar to that of mSF during the 2007-

11 period and the unique nature of the relationship between mSF and AHS.  (Id. at 2-3.)  Mr.

Luehrs opined in his report that the value of mSF at the end of the second year of the MOA

would have been between $8,600,442 and $ 27,689,565.  (Id. at 3.)

     C.    The Fit and Reliability of Mr. Thomas's Market Penetration Assumptions

AHS's argument that Mr. Thomas's and Mr. Luehrs's opinions and reports should be

stricken focuses on the fit and reliability of the methodology Mr. Thomas used in connection

with his Market Penetration Assumptions.  Specifically, AHS contends that Mr. Thomas's

opinion that 28% to 53% of AHS's Preferred and Network contractors would have purchased

mSF's products if AHS had not breached its duty of good faith and fair dealing does not fit this

case because, in order to reach this opinion, Mr. Thomas assumed that AHS had to satisfy

obligations that the MOA did not actually impose.  AHS further argues that Mr. Thomas's

opinion is unreliable because (1) his sample was too small and improperly excluded Preferred

and Network contractors who did not act in response to the pressure imposed on them by AHS in

June 2010; (2) the sample group of Preferred and Network contractors may not have been

representative of AHS's entire population of Preferred and Network Contractors; and (3) there is

no evidence that the eight contractors who purchased products from mSF after they were

pressured by AHS in June 2010 did so as a result of that pressure.

AHS's arguments that Mr. Thomas's opinion does not fit this case and is unreliable both

begin with Mr. Thomas's decision to eliminate from his Market Penetration Assumptions the

161-176 contractors from the target group who took no action in response to AHS's attempts to pressure them to comply with their status reporting requirements in June 2010 (the "non-responders"). Only 4.2% of the target group purchased products from mSF during the seven months following June 2010.[8] (Thomas Dep. at 22-23, 145-46.) Consequently, Mr. Thomas's opinion that 28% to 53% of AHS's Preferred and Network contractors would have purchased mSF's products if AHS had not breached its duty of good faith and fair dealing depends on his elimination of the non-responders from his calculations.

During his deposition, Mr. Thomas explained that he excluded the 162-176 non-responders because, if AHS had complied with its obligations under the MOA, the non-responders would have purchased products from mSF at the same rate as the 15-29 Preferred and Network contractors who responded to the pressure applied on them by AHS in June 2010:

> Q. But your opinion, your ultimate opinion in this case is that between 28 percent and 53 percent of the entire preferred and network contractor base would voluntarily choose to purchase an MSF product?
>
> A. Yes.
>
> Q. That would include the 162 to 176 of the 191 that didn't respond to that pressure; correct?
>
> A. Yes.
>
> Q. So you're applying the analysis that arrived at the 28 to 53 percent to the 162 to 176 contractors that took no action in response to the pressure?
>
> A. I'm applying those numbers as probable numbers for the ones who did not respond.
>
> Q. Right. The probable numbers, in your opinion, are that 28 to 53 percent of the ones that did not respond would respond by buying an MSF product?

---

[8] $8 \div 191 = 4.188\%$

A.  With an 85 percent confidence interval, yes. . . . .

Q.  You assume that these 162 to 176 contractors would do something that the very data on which you rely shows they did not do; true? . . . .

THE WITNESS:  No.  The agreement states in the MOA that they would require them to do it.  And they had not required them to do it.  They had put pressure. Had they been required to do it, I don't know to what extent that would go.  I would expect given they had to make a choice in order to be compliant, that they would, with an 85 percent confidence interval, pick within this range.[9]

(Thomas Dep. at 31-33.)  Mr. Thomas explained that his opinion is based on an assumption that all 191 contractors in the target group would have eventually complied with their status reporting requirements by purchasing products from mSF or by using existing AHS products, if AHS satisfied its obligations under the MOA by doing what it needed to do to cause them to comply. (Id. at 42-45.)  Because Mr. Thomas believed that AHS was contractually obligated to compel all of its 4500 Preferred and Network contractors to fully comply with their status reporting requirements, he calculated his Market Penetration Assumption by simply applying the percentage of contractors from the target group who responded to pressure from AHS in June 2010 by purchasing products from mSF (8 out of 21-29 contractors) to all of AHS's 4500 Preferred and Network contractors.  (Id. at 47-48, 53-54.)

During the February 20, 2014 Hearing, Mr. Thomas clarified that his methodology depends on the assumption that AHS was contractually obligated to bring all of its Preferred and Network contractors into compliance with their status reporting requirements.  (3/20/14 Hr'g Tr. at 91.)  In fact, Mr. Thomas testified that he assumed that the MOA obligated AHS to ensure that its Preferred and Network contractors complied with their status reporting requirements or

---

[9]Counsel for mSF subsequently notified counsel for AHS that Mr. Thomas "had determined the contractor range at a 90% confidence level," not with an 85 percent confidence interval.  (Pl.'s Opp'n to Mot. to Strike, Ex. C.)

eliminate those contractors who did not comply.  (Id.)  Mr. Thomas explained that he based this

assumption on language in the MOA:

> I did make an assumption from that . . . .  That based on the agreement in the
> MOA, that the AHS would require that their contractors be in compliance . . . [o]r
> they would be in breach of contract based on the fact that they had all signed an
> agreement to do that. . . .  And then it would be up to AHS to address that
> contractually with them, which could be canceling their contracts or not renewing
> their contractors or whatever it might be.  Again, I don't know what level of
> coercion or inducement might be necessary to do that, only that they had
> committed to [m]SF that they would and that [m]SF had relied upon that.

(Id. at 93.)

In order to determine whether Mr. Thomas's opinions fit this case, we must determine

whether AHS's duty of good faith and fair dealing with respect to the status reporting

requirements provision of the MOA encompasses an obligation to compel all of its Preferred and

Network contractors to comply with their status reporting requirements and to eliminate any

Preferred and Network contractors who did not comply with those requirements.  The duty of

good faith and fair dealing has been defined as "'honesty in fact and the observance of

reasonable commercial standards of fair dealing.'"  Warminster Equities, LLC v. Warminster

Commerce, LLC, 497 F. App'x 187, 193 (3d Cir. 2012) (quoting 13 Pa. Cons. Stat. Ann. §

1201(b)(20)); see also Cavanaugh v. Avalon Golf Props., LLC., No. E2010–00046–COA–R3–

CV, 2011 WL 662961, at *8 (Tenn. Ct. App. Feb. 24, 2011).[10]  The United States Court of

---

[10]We have diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as mSF is a citizen of Pennsylvania and AHS is a citizen of Tennessee and the amount in controversy exceeds $75,000.  "As a federal court sitting in diversity, we apply the choice-of-law rules of the forum state, which is Pennsylvania in this case."  Pacific Emp'rs Ins. Co. v. Global Reins. Corp., 693 F.3d 417, 432 (3d Cir. 2012) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 170–71 (3d Cir. 2011)).  "'Pennsylvania applies the . . . flexible, interests/contacts methodology to contract choice-of-law questions.'"  Id. (alteration in original) (quoting Hammersmith v. TIG Ins. Co., 480 F.3d 220, 226–27 (3d Cir. 2007)).

Appeals for the Third Circuit has given the following examples of bad faith: "'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'"  Warminster Equities, 497 F. App'x at 193 (quoting Kaplan v. Cablevision of PA, Inc., 671 A.2d 716, 722 (Pa. Super. Ct. 1996).  The Tennessee Court of Appeals has explained that "'[t]here is an implied undertaking in every contract on the part of each party that he will not intentionally or purposely do anything . . . which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee.'" SecureAmerica Business Credit v. Schledwitz, No. W2012-2605-COA-R3-CV, 2014 WL 1266121, at *27 (Tenn. Ct. App. Mar. 28, 2014) (first alteration in original) (quoting Winfree v. Educators Credit Union, 900 S.W.2d 285 (Tenn. Ct. App. 1995)).  "[M]ere 'inaction' may suffice to breach the implied duty."  Id. (quoting Vraney v. Medical Specialty Clinic, P.C., No. W2012-2144-COA-R-CV, 2013 WL 4806902, at *31 (Tenn. Ct. App. Sept. 9, 2013)).

However, the duty of good faith "is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term."  Northview Motors, Inc. v. Chrysler

---

The MOA does not contain a choice of law provision.  Consequently, the first step in our choice of law analysis is to "identify the jurisdictions whose laws might apply," in this case, Pennsylvania and Tennessee.  Id. (citing Hammersmith, 480 F.3d at 230.)  We then "determine the substance of these states' laws, and look for actual, relevant differences between them."  Id. (citing Hammersmith, 480 F.3d at 230.)  "'If [the] two jurisdictions' laws are the same, then there is no *conflict* at all, and a choice of law analysis is unnecessary.'"  Id. (alteration in original) (quoting Hammersmith, 480 F.3d at 230).  We conclude that there is no relevant difference between the law of Pennsylvania and the law of Tennessee with regard to the contractual duty of good faith and fair dealing.  Accordingly, we need not engage in a choice of law analysis to resolve the instant Motion to Strike.

Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000) (citations omitted); see also Delaware Cnty.
Chamber of Commerce v. USI Ins. Servs., LLC, Civ. A. No. 12-2280, 2013 WL 6847001, at *9
(E.D. Pa. Dec. 30, 2013) (stating that "'[t]he duty of good faith applies only in limited
circumstances because implied duties cannot trump the express provisions in the contract.'"
(alteration in original) (quoting Kamco Indus. Sales, Inc. v. Lovejoy, Inc., 779 F. Supp. 2d 416,
426 (E.D. Pa. 2011))); Dick Broad. Co. v. Oak Ridge FM, Inc., 395 S.W.3d 653, 666 (Tenn.
2013) (stating that "'the common law duty of good faith does not extend beyond the agreed upon
terms of the contract and the reasonable contractual expectations of the parties.'"  (quoting
Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 684, 687 (Tenn. 1996))).  Consequently, since
the "'obligation of good faith is tied specifically to and is not separate from the [express] duties a
contract imposes on the parties,' it cannot imply a term not explicitly contemplated by the
contract." John B. Conomos, Inc. v. Sun Co., Inc. (R&M), 831 A.2d 696, 706-07 (Pa. Super. Ct.
2003) (alteration in original) (quoting Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d
418, 434 n.11 (Pa. 2001)); see also Dick Broad. Co., 395 S.W.3d at 666 (explaining that "'[t]he
implied obligation of good faith and fair dealing does not . . . create new contractual rights or
obligations, nor can it be used to circumvent or alter the specific terms of the parties'
agreement'" (alterations in original) (quoting Lamar Adver. Co. v. By-Pass Partners, 313 S.W.3d
779, 791 (Tenn. Ct. App. 2009))).

     AHS argues that the MOA did not explicitly contemplate imposing an obligation on AHS
to ensure that its approximately 4500 Preferred and Network contractors comply with the status
reporting requirements in their agreements with AHS or cancel its agreements with any
contractors who do not comply with those requirements.  The relevant provision of the MOA
states only that AHS will provide the following to mSF:  "Requiring Preferred and Network

AHS contractors to report Appointment Set within 24 hours and SWO Completion within 5 business days.  Provide mSF ninety (90) days advance notification of any additional required statuses." (MOA at 2.)  We therefore agree with AHS that the plain language of the MOA does not explicitly contemplate an obligation on the part of AHS to ensure that its contractors comply with status reporting requirements in their agreements with AHS and to terminate its contracts with Preferred and Network contractors who failed to fully comply with those requirements.

mSF has taken the position that Mr. Thomas's assumptions regarding AHS's obligations under the MOA are accurate and are consistent with our January 17, 2013 and April 25, 2013 Memoranda.  (See 3/20/14 Hr'g Tr. at 97-99; Pl.'s Opp'n to Mot. to Strike at 23 n.7, 26.) Indeed, mSF has explained that:

> Thomas' assumptions are not based on the level of pressure that AHS might choose to apply to its contractors; they are based on the assumption that AHS would adhere to the MOA by requiring its contractors to comply with the reporting requirements, irrespective of the techniques used by AHS to achieve this result.  Here, the techniques used by AHS on the 191 contractors were successful in bringing about compliance in only a subset of that group and, hence, Thomas looked at the group that was actually required to comply, rather than the remainder who - despite AHS' efforts - were not.

(Pl.'s Opp'n to Mot. to Strike at 27 n.11.)  mSF further contends that its interpretation of the MOA is supported by the following passage from our January 17, 2013 Memorandum with respect to AHS's first Motion for Summary Judgment:

> _We conclude that there is evidence in the summary judgment record upon which a jury could find that AHS evaded the spirit of the MOA, lacked diligence, and slacked off in performing its status reporting requirement obligation under the MOA, and that it willfully rendered imperfect performance of its obligations related to status reporting requirements under the MOA, by failing to mandate 100% timely compliance with status reporting requirements_.

(Id. at 28 (emphasis in original) (quoting myServiceForce I, 2013 WL 180287, at *15).)

mSF has, however, misconstrued the passage quoted above. Our reference to AHS's failure "to mandate 100% timely compliance with status reporting requirements," clearly pertains to our references, in the two paragraphs immediately preceding the quoted language, to the following: (1) evidence that, in 2010, "AHS had an internal reporting goal of 70% of appointment statuses and 75% of job completions;" (2) evidence that AHS did not track whether its contractors timely reported any of those statuses; (3) AHS's failure to take any steps to impose penalties on contractors who failed to comply with the status reporting requirements prior to June 2010; and (4) e-mails AHS sent to its contractors in June 2010, which informed those contractors that they would only be penalized for failing to comply with their status reporting requirements if they complied with those requirements 75% of the time or less. See myServiceForce I, 2013 WL 180287, at *14-*15. Thus, read in context, our statement that a jury could find that AHS had breached its duty of good faith and fair dealing by "failing to mandate 100% timely compliance with status reporting requirements" means only that a jury could find that, in the face of AHS's obligation to require its contractors to "report Appointment Set within 24 hours and SWO Completion within 5 business days," its internal goal of 70-75% compliance and alleged failure to monitor or in any way enforce compliance could be seen as violating the duty of good faith and fair dealing. Indeed, a jury could find, based on this evidence, that AHS evaded the spirit of the bargain, lacked diligence and slacked off in performing its obligation, thus injuring mSF's right to receive the fruits of the MOA. See Warminster Equities, 497 F. App'x at 193; SecureAmerica, 2014 WL 1266121, at *27. Thus, our statement does not support Mr. Thomas's assumption that AHS could *only* satisfy its duty of good faith and fair dealing by ensuring that *all* of its Preferred and Network contractors comply with their status reporting

obligations *100%* of the time and by terminating its agreements with *all* of its Preferred and Network contractors who did not so comply.

We conclude, therefore, that Mr. Thomas's assumption that AHS was obligated by the status reporting requirements provision of the MOA to ensure that all of its approximately 4500 Preferred and Network contractors comply with the status reporting requirements in their agreements with AHS or terminate its agreements with the non-complying contractors assumes a contractual duty on the part of AHS that the MOA simply did not contemplate. Accordingly we reject Mr. Thomas's essential assumption that AHS's contractual compliance would necessarily result in 100% of the contractors using either mSF's or AHS's status reporting products.

Mr. Thomas based his methodology for calculating his Market Penetration Assumption on his understanding that AHS had an obligation pursuant to the MOA to compel all of its 4500 Preferred and Network contractors to fully comply with their status reporting requirements or be terminated.[11] (See 3/20/14 Hr'g Tr. at 90-93.) As stated above, however, this understanding is based upon a misinterpretation of the MOA and is without evidentiary support in the record of this case. We conclude, therefore, that Mr. Thomas's Market Penetration Assumption does not fit the facts of this case and is properly excluded from the record. See Meadows, 306 F. App'x at 790 (stating that "expert testimony based on assumptions lacking factual foundation in the record is properly excluded" (citing Stecyk, 295 F.3d at 414)). We further conclude that, since Mr. Thomas's methodology was based on his assumption that the MOA imposed an obligation on AHS that it did not, in fact, impose, that methodology is not reliable. See ZF Meritor, 696 F.3d

---

[11]Plaintiff's counsel agreed, during the March 20, 2014 Hearing, that Mr. Thomas's methodology was based on his assumption that the MOA imposed an obligation on AHS to compel all of its approximately 4500 Preferred and Network contractors to fully comply with their status reporting requirements or be terminated. (3/20/14 Hr'g Tr. at 97-98.)

at 291 (stating that "'the reliability analysis [required by Daubert] applies to all aspects of an expert's testimony:  the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion'" (alterations in original) (quoting Heller, 167 F.3d at155)). Since Mr. Thomas's opinions regarding what mSF's revenue and profits would have been if AHS had not breached its obligation of good faith and fair dealing with respect to the status reporting requiremnts provision of the MOA are based on a misunderstanding of AHS's contractual obligations, we conclude that his opinions and Report do not "'fit' under the facts of the case," are not sufficiently reliable to be entered into evidence in this case pursuant to Rule 702, and, consequently, will not "'aid the jury in resolving a factual dispute.'"  Meadows, 306 F. App'x at 790 (quoting Lauria, 145 F.3d at 599).  AHS's December 20, 2013 Motion to Strike Plaintiff's Experts is, therefore, granted as to Mr. Thomas's opinions of what mSF's revenue and profits would have been if AHS had not breached its obligation of good faith and fair dealing and as to his October 10, 2013 Report.[12]

      D.     The Fit and Reliability of Mr. Luehrs's Opinions and Report

As we discussed, *supra*, Mr. Luehrs prepared a valuation of mSF as of the end of the second year of the MOA based on the "revenue that would have been generated by the myServiceForce customer base, consisting of the AHS Preferred and Network contractors who would have signed up with mSF by the end of Year 2."  (Luehrs Rpt. at 2.)  Mr. Luehrs conducted his valuation of mSF using a "Market Multiple" of the revenue figures calculated by Mr. Thomas in his analysis of the "revenue that would have been generated by the Preferred and Network contractors in Year 2 of the contractual relationship."  (Id.)  Mr. Luehrs estimated the

---

[12]Since we are granting AHS's Motion to Strike as to Thomas's opinions and Report on this basis, we need not consider AHS's other arguments that Mr. Thomas's opinions and Report are unreliable.

value of mSF at the end of the second year of the MOA, based on Mr. Thomas's calculations of

mSF's annualized revenues for that year, as between $ 8,600,442 and $ 27,689,565.  (Id. at 3.)

Mr. Luehrs's opinion of the value of mSF at the end of the second year of the MOA is

based on Mr. Thomas's opinion of the revenues that mSF would have generated during the

second year of the MOA if 28%-53% of mSF's Preferred and Network contractors purchased

products from mSF.  As we have discussed at length, Mr. Thomas's opinions with respect to the

revenue that mSF would have generated in the second year of the MOA are based on a

misinterpretation of the MOA and a misunderstanding of the duty of good faith and fair dealing,

lack foundation in the evidentiary record of this case, and result from a flawed methodology.

Since the core assumptions underpinning Mr. Luehrs's estimated valuations of mSF thus lack

evidentiary and scientific support, we conclude that the valuations are not sufficiently reliable to

be entered into evidence in this case pursuant to Rule 702 and that they would confuse, rather

than aid, the jury in determining whether, or to what extent, mSF has suffered any damages in

this case.  See ZF Meritor, 696 F.3d at 290; Meadows, 306 F. App'x at 790.  AHS's Motion to

Strike Experts is, therefore, granted as to Mr. Luehrs's analysis of the economic loss sustained by

mSF and his October 18, 2013 Report.

## IV.   CONCLUSION

For the foregoing reasons, we grant AHS's Motion to Strike Experts in its entirety.  Mr.

Thomas's October 10, 2013 Report and opinions as to what mSF's revenue and profits would

have been at the end of the second year of the MOA had AHS not breached its duty of good faith

and fair dealing with respect to the status reporting requirements provision of the MOA and Mr.

Luehrs's October 18, 2013 Report and opinions as to mSF's value at the end of the second year of the MOA are stricken from the record of this action.

                                        BY THE COURT:

                                        /s/ John R. Padova

                                        _____

                                        John R. Padova, J.